# PLAINTIFF'S EXHIBIT 4

Debra L. Rubin

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

| | |
|---|---|
| DEBRA L. RUBIN | : CIVIL ACTION |
| v. | : |
| AMERIHEALTH ADMINISTRATORS, INC. and CROZER-CHESTER MEDICAL CENTER | : NO. 12-3719-RK |

- - -

January 23, 2013

- - -

Oral deposition of DEBRA L. RUBIN, taken pursuant to notice, was held at the law offices of Barnard, Mezzanotte, Pinnie & Seelaus, 218 West Front Street, Media, Pennsylvania 19063, beginning at 9:48 a.m., on the above date, before Kristy L. Liedtka, a Professional Court Reporter and Notary Public in and for the Commonwealth of Pennsylvania.

- - -

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Debra L. Rubin

| | Page 2 | | Page 4 |
|---|---|---|---|

APPEARANCES:

BARNARD, MEZZANOTTE, PINNIE & SEELAUS
BY:  MARK S. PINNIE, ESQUIRE
218 West Front Street
Media, Pennsylvania 19063
(610) 565-4055
Representing the Plaintiff

DUGAN BRINKMANN MAGINNIS AND PACE
BY:  GERALD J. DUGAN, ESQUIRE
1880 John F. Kennedy Boulevard
Suite 1400
Philadelphia, Pennsylvania 19103
(215) 563-3500
gjdugan@dbmplaw.com
Representing the Defendant

- - -

**Page 4**

8    National Medical    6
Reviews, Inc.
Document
9    Letter from HAN    6
Neurological
Associates, 2/21/12
10    Letter from Buckley 6
to Rubin, 4/23/12

11    Medical Policy    6
Bulletin
12    Pennsylvania    6
Department of
Health letter,
3/2/11

**Page 3**

- - -
INDEX
- - -

Testimony of:  DEBRA L. RUBIN
By Mr. Dugan        6, 79
By Mr. Pinnie        73

- - -

EXHIBITS

- - -

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Letter from Rubin to Hill, 4/22/12 | 6 |
| 2 | Memorandum to MCMC from Rubin, 5/21/12 | 6 |
| 3 | Member External Review Appeal Acknowledgement Letter | 6 |
| 4 | Decision Notification | 6 |
| 5 | Provider Appeal Review Determination | 6 |
| 6 | Medical History | 6 |
| 7 | Appeal Review Determination | 6 |

**Page 5**

- - -
DEPOSITION SUPPORT INDEX
- - -

Direction to Witness Not to Answer
Page Line    Page Line    Page Line
None

Request for Production of Documents

Page Line    Page Line    Page Line
None

Stipulations
Page Line    Page Line    Page Line
6  4

Question Marked

Page Line    Page Line    Page Line
None

Debra L. Rubin

Page 6

(Deposition Exhibit Nos. 1 through 12, were marked for identification.)

(It is hereby stipulated and agreed by and between counsel that signing, sealing, filing and certification are waived; and that all objections, except as to the form of the question, will be reserved until the time of trial.)

- - -

DEBRA L. RUBIN, after having been duly sworn, was examined and testified as follows:

- - -

EXAMINATION

- - -

BY MR. DUGAN:

Q.    Debbie, my name is Gerry Dugan and I represent the defendants in this lawsuit and those defendants are AmeriHealth Administrators doing business as AmeriHealth Administrators, Inc. and Crozer-Chester Medical Center in a

Page 7

lawsuit that's currently pending in the United States District Court in the Eastern District of Pennsylvania in which you're the plaintiff. And you've been kind enough to appear after we've requested your appearance through your attorney.

I'm here to ask you a series of questions. I want to give you some very preliminary instructions, and there will be very few because you're represented by counsel and I'm totally convinced that most of this information has been provided to you in advance. So that the transcript is clear and concise, I would ask that you just hesitate for a moment after the question is asked so the stenographer can record the question and give you a chance to absorb the question before formulating your answer. So there should be just a little delay for clarity's sake?

Do you understand that?

A.    Yes, sir.

Page 8

Q.    It's also very unlikely in a deposition like this where nodding of the head or shaking of the head might happen, but the court reporter can only record verbal responses. So just make sure your answers are verbal. Okay?

A.    Okay.

Q.    It's not an endurance contest and it's not a memory contest. If you don't know the answer to a certain question, just please tell me that you don't and don't guess. You can estimate when it's necessary, although I don't expect that would happen, but guessing is not appropriate, so don't do that.

A.    Okay.

Q.    If you want to take a break at any time, just tell me. We will stop. You can speak with your counsel separately. You can take a comfort break. Whatever you need. But know that if you take a break to speak with your lawyer, that will not lead us to believe that anything is being hidden. You have

Page 9

every right to talk to your lawyer at any time.

Do you understand that?

A.    Yes, sir.

Q.    Be very careful, even though my questions won't be directed to this information, don't ever tell me anything your lawyer ever said to you or anything that you ever said to your lawyer. That's protected and privileged.

Do you understand that?

A.    Yes.

Q.    Okay. Now, having reviewed the materials in this case, I understand that you've suffered a very serious injury and I know that there is a history in this file of some very strong medication and I think it's appropriate that I ask you first whether you're under the influence of that medication today and if you are, what medication are you taking?

A.    I took two Vicodins and a Dilaudid at 7 o'clock this morning.

3 (Pages 6 to 9)

Debra L. Rubin

Page 10

Q. I have passing knowledge about the strength of those medications and I know that they are very strong and I understand they're taken for a good reason in your case, but does the presence of Vicodin and Dilaudid about three hours ago in any way affect your ability to understand what I'm saying and what I'm asking and in any way inhibit your ability to frame appropriate answers to questions?

A. No.

MR. PINNIE: Could we go off the record one second?

(A discussion off the record occurred.)

BY MR. DUGAN:

Q. Let me go back, and you've understood my question, you've advised me that the medication, in spite of the fact that it's very strong and meant for pain relief, is not going to in any way influence or affect your ability to both understand questions and to respond to

Page 11

questions, correct?

A. That's correct.

Q. Have you been deposed before, Deb? In an environment like this where lawyers are asking you questions?

A. Yes.

Q. In what kind of an environment were you asked questions in a deposition? What was it about?

A. It was a car accident. I was rear-ended.

Q. How long ago would you say that was?

A. Approximately 25 years ago.

Q. Okay. Other than that car accident deposition, have you been deposed in any other case of any kind?

A. No.

Q. In terms of the personal injury that you suffered when you fell in the parking lot, I am correct then your deposition has not been taken in that case yet?

A. That's correct.

Page 12

Q. Have you been a defendant in any other lawsuits that you can remember?

A. No.

Q. How about as a plaintiff? Have you been a plaintiff, other than in the fall that you experienced, which I assume is the subject of some litigation, and this case involving AmeriHealth, have you been a plaintiff in any other litigation?

A. No.

Q. Although I've spoken to your lawyer off the record and I've read some materials that will be marked as exhibits, in terms of background I understand that -- and we will talk about the fall in a minute. I understand that that is the subject of either pending litigation or anticipated litigation against the entity that was responsible for the pothole; is that right?

A. Yes.

Q. Is that a pending lawsuit?

A. Yes.

Page 13

Q. All right. Did you review any documents in preparation for today's deposition?

A. Yes, I did.

Q. What did you review?

A. My lawyer sent me a very large -- (indicating) -- mailing and I glanced through it over the weekend.

MR. PINNIE: And those would have been the 26(f) disclosures.

MR. DUGAN: Yep. Gotcha.

BY MR. DUGAN:

Q. Other than speaking to your lawyer in preparation for this deposition, did you meet with or discuss this deposition with anyone else with your lawyer not present?

A. No.

Q. I'm going to ask some very, hopefully, noninvasive questions about your background. Can you tell me how old you are?

A. 56.

Q. And I don't need to know

4 (Pages 10 to 13)

Debra L. Rubin

Page 14

your home address, but what area of the county do you live in?

A. Media, here in Delaware County.

Q. Do you have a family?

A. I have siblings.

Q. Do you have children?

A. No.

Q. Are you married?

A. Yes, I am.

Q. And how long have you been married?

A. 18 years.

Q. How is your husband employed?

A. He's a -- he's employed at Crozer-Chester Medical Center.

Q. And what does he do there?

A. He's a burn technician at the burn center.

Q. Before the accident that you suffered, were you employed?

A. No.

Q. How long has it been since

Page 15

you were last employed?

A. I left my job in 2006.

Q. And what did you do in your last job?

A. I was an administrator at Bryn Mawr College and I taught family law at the Graduate School of Social Work at Bryn Mawr.

Q. Can you tell me, Deb, about your educational background?

A. I have a Bachelor's Degree in Social Work and I have a Master's in Social Service and a Master's in Law and Social Policy.

Q. And where did you obtain those degrees?

A. Bryn Mawr Graduate School of Social Work and Social Research. The master's.

Q. Understood. And if I understand correctly, your insurance coverage is as a result of your husband's employment at Crozer?

A. That is correct.

Page 16

Q. I'm going to ask you some questions now if I could about your prior health history before the accident. Had you had any serious accidents before the one you suffered in this case?

A. I referred to the car accident --

Q. Car accident.

A. -- 25 years ago.

Q. Did that result in any serious injury?

A. A soft tissue injury to my neck and shoulder.

Q. From which you recovered?

A. More or less.

Q. Okay. How about your prior health history in terms of prior surgery or disease?

A. I survived two ruptured brain aneurysms in April of 2005. I have coils and a shunt in my brain.

Q. And where was that surgery done?

A. Thomas Jefferson Neurology.

Page 17

Q. What were the circumstances under which you suffered your aneurysms? Do you recall them?

A. Vaguely.

Q. Was it spontaneous?

A. Yeah, I collapsed on the couch at home and my husband found me unconscious.

Q. Was there one surgery or more than one as a result of the aneurysms?

A. There were two the morning I was admitted to the hospital.

Q. I'm sorry, that was in 2005, correct?

A. Yes.

Q. And there was a subsequent surgery?

A. I had a large aneurysm that was repaired. I was taken into the recovery room. I was paralyzed on the left side of my body. They took me back into the OR and found a second aneurysm that had also ruptured and they repaired

5 (Pages 14 to 17)

Debra L. Rubin

Page 18

the second aneurysm.

MR. PINNIE: On the same day?

THE WITNESS: Almost immediately.

BY MR. DUGAN:

Q. I'm certainly not downplaying the significance of a ruptured aneurysm, especially two of them, but did you make a substantial recovery after the surgery from those ruptures, in terms of the absence of paralysis, for example?

A. Yes -- well, I am disabled.

Q. And the disability generates from the aneurysms and the side effects and the --

A. Yes.

Q. Okay. What kind of disability did you suffer as a result of the aneurysms?

A. Primarily cognitive deficits.

Q. What kind of therapy have

Page 19

you received as a result of the cognitive deficits you suffered as a result of the aneurysms?

A. I did not receive therapies.

Q. Okay. How do these cognitive deficits evidence themselves, Deb?

A. I have short-term memory problems. I cannot multitask. I have trouble concentrating.

Q. In terms of your activities of daily living, are you able to perform those independently in spite of the disability?

A. Yes.

Q. Are you able to drive?

A. Yes.

Q. Do you need any domestic assistance to care for your home and needs that you have around your house because of your disability or do you do that yourself?

A. I need help, but it's not because of that disability.

Page 20

Q. As a result of the accident and what you've suffered?

A. Yes.

Q. Okay. And the time frame between the aneurysms in 2005 and your accident in 2011, during those six years, were you able to function independently in spite of your disability?

A. Yes.

Q. Between 2005 and 2011 when you suffered the accident on June 17th, after you were discharged from the hospital from the surgery or surgeries in question, did you continue to receive medical care for the disabilities caused by the aneurysms?

A. Yes.

Q. What kind of medical care did you receive during that six-year period?

A. After I was discharged from Thomas Jefferson, I went to Bryn Mawr Rehabilitation Hospital for approximately a week. I recuperated at home for

Page 21

approximately two months and then I returned to my job.

Q. What were the circumstance -- and you returned to your job and you ended your job in 2006; is that right?

A. Yes.

Q. What were the circumstances that necessitated you ending your employment in 2006?

A. I later found out I had gone back to work way too soon and I was having difficulty performing my job and keeping up, working harder and harder and I ended up asking for medical leave and being directed by my neurosurgeon to a psychiatrist.

Q. Have you continued before the accident to receive psychiatric care as a result of what you went through from '05 until '11?

A. Yes.

Q. And have you continued with that psychiatric care after your

6 (Pages 18 to 21)

Debra L. Rubin

Page 22

June 17th, 2011 accident?

A. Yes.

Q. Do you receive Social Security disability?

A. Yes, I do.

Q. And did you qualify and receive disability before the June 17, 2011 accident as a result of the injuries suffered from the aneurysm?

A. Yes.

Q. Approximately when did you start receiving Social Security disability, Deb?

A. I can answer that. I just need a minute.

Q. Take your time.

MR. PINNIE: Well, you went back --

MR. DUGAN: That's okay.

MR. PINNIE: -- you went back to work in '06. Did you get it in '06?

THE WITNESS: Yes, I did.

BY MR. DUGAN:

Page 23

Q. Okay. And have you continued to receive Social Security disability?

A. Yes.

Q. Many times Social Security disability applications are denied the first time and then granted. Were you denied initially or were you granted disability immediately?

A. Immediately.

Q. I'd like you now, if you could, in your own words to tell me everything you can recall about the June 17th, 2011 accident. What you were doing, where you were coming from and what happened.

A. I was coming from a medical appointment with my primary care physician. I left her office. It was a Friday --

Q. What's her name, by the way? I'm sorry.

A. Karen Scoles, S-C-O-L-E-S.

Q. Okay. I interrupted, so go

Page 24

ahead.

A. I left her office. I went to Target to purchase groceries. I was going to be home for the weekend. I was leaving the parking lot -- I was leaving Target. I was in the parking lot going to my car. My shopping cart stopped, my body did not. My left foot went under the wheel of the cart.

Q. Were you able to see what caused your cart to stop?

I don't mean before it happened. I mean after you had suffered the injury.

A. I don't even recall looking. I -- I...

MR. PINNIE: You don't recall looking after the accident happened?

THE WITNESS: No, I don't.

MR. PINNIE: Did there come a time were you ultimately saw what caused your cart to stop?

THE WITNESS: Yes.

Page 25

MR. PINNIE: And what was that?

THE WITNESS: I'm not sure of the day, but I know it was the week -- the accident happened on a Friday. I saw the pothole early the following week.

MR. DUGAN: Okay. Off the record for a minute.

(A discussion off the record occurred.)

MR. DUGAN: Let's go back if we could.

BY MR. DUGAN:

Q. After the accident, can you tell me how it first came to be that you noticed that you were having more than just some minor soft tissue problems of some kind? How did the seriousness of this accident begin to demonstrate itself for the first time?

A. Immediately in the parking lot my foot swelled, my foot bruised. I was in excruciating pain. I went to

7 (Pages 22 to 25)

Debra L. Rubin

Page 26

Crozer's ER the following day to make sure nothing was broken.

Q. And did you find there was no fracture?

A. That's correct.

Q. But did the pain continue uninterrupted?

A. Yes.

Q. Tell me what you next did after determining, Deb, that there was no fracture in terms of your care and treatment?

A. At the emergency room, I was referred to a doctor. I saw him on Monday of that -- that Monday.

Q. What kind of specialist was that, do you remember?

A. A foot and ankle specialist.

Q. And what did he do for you or what did he conclude?

A. Over -- I was under the care of two doctors in the practice for a month. They prescribed pain pills, took I believe two MRIs to determine if there

Page 27

was something they had missed from the x-ray.

Q. How long did that treatment with the foot and ankle specialist go on?

A. One month.

Q. And did you obtain any relief from the treatment they provided?

A. No.

Q. When was the first time that you were diagnosed with what used to be called RSD and is now called CRPS?

A. My official --

Q. I think that's chronic regional pain syndrome.

A. My official diagnosis was in October of 2011.

Q. And who made the CRPS diagnosis?

A. My Crozer doctors thought that's what I had. It was Dr. Robert Schwartzman at Drexel University who confirmed the diagnosis.

Q. When you were first advised about the diagnosis, were they calling it

Page 28

reflex sympathetic dystrophy or were they calling it CRPS, do you remember?

A. RSD.

Q. And approximately when was the diagnosis of RSD made by the doctor at Crozer and then confirmed by Dr. Schwartzman, approximately?

A. Well --

Q. I'm sorry, I think you said October of 2011. When did Schwartzman confirm the diagnosis as best you can recall?

A. That was October '11.

Q. Okay. How were you directed to Dr. Schwartzman?

A. I don't recall which of the doctors. I saw two at least. My primary care and an orthopedic specialist, whom I consulted with after the foot and ankle specialist wanted to do surgery and I wanted a second opinion.

Q. Do you remember who the orthopedic specialist was?

A. Dr. Bash, B-A-S-H.

Page 29

Q. When you first got to see Dr. Schwartzman, that was in or about October of 2011, correct?

A. Yes.

Q. And during your first appointment, did he advise you that he believed the proper diagnosis was RSD?

A. Yes.

Q. And after he made that diagnosis -- and let me go back for a minute. Did he tell you what he based the diagnosis on, whether it was test results or your history or maybe some other information?

A. History and observation.

Q. How would you describe the observations he was capable of making in terms of how you physically appeared or how you described your condition to him that led to a diagnosis?

A. I'm sorry, could you say that again?

Q. How did Dr. Schwartzman -- or what did he ask you to do or what did

8 (Pages 26 to 29)

Debra L. Rubin

Page 30

he examine, what did you report to him that led him to make a diagnosis, as you remember it?

A. Someone -- a medical staff person took a very extensive history prior to Dr. Schwartzman coming into the room. It was I believe a combination of that medical history and again his own observations. He obviously looked at my foot, but he started with my head and went down to my foot and identified problems in my body.

Q. Were you already on pain medication when you first saw Dr. Schwartzman? If you remember.

A. Yes.

Q. Did Dr. Schwartzman make any prescriptions of his own as a result of his observations and diagnosis?

A. No.

Q. What prescription medication were you taking by the time you saw Schwartzman in October of 2011?

A. I don't remember.

Page 31

Q. All right. What course of treatment did Dr. Schwartzman propose as a result of his diagnosis, as you remember it?

A. He discussed ketamine infusions with me.

Q. What did he explain as you recall it as to what ketamine infusions would do or could do?

A. He said they were not a -- it was not a cure for my disease, that there is no cure, but that it would alleviate a significant amount of pain if it worked for me.

Q. Did he indicate that there was some possibility it would not work?

A. Yes.

Q. Did he explain whether or not this was going to be inpatient or outpatient ketamine treatment?

A. He said that both options were available; however, due to my aneurysms, coils, shunt, he felt that inpatient hospitalization was the proper

Page 32

treatment protocol for me.

Q. Did he explain that this was an IV process?

A. Yes.

Q. Did he explain how long the intravenous inpatient process would last?

A. Yes.

Q. And what did he tell you?

A. Five days.

Q. Five continuous days?

A. Yes.

Q. During your conversation with Dr. Schwartzman, did he ask you questions about your medical coverage?

A. I don't remember, but I do not think so.

Q. Okay. Did you have to wait any considerable period of time to get your appointment with Dr. Schwartzman, if you remember?

A. I remember that I called him in either August or September of 2011 and I was given an appointment for October 2014.

Page 33

Q. And then there was a cancellation, I understand?

A. That's correct.

Q. Was it during the first appointment with Dr. Schwartzman that he talked about ketamine infusion on an inpatient basis?

A. Yes.

Q. I'm jumping forward just a minute, Deb, and I'm not trying to confuse you in any way, but on how many different occasions have you seen Dr. Schwartzman, would you say?

A. That was the only time.

Q. During the discussion you had with Dr. Schwartzman in the office -- I know that was the only time you physically were in his presence -- did you ever have any subsequent conversations with him telephonically or by correspondence that you remember?

A. Yes.

Q. Can you tell me about those?

A. I had one email exchange

9 (Pages 30 to 33)

Debra L. Rubin

Page 34

with him in October of 2012.

Q. And what was the substance of that email exchange?

A. I was very upset because Dr. Schwartzman only sees patients once a year and in October 2011 I was given an appointment for October 2012. I missed my appointment and I reached out to him by email.

Q. To try to get an appointment rescheduled?

A. Yes.

Q. What had happened that caused you to miss the appointment, do you remember?

A. I misplaced the appointment card.

Q. Okay. Was he able to reschedule you?

A. I have not seen Dr. Schwartzman.

Q. Okay. Is there a reason you were not -- or did not reschedule with him?

Page 35

A. Well, I was given an appointment for October 2013 or '14, I'm not sure.

Q. You still have the appointment scheduled. You haven't seen him, though.

A. That's correct.

Q. Okay. Did Dr. Schwartzman explain to you why he only sees patients once a year?

A. No.

Q. Did you know or do you know today any other patients who have seen Dr. Schwartzman for CRPS?

A. I know one person.

Q. I think you made reference to another patient in one of your letters. How is it that you know another person who has seen Dr. Schwartzman for CRPS?

A. I have two wonderful sisters and they found a resource for me that led to my communication with this other patient.

Page 36

Q. And did the other patient -- was that other patient diagnosed with CRPS?

A. Yes.

Q. And do you know whether that other patient ever received IV infusion of ketamine?

A. Yes.

Q. Was it through Dr. Schwartzman?

A. Yes.

Q. And did that other patient indicate to you either directly or indirectly that that process or procedure was covered under his or her medical policy?

A. I don't remember discussing that.

Q. Okay. During any conversation you had with Schwartzman on the October 2011 office visit, did the issue of insurance coverage ever come up?

A. I don't remember.

Q. Did Dr. Schwartzman schedule

Page 37

you on that visit in October of 2011 for the five-day inpatient IV infusion of ketamine?

A. No.

Q. What was your understanding of what would happen next after your office visit, his diagnosis and then his recommendation that that was the treatment of choice?

A. In order to be accepted for ketamine, he has a diagnostic process that patients have to go through and I left understanding that I think I would be contacted for information on those procedures.

Q. Were you ever contacted?

A. Yes.

Q. And tell me the circumstances, Deb, under which you were contacted about the diagnostic process that you would have to go through before the ketamine infusion would take place?

A. I received a phone call from a staff person in his office.

10 (Pages 34 to 37)

Debra L. Rubin

Page 38

Q. How close in time would you say it was to the October 2011 office visit?

A. That I was contacted?

Q. Yes, about the diagnostic process that you would need to go through?

A. I don't remember. I do know that it was within a month of seeing him.

Q. And do you remember what that individual in the office said would happen next?

A. I had three tests or three different medical appointments that I had to -- had to have.

Q. They were tests set up through Dr. Schwartzman's office that were needed before the IV infusion process could begin?

A. Yes.

Q. And do you remember whether or not you had those tests done?

A. Yes, I did.

Q. What kind of tests were

Page 39

they?

A. The first one was a neuropsychological evaluation.

Q. Okay.

A. The second one was something called a tilt test.

Q. What did that involve, do you remember?

A. Being strapped onto a machine.

MR. PINNIE: Like a bed?

THE WITNESS: A bed, something.

BY MR. DUGAN:

Q. And literally tilted?

A. Yes.

Q. Okay.

A. And then I left that appointment and went across the street to a third appointment and I don't remember what that was.

Q. Were those tests close in time to when you got that phone call from someone in his office approximately a

Page 40

month later?

A. Yes.

Q. After those tests were completed, did you receive contact back from Dr. Schwartzman's office about the IV infusion process?

A. Yes.

Q. Tell me what happened there. Did they call you and schedule it?

A. No, there is a significant waiting list for treatment. I was told that I had been approved for the infusions.

Q. Did they tell you how long the wait was going to be?

A. It can be -- I was told it could be years.

Q. Have you ever gotten a call back from Dr. Schwartzman's office about scheduling those infusions?

A. Yes.

Q. And can you tell me about that?

A. There was a cancellation and

Page 41

a bed available and a nurse called to ask me if I was available for treatment.

Q. Approximately when would that have been?

A. It may have been April of 2012.

Q. And when the nurse said that there was a cancellation and a bed may be available, what happened next?

A. It was a nurse I was speaking with and I had not done -- I had not had a blood test that would have been required. And I'm pretty sure it was a Friday and the bed was available on Monday and there was no time to get the blood test, so I was not a candidate for that bed.

Q. Because you couldn't get the blood test in time?

A. That's correct.

Q. What happened after that bed became unavailable in terms of scheduling for the IV ketamine infusion?

A. Nothing.

11 (Pages 38 to 41)

Debra L. Rubin

Page 42

Q. After the nurse said that you needed to have blood work and you couldn't get it done in time, you were told the bed was not available, correct?

A. That is correct.

Q. Did you ever hear back from their office about rescheduling?

A. No.

Q. Are you still waiting to hear from them about rescheduling?

A. My status now is that because of financial -- because I cannot meet the financial obligation for treatment, they will not consider me a candidate for a bed.

Q. What information did you receive from either Schwartzman or his staff about the financial responsibility and what the cost was for this five-day IV infusion of ketamine? Did they give you some numbers?

A. Yes.

Q. What kind of numbers did they give you that you remember?

Page 43

A. The treatment itself was $5,000 and the staff explained that that was for -- that would only be one of the charges that -- that maybe was for the ICU, but that doctors and all the other services that are provided are billed separately.

Q. Did they give you any other numbers other than the $5,000 --

A. No.

Q. -- that you recall?

A. No.

MR. PINNIE: Was that number 5,000?

THE WITNESS: No. Thank you. 50,000.

BY MR. DUGAN:

Q. That the treatment itself was 50,000?

A. Yes.

Q. And that was only for the treatment itself?

A. Yes.

Q. Did you advise the staff of

Page 44

Dr. Schwartzman's office that you could not meet those financial responsibilities and, therefore, they have not rescheduled you?

A. Yes.

Q. You passed that information on to them?

A. Yes.

Q. And when you passed that information on to them, was that at a point in time that you learned that the health insurance company in question was denying the treatment because it was experimental and/or investigative?

A. I was told I was denied the treatment.

Q. Okay. We're going to get into that obviously next. My understanding then is that as a result of the denial that is the subject of this litigation, you have advised the people at Dr. Schwartzman's office that you're not financially capable of having this procedure because of the cost?

Page 45

A. That is correct.

Q. Do you know whether Dr. Schwartzman or his office ever reached out to AmeriHealth or to Crozer and provided any information to them about the treatment in question, whether there was any communication between them?

A. I don't know.

Q. All right. Were you also receiving treatment from another physician whose name -- bear with me for a minute --

MR. DUGAN: Off the record.

(A discussion off the record occurred.)

BY MR. DUGAN:

Q. Can you tell me who Dr. Spears is?

A. Dr. Spears is a neurologist at Crozer.

Q. Was Dr. Spears one of the individuals who directed you to Dr. Schwartzman?

A. Yes.

12 (Pages 42 to 45)

Debra L. Rubin

Page 46

Q. And from correspondence I see in the file, I think Dr. Spears did reach out to someone at AmeriHealth; is that correct, as far as you know?

A. Yes.

Q. Do you continue to receive treatment from Dr. Spears?

A. Yes.

Q. And what kind of treatment does he provide for you, Deb?

A. He prescribes pain medications, a few other -- and a few other medications.

Q. But the medications he prescribes for pain are directed to your -- to the injuries you suffered from the accident, as opposed to something else?

A. That's correct.

Q. Okay. Dr. Schwartzman's position was because of the aneurysms and the ruptures that you experienced and the surgery that you needed to undergo, that you were only a candidate for inpatient

Page 47

as opposed to outpatient infusion of ketamine, correct?

A. Yes.

Q. Now I would like to ask you some questions as best you can recall them about the chronology of events that deal with your interaction with AmeriHealth as a result of the request that the treatment be a covered benefit.

Okay. Again, this is not a memory contest. So I'm not going to ask or even suggest that you're held to specific dates, but can you begin chronologically, as best you can remember it, as to when you first made contact with AmeriHealth seeking coverage for this treatment and try to walk me through that process as best you can remember it?

A. I don't recall the exact circumstances. I just remember calling AmeriHealth and asking for coverage for the treatment.

Q. And did you advise the individual in question that you were

Page 48

seeking coverage for inpatient IV infusion of ketamine?

A. I believe I said IV infusions for treatment of pain.

Q. Okay. And this was a phone call?

A. Yes.

Q. What do you recall happening during that dialogue, if anything, following your request for coverage?

A. I don't know if they said no on the phone that day. I do know that if not in that conversation, then shortly after that I received -- I had another phone conversation with AmeriHealth advising me that I would not be covered.

Q. And as you recall it, Deb, that was the -- the first information you had about a denial was by phone rather than correspondence?

A. Yes.

Q. Did you then embark on the appeals process?

A. Yes, I did.

Page 49

Q. And did you receive communications from AmeriHealth as to how that appeals process would progress and how it would work?

A. Yes.

Q. Do you recall going through a multistep appeal process?

A. Yes.

Q. Did you ever need to appear at any appeal hearings that you remember?

A. No.

Q. What was your understanding about how that appeal process played out? Can you tell me as best you can remember it?

A. I know that the first appeal was written -- a letter written by my neurologist to AmeriHealth.

Q. That's Dr. Spears?

A. That's correct.

Q. And as a result of the correspondence from Dr. Spears, what's your understanding about what happened next?

13 (Pages 46 to 49)

Debra L. Rubin

Page 50

A. I was denied treatment and I was advised that there was a -- that I had two other levels of appeal and I -- AmeriHealth spoke to me about the second level.

Q. And what did they describe the second level would involve?

A. I don't recall what they said. I know that the second level was also by correspondence.

Q. Were you advised that the first level or the second level involved an external appeal by an outside entity?

A. I believe the second -- when I was denied the first request, I believe in discussing the next two levels, the third one was the external appeal.

Q. Okay. Did you receive written notification of each step in the process from AmeriHealth as to the denials and the explanation contained within those denials as to the basis?

A. Yes.

Q. And did you also receive

Page 51

communication as a result of the external appeal as to that decision?

A. Yes.

Q. And were you advised that the external appeal entity upheld the original denials at the first two levels?

A. Yes.

Q. And were you advised that the basis for the denials in each step of the process was a determination that the treatment in question was deemed to be experimental and/or investigative?

A. Yes.

Q. Did you do research on your own about the IV infusion process of ketamine and its effect on your condition?

A. Yes.

Q. Can you tell me the kind of research that you performed?

A. I used WebMD and Google to learn everything I could about the disease and possible treatments.

Q. During your research, did

Page 52

you learn that any other health insurance companies denied this same treatment for the condition you had?

A. Yes.

Q. And do you remember what you learned about other insurance companies denying this treatment for your condition based on the fact that they had concluded it was experimental and/or investigative?

MR. PINNIE: I'm going to object to the form, but you can answer that question. Go ahead.

THE WITNESS: Some insurance companies provide the treatment, some do not. Some provide it after appeals.

BY MR. DUGAN:

Q. Okay. We're going to identify a couple of exhibits in a minute. I want to ask you a question from the complaint and I realize you didn't draft the complaint. I mean, lawyers do those things, but did you have occasion to read the complaint that was

Page 53

filed on your behalf in this case?

MR. PINNIE: That was that piece of paper that started the lawsuit, the pieces of paper that started the lawsuit. That's the complaint.

THE WITNESS: For the ketamine?

BY MR. DUGAN:

Q. Yes.

A. Specifically.

Q. Did you have occasion to read the complaint?

THE WITNESS: Did you send it to me?

MR. PINNIE: You have to say what you remember, if you remember.

THE WITNESS: Oh, okay.

MR. PINNIE: If you remember.

THE WITNESS: I don't remember.

BY MR. DUGAN:

14 (Pages 50 to 53)

Debra L. Rubin

Page 54

Q. I just want to read you a sentence from the complaint and ask you a question if I could about it. Paragraph 26 of the complaint reads as follows: AmeriHealth continues to maintain a refusal to pay the healthcare benefits due without good cause or grounds and in violation of its duties under the plan and the law.

And I know you did not draft this complaint, but can you tell me the basis, as you understand it, for the statement that AmeriHealth is denying these benefits without good reason?

A. I'm sorry, can you ask me that again?

Q. Yes. I read the paragraph to you.

A. Yes.

Q. And it alleges that AmeriHealth refused to pay for this treatment without good reason or cause. It says specifically "without good cause or grounds." And I'm asking if you can

Page 55

tell me what your understanding is or your basis for the statement, admitted drafted by a lawyer, not by yourself, that AmeriHealth has denied these benefits without good cause or good reason?

A. Well, my understanding is that AmeriHealth has denied the treatment because they consider it experimental and investigational.

Q. Do you have any basis to conclude that AmeriHealth denied this treatment for any other reason other than their belief that it's experimental and/or investigative?

A. No.

Q. I've placed in front of your lawyer, Deb, some exhibits and I'm going to ask some questions about them. And I'm going to try to ask about them in some form of chronological order, but we won't be going from 1 through 12 because -- or 1 through 11 because I'm not sure they're ordered quite that way

Page 56

and that's not anyone's fault.

The first one I want to refer to is Exhibit Number 9 and these are tabbed for your benefit and I've provided a copy to the court reporter. There's no --

MR. DUGAN: Off the record.

(A discussion off the record occurred.)

BY MR. DUGAN:

Q. Exhibit Number 9, Deb, is a letter authored by Dr. Spears on February 21st, 2012 and it deals with the fact that you are or had been under his care for several months and he makes reference to several papers published over the past five years. Do you remember whether Dr. Spears sent you a copy of this letter?

A. He did not.

Q. Okay. Am I correct -- withdraw that.

Do you remember having seen this letter before?

Page 57

A. Yes.

Q. Okay. And would the circumstances under which you've seen this letter be that it was provided to you by counsel or did you receive it from some other source, do you remember?

A. I called Dr. Spears' office and requested a copy of it.

Q. Okay. Did you have a conversation with Dr. Spears about its contents?

MR. PINNIE: Is that -- oh, sorry.

BY MR. DUGAN:

Q. Did he talk to --

MR. PINNIE: Did you shake your head? I'm sorry.

THE WITNESS: No, I didn't shake my head.

MR. PINNIE: I was just thinking. I'm sorry.

MR. DUGAN: Okay.

MR. PINNIE: I thought I saw you shake --

15 (Pages 54 to 57)

Debra L. Rubin

Page 58

THE WITNESS: I met with Dr. Spears prior to his writing this letter to discuss it with him.

Q. Did you provide any articles to him?

A. No.

Q. That you got from your research?

A. No.

Q. And did you ask him to write this letter to AmeriHealth?

A. Yes, I did.

Q. Okay. I'm going to ask you if you would now to look at Exhibit Number 5, and Exhibit Number 5 is a letter that is time stamped two different ways. It appears the letter is time stamped right up in here March 28th, 2012 and it's marked as "Received" April 18th, 2012, but it deals with -- in this section I'm pointing to right here, Deb, it deals with an admission date of February 10th, 2012. Was it your

Page 59

understanding that if everything had gone smoothly in terms of any testing that needed to be done, you would have been admitted to the hospital on February 10th, 2012 by Schwartzman, if you know?

A. I don't know.

Q. Okay. Was it your understanding that in or about that period of time, in March of 2012, it is when you received your initial denial? If you recall.

A. Yes.

Q. And if you look at this letter authored by AmeriHealth, it identifies to you because it's written to you as you can see and I assume that's your correct address, the Providence Road address? Over here. (Indicating.) 1295 --

A. That --

Q. -- North Providence?

MR. PINNIE: Is that where it was sent to you?

Page 60

THE WITNESS: Yes.

BY MR. DUGAN:

Q. Did you receive this letter?

A. Yes, I did.

Q. And am I correct that this letter identifies the fact that the medical policy in question, quote, intravenous ketamine is considered experimental/investigational and, therefore, not covered, for treatment of CRPS? Is that correct, that was the first time you were advised in writing that this treatment was being denied by AmeriHealth?

A. Yes.

Q. And then it goes on to say that if you disagree with this decision you can appeal by phone or in writing within 180 days, correct?

A. Yes.

Q. And, in fact, you pursued that appeal; is that right?

A. That's correct.

Q. And that decision was on

Page 61

March the 28th, 2012 by its time stamped date. And then if you'd look at Exhibit 1, it appears you then authored a letter to Dr. Gideon Hill on April 22, 2012. Does that appear to be correct?

A. Yes.

Q. How did you get Dr. Hill's name, Deb?

A. I believe it was speaking with the woman I reference in the first sentence.

Q. That's with Pat Buckley?

A. Patricia Buckley.

Q. Okay. And in this letter you describe Dr. Schwartzman and his diagnosis and then you go on to describe your injuries in the accident and this letter is then submitted with a copy to your lawyer, of course, and I think the letter is self-explanatory. Do you remember receiving a response to this letter either in writing or by phone?

MR. PINNIE: As far as like a decision?

16 (Pages 58 to 61)

Debra L. Rubin

Page 62

MR. DUGAN: Right.

MR. PINNIE: Yeah, a decision.

THE WITNESS: Well, I -- I know that I was denied, so I...

BY MR. DUGAN:

Q.  Okay.

A.  I am pretty sure that I received another denial letter.

Q.  We'll cover that in a minute. I want to make reference to another paragraph in this letter. It's the third paragraph on the first page and I just want to read that sentence and ask if you can provide some information to us. Quote, In a decision in March of 2011, an external utilization review appeal was done through the Pennsylvania Department of Health on behalf of another of Dr. Schwartzman's CRPS patients when their insurance denied them for identical reasons. This external medical review found, quote, the health plan deemed the use of IV ketamine to be not medically

Page 63

necessary, but also stated it was against the health plan's policy because it was considered experimental or investigational, close quote.

Where did you get the information about that other denial or that other appeal when you're talking about another of Schwartzman's patients?

A.  From a woman who was Dr. Schwartzman's patient.

Q.  And how had you made contact with her, do you remember?

A.  I've only had email correspondence with her.

Q.  And she told you that she was denied for the same reason you were denied, based on the fact that it was thought to be experimental or investigational, correct?

A.  I don't know that she told me she was. I know that she told me many patients are.

Q.  Are denied for that reason?

A.  Yes.

Page 64

Q.  Okay. Then if you would go to Exhibit 8, which is an April 27th, 2012 outside review by National Medical Reviews, Incorporated which indicates that it is upholding the original denial. And my question is, do you remember receiving notification that an outside entity, National Medical Reviews, had upheld the initial denial by AmeriHealth on or about April 27, 2012?

A.  I did receive notification. However, I've never seen this company's name before.

Q.  You received notification in another form that an outside reviewer had concluded that they were upholding the denial?

A.  Yes.

Q.  Okay.

A.  It was -- it was not this company, though.

Q.  We're going to get to another company in a minute. There was another outside appeal, but was it your

Page 65

understanding that there was at least one outside review done of the decision to deny coverage and that those denials were upheld by outside reviewers?

A.  I did not know that the second appeal was submitted to an outside entity.

Q.  If you'd look now at Exhibit 3. I'm trying to stay in chronological order. This is an April 30th, 2012 letter directed to you by Dr. Hill, Gideon Hill, and do you recall receiving this letter?

And this is a request for a standard external appeal.

A.  Yes.

Q.  Okay. And if you then look at Exhibit 4, this is that external appeal from MCMC.

A.  That's the company I recognize.

Q.  And you received a copy of this report?

A.  Yes, I did.

17 (Pages 62 to 65)

Golkow Technologies, Inc. - 1.877.370.DEPS

Debra L. Rubin

Page 66

Q. And that's Exhibit 4. And did you find in reviewing it that MCMC had upheld the denial by AmeriHealth for the IV infusion of ketamine for the treatment of your condition?

A. Yes.

Q. Was it your understanding that as of May the 30th 2012 the appeal process had been exhausted both internally and externally now with the decision of MCMC?

A. Yes.

Q. And that you had exhausted all your levels of appeal with AmeriHealth?

A. That's correct.

Q. If you take a look at Exhibit 11, I'm wondering whether you've ever seen the medical policy bulletin that deals with CRPS before I'm handing it to you today. Have you ever seen this before?

A. No.

Q. Okay. Exhibit 11 is the

Page 67

medical policy bulletin that was used as the basis for this decision and it specifically refers to intravenous ketamine on the fourth page and fifth page. It carries over to page 5. And this medical policy in question concludes, quote, Therefore, intravenous ketamine in CRPS has not been shown to improve the net health outcome. In addition, intravenous ketamine has not been approved by the FDA for use in CRPS.

Has anyone told you -- rather than not having seen this medical policy, has anyone ever told you about its existence, that that was the basis for the decision, specifically that there was a medical policy?

A. Yes.

Q. And where did you get that information, if you remember?

A. From speaking with AmeriHealth's -- AmeriHealth.

MR. PINNIE: Did they give you that information verbally or

Page 68

did they give you this piece of paper?

THE WITNESS: I don't remember seeing this piece of paper. I do remember speaking with someone in -- on the phone.

MR. PINNIE: And they essentially told you what Mr. Dugan has read to you?

THE WITNESS: Yes.

BY MR. DUGAN:

Q. When someone files a complaint, the defendant often files an answer and I want to ask you some questions about part of the answer that AmeriHealth filed in response to your complaint and ask if you have any information about this portion of the answer. This is what's called an affirmative defense. I'm not asking to explain what that is. I'd be shocked if you knew what it meant. But it describes the Crozer medical benefits plan itself, which is the plan under which you've made

Page 69

this claim. And part of that plan contains the following language. It provides that certain expenses are not covered including, quote, charges for any treatment, supply or medicine that is not medically necessary or is considered unsafe, experimental or investigational by the American Medical Association or the appropriate specialty society. The use of inpatient ketamine infusion has not been approved by the American Medical Association, the American Academy of Neurology or the American Academy of Pain Management. Neither the American Academy of Neurology nor the American Academy of Pain Management has approved ketamine treatment for the complex regional pain syndrome and they deem such treatment experimental, close quote.

In your research, did you find any information that any of those societies actually did approve ketamine intravenously for the treatment of your condition?

18 (Pages 66 to 69)

Debra L. Rubin

Page 70

A.   No.

Q.   In terms of your condition as a result of the accident that you suffered, has your condition continued to deteriorate or progress or has it remained the same or has it improved in any way?

A.   I continue to deteriorate.

Q.   Can you explain to me, Deb, the circumstances under which it's deteriorating and how those deteriorations evidence themselves?

A.   The injury was to my left foot, isolated to my left foot. It then traveled to my knee, then it traveled to my thigh. I presently experience significant pain through my pelvic region and I believe the disease is now progressing down the right side of my body from my thigh down.

Q.   The prescribing physician for your pain medication is Dr. Spears?

A.   Yes.

Q.   And what prescription

Page 71

medication does he have you on for the pain?

A.   At this time Dilaudid and Vicodin.

Q.   And do you know what the dosage is of either of those?

A.   The Dilaudid is 4 milligrams and I can take up to four a day. The Vicodin is 10, I don't know if it's milligrams or not, but it's the highest form of -- strength of Vicodin and I can also take four of those a day.

Q.   How long have you been on that strength and that frequency approximately?

A.   I've been through so many combinations. I'm not sure exactly how long it's been.

Q.   Regardless of the combinations or the strength, approximately how long have you been on Dilaudid and Vicodin for your condition?

A.   Those two specific medications?

Page 72

Q.   They're the last two pain medications you have been prescribed; is that right?

A.   That is correct.

Q.   About how long have you been taking them?

A.   I don't -- I don't know.

Q.   Has it been years rather than months?

A.   No, it's been months.

Q.   Is it your recollection that either the frequency or the strength has increased?

A.   Yes.

MR. DUGAN:  Off the record.

(A discussion off the record occurred.)

MR. DUGAN:  Back on the record.

BY MR. DUGAN:

Q.   Do you have any reason to believe, from anything that you've learned, that the decision by AmeriHealth and then the decisions by the outside

Page 73

reviewers were based on anything other than the belief that the treatment in question, IV infusion of ketamine for your condition, that there was any other reason for denial other than the belief that those or that that treatment is experimental and/or investigative?

A.   No.

MR. DUGAN:  That's all the questions. I have. Your lawyer might have some, though.

MR. PINNIE:  I might have a couple. Off the record for a second.

(A discussion off the record occurred.)

- - -

EXAMINATION

- - -

BY MR. PINNIE:

Q.   Deb, I just wanted to ask you a few questions in follow up. Mr. Dugan made reference to the fact that you had done a significant amount of

19 (Pages 70 to 73)

Debra L. Rubin

Page 74

research on your own. Is that an accurate statement?

A.    Yes.

Q.    As far as your investigation of the ketamine procedures and your investigation of them, did you find occasions where ketamine was considered successful as a means of alleviating pain in CRPS and RSD patients?

A.    Yes.

Q.    And was it a mixed bag from the research that you found or did one predominate over the other? How would you describe your findings?

A.    I would describe my findings by saying that ketamine works for some patients and it does not work for others.

Q.    And were the findings in medical journals or what were the findings contained in, if you remember?

A.    Primarily medical journals.

Q.    In your letter of April 22nd, 2012, you make reference to certain publications. Did you include those

Page 75

publications in your appeal documentation that you had forwarded to AmeriHealth?

A.    I believe so.

Q.    Okay. So in the documents that have been supplied by AmeriHealth, they give us some articles. Would those be the articles that you had supplied?

A.    I believe so.

Q.    Okay. You are a Medicare eligible patient, correct?

A.    Yes.

Q.    Because of your disability?

A.    Yes.

Q.    Have you made inquiry as to whether or not Medicare will pay its portion of this ketamine treatment?

A.    An administrator at Dr. Schwartzman's office said that they would.

Q.    And "they" being whom?

A.    Medicare.

Q.    Is it your understanding that AmeriHealth would be required to pay a portion of this ultimate treatment?

Page 76

A.    Yes.

Q.    Do you -- and we'll confirm this with folks from AmeriHealth, but have you been given some understanding of what AmeriHealth's percentage would be of the payment of the bill?

A.    My understanding is that Medicare pays 80 percent, so AmeriHealth's would be 20 percent.

Q.    Okay. And the final question that I would ask you is, in your correspondence and in Mr. Dugan's questioning of you, you made reference to a decision of March -- in March of 2011 of the Pennsylvania Department of Health and I'm going to show you what's been marked --

MR. PINNIE:  Is that 12, Gerry?

MR. DUGAN:  12.

BY MR. PINNIE:

Q.    I'm going to show you what's been marked as Exhibit 12, something that's signed by Crystal Miller from the

Page 77

Pennsylvania Department of Health. Is this the documentation that you were making reference to in your correspondence to the folks at AmeriHealth?

A.    Yes.

Q.    And is it your understanding that this Pennsylvania Department of Health decision determined that the ketamine treatment was not only necessary, but was not experimental, or do you remember?

A.    I don't recall that they said it was not experimental. I know that they said that -- they allowed the patient to have it.

Q.    Okay. And was this person someone that you had interacted with specifically or was this information that you learned from Internet research?

A.    I learned it from research.

Q.    So in your correspondence, okay, to the folks from AmeriHealth, in your third paragraph you make reference

20 (Pages 74 to 77)

Debra L. Rubin

Page 78

to, and it was actually read, "the health plan deemed the use of IV ketamine to be not medically necessary, but also stated that it was against the health plan's policy because it was considered to be experimental and investigational. This is not an accurate statement and goes against the available medical literature." And I'm going to show you on page 4 of the document that we just made reference to as Exhibit 12, I want to just ask you to take a look at the first three sentences of that page 4 just for a second.

A.   Okay.

Q.   And, in fact, did you quote -- is that a word-for-word quote from paragraph 4 of page 4 of this decision of March 2nd, 2011?

A.   Yes.

MR. PINNIE:  Okay.  I have no further questions.

MR. DUGAN:  I just have one, Deb, if I could.

Page 79

- - -

EXAMINATION

- - -

BY MR. DUGAN:

Q.   When we talked a minute ago about Medicare paying 80 percent or your belief that they would pay 80 and AmeriHealth would pay 20 of the IV infusion of ketamine, did you ever make application to Medicare to see if they would approve the 80 percent?

A.   No.

Q.   And is there a reason you didn't?

A.   Because I can't afford the part that they would not cover.

Q.   The 20 percent?

A.   That's correct.

MR. DUGAN:  That's all I have.  I appreciate your time.

MR. PINNIE:  That's all I have.

(Witness excused.)

(Deposition concluded at

Page 80

approximately 11:01 a.m.)

Page 81

CERTIFICATE

I HEREBY CERTIFY that the witness was duly sworn by me and that the deposition is a true record of the testimony given by the witness.

It was not requested before completion of the deposition that the witness, DEBRA L. RUBIN, have the opportunity to read and sign the deposition transcript.

KRISTY L. LIEDTKA, a Court Reporter and Notary Public
Dated:  February 13, 2012

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)

Debra L. Rubin

**A**

ability 10:8,10,23
able 19:12,16 20:7
    24:10 34:18
absence 18:12
absorb 7:19
academy 69:12,13
    69:14,15
accepted 37:10
accident 11:10,16
    14:21 16:3,7,8
    20:1,6,11 21:19
    22:1,8 23:14
    24:18 25:5,15,20
    46:17 61:17 70:3
accidents 16:4
accurate 74:2 78:7
acknowledgement
    3:17
action 1:3
activities 19:11
addition 67:10
address 14:1 59:18
    59:19
administrator 15:5
    75:17
administrators 1:6
    6:22,23
admission 58:23
admitted 17:13
    55:2 59:4
advance 7:14
advise 29:6 43:24
    47:23
advised 10:19
    27:23 44:21 50:2
    50:11 51:4,8
    60:12
advising 48:16
affect 10:7,23
affirmative 68:20
afford 79:15
ago 10:7 11:12,14
    16:9 79:5
agreed 6:5
ahead 24:1 52:12

alleges 54:20
alleviate 31:13
alleviating 74:8
allowed 77:15
american 69:8,11
    69:12,13,14,15
amerihealth 1:5
    6:22,23 12:8 45:4
    46:3 47:8,16,21
    48:15 49:2,18
    50:4,20 54:5,13
    54:21 55:4,8,12
    58:12 59:15 60:14
    64:9 66:3,15
    67:22 68:16 72:23
    75:2,5,23 76:3
    77:5,23 79:8
amerihealths 67:22
    76:5,9
amount 31:13
    73:24
aneurysm 17:19,23
    18:1,9 22:9
aneurysms 16:20
    17:2,11 18:16,21
    19:3 20:5,16
    31:23 46:21
ankle 26:18 27:4
    28:19
answer 5:5 7:20
    8:10 22:14 52:12
    68:14,15,19
answers 8:6 10:10
anticipated 12:19
anyones 56:1
appeal 3:17,20,23
    49:7,10,13,16
    50:3,13,17 51:2,5
    60:18,22 62:18
    63:7 64:24 65:6
    65:15,19 66:8,14
    75:1
appeals 48:23 49:3
    52:16
appear 7:5 49:9
    61:5

appearance 7:6
appearances 2:1
appeared 29:18
appears 58:18 61:3
application 79:10
applications 23:6
apply 81:19
appointment 23:18
    29:6 32:19,23
    33:5 34:7,8,10,14
    34:16 35:2,5
    39:19,20
appointments
    38:14
appreciate 79:20
appropriate 8:15
    9:18 10:10 69:9
approve 69:22
    79:11
approved 40:12
    67:11 69:11,16
approximately
    11:14 20:23 21:1
    22:11 28:4,7
    39:24 41:3 71:15
    71:21 80:1
april 16:20 41:5
    58:20 61:4 64:2
    64:10 65:11 74:22
area 14:1
articles 58:5 75:6,7
asked 7:17 11:8
asking 10:9 11:5
    21:15 47:21 54:24
    68:20
assistance 19:19
associates 4:4
association 69:8,12
assume 12:7 59:17
attorney 7:7
august 32:22
authored 56:12
    59:15 61:3
available 31:22
    41:1,2,9,14 42:4
    78:8

**B**

b 3:9
bachelors 15:11
back 10:18 17:22
    21:12 22:18,21
    25:12 29:10 40:4
    40:19 42:6 72:18
background 12:15
    13:21 15:10
bag 74:11
barnard 1:14 2:3
based 29:11 52:8
    63:17 73:1
bash 28:24,24
basis 33:7 50:22
    51:9 54:12 55:2
    55:11 67:2,15
bear 45:11
bed 39:11,12 41:1,8
    41:14,17,21 42:4
    42:15
beginning 1:17
behalf 53:1 62:19
belief 55:14 73:2,5
    79:7
believe 8:23 26:24
    30:7 48:3 50:14
    50:15 61:9 70:18
    72:22 75:3,8
believed 29:7
benefit 47:9 56:4
benefits 54:6,14
    55:5 68:23
best 28:11 47:5,14
    47:18 49:14
bill 76:6
billed 43:6
blood 41:12,16,19
    42:2
body 17:22 24:8
    30:12 70:20
boulevard 2:9
brain 16:20,21
break 8:17,21,22
brinkmann 2:8
broken 26:2

bruised 25:23
bryn 15:6,8,17
    20:22
buckley 4:5 61:12
    61:13
bulletin 4:7 66:19
    67:1
burn 14:19,20
business 6:22

**C**

call 37:23 39:23
    40:9,18 48:6
called 27:11,11
    32:21 39:6 41:1
    57:7 68:19
calling 27:24 28:2
    47:20
cancellation 33:2
    40:24 41:8
candidate 41:16
    42:15 46:24
cant 79:15
capable 29:17
    44:23
car 11:10,15 16:6,8
    24:7
card 34:17
care 19:19 20:15,18
    21:19,24 23:18
    26:11,21 28:18
    56:15
careful 9:5
carries 67:5
cart 24:7,9,11,23
case 9:14 10:5
    11:17,23 12:8
    16:5 53:1
cause 54:7,22,23
    55:5
caused 20:15 24:11
    24:23 34:14
center 1:7 6:24
    14:17,20
certain 8:10 69:3
    74:23

Debra L. Rubin

certainly 18:7
certificate 81:1
certification 6:7 81:18
certify 81:3
certifying 81:22
chance 7:19
charges 43:4 69:4
children 14:7
choice 37:9
chronic 27:13
chronological 55:21 65:10
chronologically 47:14
chronology 47:6
circumstance 21:4
circumstances 17:1 21:8 37:19 47:20 57:3 70:10
civil 1:3
claim 69:1
claritys 7:22
clear 7:15
close 38:1 39:22 63:4 69:19
cognitive 18:22 19:1,6
coils 16:21 31:23
collapsed 17:6
college 15:6
com 1:24 2:11
combination 30:7
combinations 71:17,20
come 24:21 36:22
comfort 8:20
coming 23:15,17 30:6
commonwealth 1:20
communication 35:23 45:7 51:1
communications 49:2
companies 52:2,6

52:14
company 44:12 64:21,23 65:20
companys 64:12
complaint 52:21,22 52:24 53:6,13 54:2,4,11 68:13 68:17
completed 40:4
completion 81:6
complex 69:17
concentrating 19:10
concise 7:15
conclude 26:20 55:12
concluded 52:8 64:16 79:24
concludes 67:7
condition 29:19 51:17 52:3,7 66:5 69:24 70:2,4 71:22 73:4
confirm 28:11 76:2
confirmed 27:22 28:6
confuse 33:11
consider 42:14 55:9
considerable 32:18
considered 60:8 63:3 69:6 74:7 78:5
consulted 28:19
contact 40:4 47:15 63:11
contacted 37:14,16 37:20 38:4
contained 50:21 74:20
contains 69:2
contents 57:11
contest 8:9,9 47:11
continue 20:14 26:6 46:6 70:8
continued 21:18,23 23:2 70:4

continues 54:5
continuous 32:10
control 81:21
conversation 32:12 36:20 48:13,15 57:10
conversations 33:20
convinced 7:13
copy 56:5,19 57:8 61:18 65:22
correct 11:1,2,21 11:24 15:24 17:15 26:5 29:3 33:3 35:7 41:20 42:4,5 45:1 46:4,19 47:2 49:20 56:21 59:18 60:5,11,19,23 61:5 63:19 66:16 72:4 75:10 79:18
correctly 15:21
correspondence 33:21 46:1 48:20 49:22 50:10 63:14 76:12 77:4,22
cost 42:19 44:24
couch 17:7
couldnt 41:18 42:3
counsel 6:5 7:12 8:19 57:5
county 14:2,4
couple 52:19 73:13
course 31:1 61:19
court 1:1,19 7:2 8:4 56:5 81:13
cover 62:10 79:16
coverage 15:22 32:14 36:22 47:16 47:21 48:1,10 65:3
covered 36:15 47:9 48:16 60:10 69:4
crozer 15:23 27:19 28:6 45:4,20 68:23
crozerchester 1:7

6:24 14:17
crozers 26:1
crps 27:11,17 28:2 35:14,20 36:3 60:11 62:20 66:20 67:8,11 74:9
crystal 76:24
cure 31:11,12
currently 7:1

**D**

d 3:2
daily 19:12
date 1:18 58:23 61:2
dated 81:14
dates 47:13
day 18:3 25:4 26:1 48:12 71:8,12
days 32:9,10 60:19
dbmplaw 2:11
deal 47:7
deals 56:13 58:21 58:23 66:20
deb 11:4 15:9 19:7 22:13 26:10 33:10 37:19 46:10 48:17 55:18 56:11 58:22 61:8 70:9 73:21 78:24
debbie 6:19
debra 1:3,12 3:5 6:12 81:7
decision 3:19 51:2 60:17,24 61:24 62:3,16 65:2 66:11 67:2,16 72:23 76:14 77:9 78:19
decisions 72:24
deem 69:18
deemed 51:11 62:23 78:2
defendant 2:11 12:1 68:13
defendants 6:20,21

defense 68:20
deficits 18:23 19:2 19:6
degree 15:11
degrees 15:16
delaware 14:3
delay 7:21
demonstrate 25:20
denial 44:20 48:19 59:11 62:9 63:6 64:5,9,17 66:3 73:5
denials 50:21,22 51:6,9 65:3
denied 23:6.8 44:15 50:1,15 52:2 55:4 55:8,12 60:13 62:5,21 63:16,17 63:23
deny 65:3
denying 44:13 52:7 54:13
department 4:8 62:19 76:15 77:1 77:8
deposed 11:3,17
deposition 1:12 5:2 6:1 8:2 11:9,16,22 13:3,15,16 79:24 81:4,6,8
deps 1:24
describe 29:16 50:6 61:15,16 74:14,15
described 29:19
describes 68:22
description 3:12
deteriorate 70:5,8
deteriorating 70:11
deteriorations 70:12
determination 3:21 3:24 51:10
determine 26:24
determined 77:9
determining 26:10
diagnosed 27:10

Debra L. Rubin

36:2
**diagnosis** 27:15,18 27:22,24 28:5,11 29:7,10,12,20 30:2,19 31:3 37:7 61:16
**diagnostic** 37:11,20 38:5
**dialogue** 48:9
**didnt** 52:22 57:18 79:14
**different** 33:12 38:14 58:17
**difficulty** 21:13
**dilaudid** 9:24 10:6 71:3,7,22
**direct** 81:21
**directed** 9:6 21:16 28:14 45:22 46:15 65:11
**direction** 5:5
**directly** 36:13
**disabilities** 20:15
**disability** 18:15,20 19:14,21,24 20:8 22:4,7,13 23:3,6,9 75:12
**disabled** 18:14
**disagree** 60:17
**discharged** 20:12 20:21
**disclosures** 13:10
**discuss** 13:15 58:3
**discussed** 31:5
**discussing** 36:17 50:16
**discussion** 10:15 25:10 33:15 45:14 56:8 72:16 73:15
**disease** 16:18 31:11 51:23 70:18
**district** 1:1,2 7:2,3
**doctor** 26:14 28:5
**doctors** 26:22 27:19 28:17 43:5
**document** 4:2

78:10
**documentation** 75:1 77:2
**documents** 5:8 13:2 75:4
**doing** 6:22 23:15
**domestic** 19:18
**dont** 8:10,12,12,13 8:15 9:7 13:24 24:12,15,17,20 28:16 30:24 32:15 36:17,23 38:8 39:20 45:8 47:19 48:11 50:8 53:22 59:7 63:20 68:3 71:9 72:7,7 77:13
**dosage** 71:6
**downplaying** 18:8
**dr** 27:20 28:7,15,24 29:2,23 30:6,14 30:17 31:2 32:13 32:19 33:5,12,16 34:4,20 35:8,14 35:19 36:9,24 38:17 40:5,19 44:1,22 45:2,18 45:19,21,22 46:2 46:7,20 49:19,22 56:12,18 57:7,10 58:2 61:4,7,15 62:20 63:9 65:12 70:22 75:17
**draft** 52:22 54:10
**drafted** 55:3
**drexel** 27:21
**drive** 19:16
**due** 31:22 54:7
**dugan** 2:8,8 3:6 6:18,20 10:17 13:11,12 18:6 22:19,24 25:8,12 25:14 39:14 43:17 45:13,16 52:17 53:9,24 56:7,10 57:14,22 60:2 62:1,6 68:9,11

72:15,18,20 73:9 73:23 76:20 78:23 79:4,19
**dugans** 76:12
**duly** 6:13 81:4
**duties** 54:8
**dystrophy** 28:1

**E**

e 3:2,9
**early** 25:6
**eastern** 1:2 7:3
**educational** 15:10
**effect** 51:16
**effects** 18:16
**either** 12:18 32:22 36:13 42:17 61:22 71:6 72:12
**eligible** 75:10
**email** 33:24 34:3,9 63:13
**embark** 48:22
**emergency** 26:13
**employed** 14:15,16 14:22 15:1
**employment** 15:23 21:10
**ended** 21:5,15
**endurance** 8:8
**entity** 12:20 50:13 51:5 64:8 65:7
**environment** 11:4 11:8
**er** 26:1
**especially** 18:9
**esquire** 2:4,8
**essentially** 68:8
**estimate** 8:12
**evaluation** 39:3
**events** 47:6
**evidence** 19:6 70:12
**exact** 47:19
**exactly** 71:17
**examination** 6:16 73:18 79:2

**examine** 30:1
**examined** 6:13
**example** 18:13
**exchange** 33:24 34:3
**excruciating** 25:24
**excused** 79:23
**exhausted** 66:9,13
**exhibit** 6:1 56:3,11 58:15,16 61:3 64:2 65:9,18 66:1 66:18,24 76:23 78:11
**exhibits** 12:15 52:19 55:18
**existence** 67:15
**expect** 8:14
**expenses** 69:3
**experience** 70:16
**experienced** 12:6 46:22
**experimental** 44:14 51:12 52:9 55:9 55:14 60:9 63:3 63:18 69:7,19 73:7 77:11,14 78:6
**explain** 31:7,18 32:2,5 35:9 68:21 70:9
**explained** 43:2
**explanation** 50:21
**extensive** 30:5
**external** 3:16 50:13 50:17 51:1,5 62:17,22 65:15,18
**externally** 66:10

**F**

f 2:9 13:10
**fact** 10:20 52:8 56:14 60:6,21 63:17 73:23 78:16
**fall** 12:6,17
**family** 14:5 15:6
**far** 46:4 61:23 74:4

**fault** 56:1
**fax** 1:23
**fda** 67:11
**february** 56:13 58:24 59:5 81:14
**fell** 11:20
**felt** 31:23
**fifth** 67:4
**file** 9:17 46:2
**filed** 53:1 68:16
**files** 68:12,13
**filing** 6:6
**final** 76:10
**financial** 42:12,13 42:18 44:2
**financially** 44:23
**find** 26:3 66:2 69:21 74:6
**findings** 74:14,15 74:18,20
**first** 9:19 23:7 25:16,21 27:9,23 29:1,5 30:14 33:4 39:2 47:15 48:18 49:16 50:12,15 51:6 56:2 60:12 61:10 62:13 78:13
**five** 32:9,10 56:17
**fiveday** 37:2 42:19
**folks** 76:3 77:4,23
**follow** 73:22
**following** 25:7 26:1 48:10 69:2
**follows** 6:14 54:4
**foot** 24:8 25:23,23 26:18 27:4 28:19 30:10,11 70:14,14
**foregoing** 81:18
**form** 6:9 52:11 55:21 64:15 71:11
**formulating** 7:20
**forward** 33:9
**forwarded** 75:2
**found** 17:7,23 21:11 35:22 62:23 74:12

Debra L. Rubin

four 71:8,12
fourth 67:4
fracture 26:4,11
frame 10:10 20:4
frequency 71:14
  72:12
friday 23:20 25:6
  41:14
front 1:16 2:4
  55:17
function 20:7
further 78:22

**G**

generates 18:15
gerald 2:8
gerry 6:19 76:19
gideon 61:4 65:12
give 7:9,19 42:20
  42:24 43:8 67:23
  68:1 75:6
given 32:23 34:6
  35:1 76:4 81:5
gjdugan 2:11
glanced 13:8
go 10:13,18 23:24
  25:12 27:4 29:10
  37:12,21 38:6
  52:12 61:16 64:1
goes 60:16 78:7
going 10:22 13:19
  16:1 24:4,6 31:19
  40:15 44:17 47:11
  49:6 52:10,18
  55:18,20,22 58:14
  64:22 76:16,22
  78:9
golkow 1:23,24
good 10:4 54:7,14
  54:22,23 55:5,5
google 51:21
gotcha 13:11
gotten 40:18
graduate 15:7,17
granted 23:7,8
groceries 24:3

grounds 54:7,24
guess 8:12
guessing 8:14

**H**

h 3:9
han 4:3
handing 66:20
happen 8:3,14 37:6
  38:12
happened 23:16
  24:13,19 25:5
  34:13 40:8 41:9
  41:21 49:23
happening 48:8
harder 21:14,14
havent 35:5
head 8:3,3 30:10
  57:17,19
health 4:9 16:3,17
  44:12 52:1 62:19
  62:23 63:2 67:9
  76:15 77:1,9 78:1
  78:4
healthcare 54:6
hear 42:6,10
hearings 49:10
held 1:13 47:12
help 19:23
hes 14:16,16,19
hesitate 7:16
hidden 8:24
highest 71:10
hill 3:14 61:4 65:12
  65:12
hills 61:7
history 3:22 9:16
  16:3,17 29:13,15
  30:5,8
home 14:1 17:7
  19:19 20:24 24:4
hopefully 13:20
hospital 17:13
  20:13,23 59:4
hospitalization
  31:24

hours 10:7
house 19:20
husband 14:14
  17:7
husbands 15:22

**I**

icu 43:5
id 23:11 68:21
identical 62:21
identification 6:3
identified 30:11
identifies 59:16
  60:6
identify 52:19
im 7:8,12 10:8,9
  13:19 16:1 17:14
  18:7 23:22 25:3
  28:9 29:21 33:9
  33:10 35:2 41:13
  47:11 52:10 54:15
  54:24 55:18,20,23
  57:17,21 58:14,22
  65:9 66:18,20
  68:20 71:17 76:16
  76:22 78:9
immediately 18:5
  23:9,10 25:22
improve 67:9
improved 70:6
include 74:24
including 69:4
incorporated 64:4
increased 72:13
independently
  19:13 20:7
index 5:2
indicate 31:15
  36:13
indicates 64:4
indicating 13:7
  59:19
indirectly 36:14
individual 38:11
  47:24
individuals 45:22

influence 9:20
  10:23
information 7:13
  9:7 29:14 37:14
  42:16 44:6,10
  45:5 48:18 62:15
  63:6 67:20,24
  68:18 69:21 77:19
infusion 33:6 36:6
  37:2,22 38:18
  40:6 41:23 42:20
  47:1 48:2 51:15
  66:4 69:10 73:3
  79:9
infusions 31:6,8
  40:13,20 48:4
inhibit 10:9
initial 59:11 64:9
initially 23:8
injuries 22:8 46:16
  61:17
injury 9:16 11:20
  16:11,12 24:14
  70:13
inpatient 31:19,24
  32:6 33:7 37:2
  46:24 48:1 69:10
inquiry 75:14
instructions 7:10
insurance 15:21
  36:22 44:12 52:1
  52:6,13 62:21
interacted 77:18
interaction 47:7
internally 66:10
internet 77:20
interrupted 23:24
intravenous 32:6
  60:8 67:3,7,10
intravenously
  69:23
investigation 74:4
  74:6
investigational
  55:10 60:9 63:4
  63:19 69:7 78:6

investigative 44:14
  51:12 52:9 55:15
  73:7
involve 39:7 50:7
involved 50:12
involving 12:8
isolated 70:14
issue 36:22
iv 32:3 36:6 37:2
  38:18 40:6 41:23
  42:20 48:1,3
  51:15 62:24 66:4
  73:3 78:2 79:8
ive 12:12,13 55:17
  56:4 63:13 64:12
  71:16

**J**

j 2:8
january 1:10
jefferson 16:24
  20:22
job 15:2,4 21:2,5,5
  21:13
john 2:9
journals 74:19,21
jumping 33:9
june 20:11 22:1,7
  23:14

**K**

karen 23:23
keeping 21:14
kennedy 2:9
ketamine 31:5,8,20
  33:6 36:7 37:3,11
  37:22 41:23 42:20
  47:2 48:2 51:16
  53:8 60:8 62:24
  66:4 67:4,8,10
  69:10,16,22 73:3
  74:5,7,16 75:16
  77:10 78:2 79:9
kind 7:5 11:7,17
  18:19,24 20:18
  25:19 26:16 38:24

Debra L. Rubin

42:23 46:9 51:19
knee 70:15
knew 68:22
know 8:10,21 9:16
   10:3 13:24 25:4
   33:17 35:12,12,15
   35:18 36:5 38:8
   45:2,8 46:4 48:11
   48:12 49:16 50:9
   54:10 59:6,7 62:5
   63:20,21 65:5
   71:5,9 72:7 77:14
knowledge 10:1
kristy 1:18 81:13

**L**

l 1:3,12,18 3:5 6:12
   81:7,13
language 69:2
large 13:7 17:19
law 1:14 15:6,13
   54:9
lawsuit 6:21 7:1
   12:23 53:4,5
lawsuits 12:2
lawyer 8:23 9:1,8,9
   12:13 13:6,14,17
   55:3,18 61:19
   73:10
lawyers 11:5 52:23
   82:1
lead 8:23
learn 51:22 52:1
learned 44:11 52:6
   72:23 77:20,21
leave 21:15
leaving 24:5,5
led 29:20 30:2
   35:22
left 15:2 17:22
   23:19 24:2,8
   37:13 39:18 70:13
   70:14
letter 3:13,18 4:3,5
   4:9 49:17 56:12
   56:19,24 57:4

58:3,12,17,18
   59:15 60:3,6 61:4
   61:14,18,20,22
   62:9,12 65:11,13
   74:22
letters 35:18
level 50:5,7,9,12,12
levels 50:3,16 51:6
   66:14
liedtka 1:18 81:13
line 5:6,6,6,9,9,9,13
   5:13,13,16,16,16
   82:2
list 40:11
literally 39:15
literature 78:9
litigation 12:7,10
   12:19,19 44:21
little 7:21
live 14:2
living 19:12
long 11:12 14:11,24
   27:3 32:5 40:14
   71:13,18,21 72:5
look 58:15 59:14
   61:2 65:8,17
   66:17 78:12
looked 30:9
looking 24:15,18
lot 11:21 24:5,6
   25:23

**M**

m 1:17 80:1
machine 39:10
maginnis 2:8
mailing 13:7
maintain 54:5
making 29:17 77:3
management 69:14
   69:16
march 58:19 59:10
   61:1 62:16 76:14
   76:14 78:19
mark 2:4
marked 5:15 6:2

12:14 58:20 76:17
   76:23
married 14:9,12
masters 15:12,13
   15:19
materials 9:14
   12:14
mawr 15:6,8,17
   20:22
mcmc 3:15 65:19
   66:2,11
mean 24:12,13
   52:22
means 74:8 81:20
meant 10:21 68:22
media 1:16 2:5
   14:3
medical 1:7 3:22
   4:1,6 6:24 14:17
   20:15,18 21:15
   23:17 30:4,8
   32:14 36:15 38:14
   60:7 62:22 64:3,8
   66:19 67:1,6,13
   67:17 68:23 69:8
   69:11 74:19,21
   78:8
medically 62:24
   69:6 78:3
medicare 75:9,15
   75:21 76:8 79:6
   79:10
medication 9:18,20
   9:21 10:20 30:14
   30:21 70:22 71:1
medications 10:2
   46:12,13,14 71:24
   72:2
medicine 69:5
meet 13:15 42:13
   44:2
member 3:16
memorandum 3:15
memory 8:9 19:8
   47:11
met 58:1

mezzanotte 1:15
   2:3
miller 76:24
milligrams 71:7,10
minor 25:18
minute 12:17 22:15
   25:9 29:11 33:10
   45:12 52:20 62:11
   64:23 79:5
misplaced 34:16
missed 27:1 34:7
mixed 74:11
moment 7:17
monday 26:15,15
   41:15
month 26:23 27:5
   38:9 40:1
months 21:1 56:15
   72:9,10
morning 9:24
   17:12
mris 26:24
multistep 49:7
multitask 19:9

**N**

n 3:2
name 6:19 23:21
   45:11 61:8 64:13
national 4:1 64:3,8
necessary 8:13 63:1
   69:6 77:11 78:3
necessitated 21:9
neck 16:13
need 8:21 13:24
   19:18,23 22:15
   38:6 49:9
needed 38:18 42:2
   46:23 59:3
needs 19:20
neither 69:14
net 67:9
neurological 4:3
neurologist 45:19
   49:18
neurology 16:24

69:13,15
neuropsychologi...
   39:3
neurosurgeon
   21:16
never 64:12
nodding 8:2
noninvasive 13:20
north 59:22
nos 6:1
notary 1:19 81:14
notes 82:1
notice 1:13
noticed 25:17
notification 3:19
   50:19 64:7,11,14
number 43:13 56:3
   56:11 58:16,16
numbers 42:21,23
   43:9
nurse 41:1,7,10
   42:1

**O**

object 52:11
objections 6:8
obligation 42:13
observation 29:15
observations 29:17
   30:9,19
obtain 15:15 27:6
obviously 30:9
   44:18
occasion 52:24
   53:12
occasions 33:12
   74:7
occurred 10:16
   25:11 45:15 56:9
   72:17 73:16
oclock 9:24
october 27:16
   28:10,13 29:3
   30:23 32:23 34:1
   34:6,7 35:2 36:21
   37:1 38:2

Debra L. Rubin

office 23:19 24:2
33:16 36:21 37:7
37:24 38:2,11,17
39:24 40:5,19
42:7 44:1,22 45:3
57:7 75:18
offices 1:14
official 27:12,15
oh 53:19 57:12
okay 8:6,7,16 9:13
11:15 16:16 18:19
19:5 20:4 22:19
23:1,24 25:8
28:14 32:17 34:18
34:22 35:8 36:19
39:4,17 44:17
46:20 47:10 48:5
50:18 52:18 53:19
56:21 57:2,9,22
58:14 59:8 61:14
62:7 64:1,19
65:17 66:24 75:4
75:9 76:10 77:17
77:23 78:15,21
old 13:21
once 34:5 35:10
opinion 28:21
opportunity 81:7
opposed 46:17 47:1
options 31:21
oral 1:12
order 37:10 55:21
65:10
ordered 55:24
original 51:6 64:5
orthopedic 28:18
28:23
outcome 67:9
outpatient 31:20
47:1
outside 50:13 64:3
64:7,15,24 65:2,4
65:6 72:24

**P**

pace 2:8

page 3:12 5:6,6,6,9
5:9,9,13,13,13,16
5:16,16 62:13
67:4,5,5 78:10,13
78:18 82:2
pain 10:21 25:24
26:6,23 27:14
30:13 31:13 46:11
46:15 48:4 69:13
69:16,17 70:17,22
71:2 72:1 74:8
paper 53:3,4 68:2,5
papers 56:16
paragraph 54:3,17
62:12,13 77:24
78:18
paralysis 18:13
paralyzed 17:21
parking 11:21 24:5
24:6 25:22
part 68:15 69:1
79:16
passed 44:6,9
passing 10:1
pat 61:12
patient 35:17,24
36:1,2,6,12 63:10
75:10 77:16
patients 34:5 35:9
35:13 37:12 62:20
63:8,22 74:9,17
patricia 61:13
pay 54:6,21 75:15
75:23 79:7,8
paying 79:6
payment 76:6
pays 76:8
pelvic 70:17
pending 7:1 12:18
12:23
pennsylvania 1:2
1:16,21 2:5,10 4:8
7:3 62:18 76:15
77:1,8
people 44:21
percent 76:8,9 79:6

79:11,17
percentage 76:5
perform 19:12
performed 51:20
performing 21:13
period 20:20 32:18
59:10
person 30:5 35:15
35:19 37:24 77:17
personal 11:19
ph 1:23
philadelphia 2:10
phone 37:23 39:23
48:5,12,15,19
60:18 61:22 68:6
physically 29:18
33:18
physician 23:19
45:11 70:21
piece 53:3 68:1,4
pieces 53:4
pills 26:23
pinnie 1:15 2:3,4
3:6 10:13 13:9
18:2 22:17,20
24:17,21 25:1
39:11 43:13 52:10
53:2,16,20 57:12
57:16,20,23 59:23
61:23 62:2 67:23
68:7 73:12,20
76:18,21 78:21
79:21
place 37:22
placed 55:17
plaintiff 2:6 7:4
12:4,5,9
plan 54:8 62:23
68:23,24 69:1
78:2
plans 63:2 78:4
played 49:13
please 8:11
point 44:11
pointing 58:22
policy 4:6 15:14

36:16 60:7 63:2
66:19 67:1,6,14
67:17 78:5
portion 68:18
75:16,24
position 46:21
possibility 31:16
possible 51:23
pothole 12:21 25:6
practice 26:22
predominate 74:13
preliminary 7:10
preparation 13:2
13:14
prescribed 26:23
72:2
prescribes 46:11,15
prescribing 70:21
prescription 30:21
70:24
prescriptions 30:18
presence 10:6
33:18
present 13:17
presently 70:16
pretty 41:13 62:8
primarily 18:22
74:21
primary 23:18
28:17
prior 16:2,16,17
30:6 58:2
privileged 9:10
problems 19:9
25:18 30:12
procedure 36:14
44:24
procedures 37:15
74:5
process 32:3,6
36:14 37:11,20
38:6,19 40:6
47:18 48:23 49:3
49:7,13 50:20
51:10,15 66:9
production 5:8

professional 1:19
progress 49:3 70:5
progressing 70:19
proper 29:7 31:24
propose 31:2
protected 9:10
protocol 32:1
provide 46:10
52:14,15 58:5
62:15
provided 7:14 27:7
43:6 45:5 56:5
57:4
providence 59:18
59:22
provider 3:20
provides 69:3
psychiatric 21:19
21:24
psychiatrist 21:17
public 1:20 81:14
publications 74:24
75:1
published 56:16
purchase 24:3
pursuant 1:13
pursued 60:21

**Q**

qualify 22:6
question 5:15 6:9
7:17,18,19 8:11
10:19 20:14 44:12
45:6 47:24 51:11
52:12,20 54:3
60:7 64:6 67:6
73:3 76:11
questioning 76:13
questions 7:9 9:6
10:11,24 11:1,5,8
13:20 16:2 32:14
47:5 55:19 68:15
73:10,22 78:22
quite 55:24
quote 60:7 62:16
62:23 63:4 67:7

Debra L. Rubin

Page 89

69:4,19 78:17,17

**R**

reach 46:3
reached 34:8 45:3
read 12:13 52:24
  53:13 54:1,17
  62:14 68:9 78:1
  81:7
reads 54:4
realize 52:21
rearended 11:11
reason 10:5 34:22
  54:14,22 55:6,13
  63:16,23 72:21
  73:5 79:13
reasons 62:22
recall 17:3 23:13
  24:15,18 28:12,16
  31:8 43:11 47:5
  47:19 48:8,17
  49:6 50:8 59:12
  65:13 77:13
receive 19:4 20:14
  20:19 21:19 22:3
  22:7 23:2 40:4
  42:17 46:6 49:1
  50:18,24 57:5
  60:3 64:11
received 19:1 36:6
  37:23 48:14 58:20
  59:11 62:9 64:14
  65:22
receiving 22:12
  45:10 61:21 64:7
  65:13
recognize 65:21
recollection 72:11
recommendation
  37:8
record 7:18 8:4
  10:14,15 12:13
  25:9,10 45:13,14
  56:7,8 72:15,16
  72:19 73:13,15
  81:4

recovered 16:14
recovery 17:21
  18:11
recuperated 20:24
refer 56:3
reference 35:16
  56:16 61:10 62:11
  73:23 74:23 76:13
  77:3,24 78:11
referred 16:6 26:14
refers 67:3
reflex 28:1
refusal 54:6
refused 54:21
regardless 71:19
region 70:17
regional 27:14
  69:17
rehabilitation
  20:23
relief 10:22 27:7
remained 70:6
remember 12:2
  26:17 28:2,22
  30:3,15,24 31:4
  32:15,20,21 33:21
  34:15 36:17,23
  38:8,10,21 39:8
  39:20 42:24 47:14
  47:18,20 49:10,14
  52:5 53:17,18,21
  53:23 56:18,23
  57:6 61:21 63:12
  64:6 67:20 68:4,5
  74:20 77:12
repaired 17:20,24
report 30:1 65:23
reporter 1:19 8:4
  56:5 81:14,22
represent 6:20
represented 7:12
representing 2:6,11
reproduction 81:20
request 5:8 47:8
  48:10 50:15 65:14
requested 7:6 57:8

81:6
required 41:13
  75:23
reschedule 34:19
  34:23
rescheduled 34:11
  44:3
rescheduling 42:7
  42:10
research 15:18
  51:14,20,24 58:9
  69:20 74:1,12
  77:20,21
reserved 6:10
resource 35:22
respond 10:24
response 61:21
  68:16
responses 8:5
responsibilities
  44:2
responsibility
  42:18
responsible 12:20
result 15:22 16:10
  17:10 18:20 19:1
  19:2 20:1 21:20
  22:8 30:18 31:3
  44:19 47:8 49:21
  51:1 70:3
results 29:13
returned 21:2,4
review 3:17,21,23
  13:1,5 62:17,22
  64:3 65:2
reviewed 9:13
reviewer 64:15
reviewers 65:4 73:1
reviewing 66:2
reviews 4:1 64:4,8
right 9:1 12:21
  13:1 21:6 31:1
  45:9 58:19,22
  60:22 62:1 70:19
  72:3
road 59:18

robert 27:20
room 17:21 26:13
  30:7
rsd 27:11 28:3,5
  29:7 74:9
rubin 1:3,13 3:5,13
  3:15 4:5 6:12
  81:7
ruptured 16:19
  17:24 18:9
ruptures 18:12
  46:22

**S**

s 2:4 3:9
sake 7:22
saw 24:22 25:6
  26:14 28:17 30:14
  30:22 57:23
saying 10:8 74:16
says 54:23
schedule 36:24
  40:9
scheduled 35:5
scheduling 40:20
  41:22
school 15:7,17
schwartzman
  27:21 28:7,10,15
  29:2,23 30:6,15
  30:17,23 31:2
  32:13,19 33:5,13
  33:16 34:5,21
  35:8,14,19 36:10
  36:20,24 42:17
  45:3,23 59:5
  61:15
schwartzmans
  38:17 40:5,19
  44:1,22 46:20
  62:20 63:8,10
  75:18
scoles 23:23,23
sealing 6:6
second 10:14 17:23
  18:1 28:21 39:5

50:4,7,9,12,14
  65:6 73:14 78:14
section 58:22
security 22:4,12
  23:2,5
see 24:10 29:1 46:2
  59:17 79:10
seeing 38:9 68:4
seeking 47:16 48:1
seelaus 1:15 2:3
seen 33:12 34:20
  35:5,13,19 56:23
  57:3 64:12 66:19
  66:21 67:13
sees 34:5 35:9
selfexplanatory
  61:20
send 53:14
sent 13:6 56:18
  59:24
sentence 54:2 61:11
  62:14
sentences 78:13
separately 8:20
  43:7
september 32:22
series 7:8
serious 9:15 16:4
  16:11
seriousness 25:19
service 15:13
services 43:6
set 38:16
shake 57:16,19,24
shaking 8:3
shocked 68:21
shopping 24:7
shortly 48:13
shortterm 19:8
shoulder 16:13
show 76:16,22 78:9
shown 67:8
shunt 16:21 31:23
siblings 14:6
side 17:22 18:16
  70:19

sign 81:7
signed 76:24
significance 18:8
significant 31:13
    40:10 70:17 73:24
signing 6:6
sir 7:24 9:4
sisters 35:21
six 20:6
sixyear 20:19
smoothly 59:2
social 15:7,12,13,14
    15:18,18 22:3,12
    23:2,5
societies 69:22
society 69:9
soft 16:12 25:18
soon 21:12
sorry 17:14 23:22
    28:9 29:21 54:15
    57:13,17,21
source 57:6
speak 8:19,22
speaking 13:13
    41:11 61:9 67:21
    68:5
spears 45:18,19,21
    46:2,7 49:19,22
    56:12,18 57:7,10
    58:2 70:22
specialist 26:16,18
    27:4 28:18,20,23
specialty 69:9
specific 47:13
    71:23
specifically 53:11
    54:23 67:3,16
    77:19
spite 10:20 19:13
    20:8
spoke 50:4
spoken 12:12
spontaneous 17:5
staff 30:4 37:24
    42:18 43:2,24
stamped 58:17,19

61:1
standard 65:15
start 22:12
started 30:10 53:3
    53:5
stated 63:1 78:3
statement 54:13
    55:2 74:2 78:7
states 1:1 7:2
status 42:11
stay 65:9
stenographer 7:18
step 50:19 51:9
stipulated 6:4
stipulations 5:12
stop 8:18 24:11,23
stopped 24:7
strapped 39:9
street 1:16 2:4
    39:19
strength 10:2 71:11
    71:14,20 72:12
strong 9:17 10:3,21
subject 12:7,18
    44:20
submitted 61:18
    65:6
subsequent 17:17
    33:19
substance 34:2
substantial 18:10
successful 74:8
suffer 18:20
suffered 9:15 11:20
    14:22 16:5 17:2
    19:2 20:2,11 22:9
    24:13 46:16 70:4
suggest 47:12
suite 2:9
supervision 81:22
supplied 75:5,7
supply 69:5
support 5:2
sure 8:5 25:3 26:2
    35:3 41:13 55:24
    62:8 71:17

surgeries 20:13
surgery 16:17,22
    17:9,18 18:11
    20:13 28:20 46:23
survived 16:19
swelled 25:23
sworn 6:13 81:4
sympathetic 28:1
syndrome 27:14
    69:18

**T**

t 3:9
tabbed 56:4
take 8:17,20,22
    22:16 37:22 66:17
    71:8,12 78:12
taken 1:13 10:4
    11:22 17:20
talk 9:1 12:16
    57:15
talked 33:6 79:5
talking 63:7
target 24:3,6
taught 15:6
technician 14:19
technologies 1:23
telephonically
    33:20
tell 8:11,18 9:7
    13:21 15:9 23:12
    25:16 26:9 29:11
    32:8 33:23 37:18
    40:8,14,22 45:17
    49:14 51:19 54:11
    55:1
terms 11:19 12:15
    16:17 18:12 19:11
    26:11 29:18 41:22
    59:2 70:2
test 29:12 39:6
    41:12,16,19
testified 6:14
testimony 3:5 81:5
testing 59:2
tests 38:13,16,22,24

39:22 40:3
thank 43:15
thats 7:1 9:10 11:2
    11:24 22:19 26:5
    27:13,20 33:3
    35:7 41:20 46:19
    49:19,20 53:5
    56:1 59:17 60:23
    61:12 65:20 66:1
    66:16 73:9 76:24
    79:18,19,21
therapies 19:4
therapy 18:24
theres 56:6
theyre 10:4 55:24
    72:1
thigh 70:16,20
things 52:23
think 9:18 27:13
    28:9 32:16 35:16
    37:13 46:2 61:19
thinking 57:21
third 39:20 50:17
    62:13 77:24
thomas 16:24 20:22
thought 27:19
    57:23 63:18
three 10:7 38:13,13
    78:13
tilt 39:6
tilted 39:15
time 6:10 8:18 9:2
    20:4 22:16 23:7
    24:22 25:21 27:9
    30:22 32:18 33:14
    33:17 38:1 39:23
    41:15,19 42:3
    44:11 58:17,18
    59:10 60:12 61:1
    71:3 79:20
times 23:5
tissue 16:12 25:18
today 9:20 35:13
    66:21
todays 13:2
told 40:11,16 42:4

44:15 63:15,20,21
    67:12,14 68:8
totally 7:12
transcript 7:15
    81:8,19
traveled 70:15,15
treatment 26:12
    27:3,7 31:2,20
    32:1 37:9 40:11
    41:2 42:14 43:1
    43:18,22 44:13,16
    45:6,10 46:7,9
    47:9,17,22 48:4
    50:1 51:11 52:2,7
    52:14 54:22 55:8
    55:13 60:10,13
    66:5 69:5,17,18
    69:23 73:2,6
    75:16,24 77:10
treatments 51:23
trial 6:10
trouble 19:10
true 81:4
try 34:10 47:17
    55:20
trying 33:10 65:9
two 9:23 16:19
    17:12 18:9 21:1
    26:22,24 28:17
    35:21 50:3,16
    51:6 58:17 71:23
    72:1

**U**

ultimate 75:24
ultimately 24:22
unavailable 41:22
unconscious 17:8
undergo 46:23
understand 7:23
    9:3,11,14 10:4,8
    10:24 12:16,17
    15:21 33:2 54:12
understanding
    37:5,13 44:19
    49:12,23 55:1,7

Debra L. Rubin

59:1,9 65:1 66:7 75:22 76:4,7 77:7
**understood** 10:19 15:20
**uninterrupted** 26:7
**united** 1:1 7:2
**university** 27:21
**unsafe** 69:7
**upheld** 51:5 64:9 65:4 66:3
**upholding** 64:5,16
**upset** 34:4
**use** 62:24 67:11 69:10 78:2
**utilization** 62:17

### V

**v** 1:4
**vaguely** 17:4
**verbal** 8:5,6
**verbally** 67:24
**vicodin** 10:6 71:4,9 71:11,22
**vicodins** 9:23
**violation** 54:8
**visit** 36:21 37:1,7 38:3

### W

**wait** 32:17 40:15
**waiting** 40:11 42:9
**waived** 6:7
**walk** 47:17
**want** 7:9 8:17 52:20 54:1 56:2 62:11,14 68:14 78:11
**wanted** 28:20,21 73:21
**way** 10:7,9,22 21:12 23:21 33:11 55:24 70:7
**ways** 58:18
**webmd** 51:21
**week** 20:24 25:5,7
**weekend** 13:8 24:4

**went** 20:22 21:20 22:17,20 24:2,8 25:24 30:11 39:19
**west** 1:15 2:4
**weve** 7:5
**whats** 23:21 49:22 68:19 76:16,22
**wheel** 24:9
**withdraw** 56:22
**witness** 5:5 18:4 22:23 24:20,24 25:3 39:12 43:15 52:13 53:7,14,19 53:22 57:18 58:1 60:1 62:4 68:3,10 79:23 81:4,5,7
**woman** 61:10 63:9
**wonderful** 35:21
**wondering** 66:18
**wont** 9:6 55:22
**wordforword** 78:17
**words** 23:12
**work** 15:7,12,18 21:12 22:21 31:16 42:2 49:4 74:17
**worked** 31:14
**working** 21:14
**works** 74:16
**write** 58:11
**writing** 58:2 60:12 60:18 61:22
**written** 49:17,17 50:19 59:16

### X

**x** 3:2,9
**xray** 27:2

### Y

**yeah** 17:6 62:2
**year** 34:6 35:10
**years** 11:14 14:13 16:9 20:6 40:17 56:17 72:8
**yep** 13:11

**youd** 61:2 65:8
**youre** 7:4,11 9:19 44:22 47:12 63:7
**youve** 7:4 9:15 10:18,19 20:2 57:3 66:18 68:24 72:22

### Z

### 0

**000** 43:2,9,14,16,19
**01** 80:1
**05** 21:21
**06** 22:21,22

### 1

**1** 3:13 6:1 55:22,23 61:3
**10** 4:5 71:9
**10th** 58:24 59:5
**11** 4:6,9 21:21 28:13 55:23 66:18 66:24 80:1
**12** 3:14,15 4:4,5,8 6:2 55:22 76:18 76:20,23 78:11
**123719rk** 1:7
**1295** 59:20
**13** 81:14
**14** 35:2
**1400** 2:9
**17** 22:7
**17th** 20:11 22:1 23:14
**18** 14:13
**180** 60:19
**1880** 2:9
**18th** 58:20
**19063** 1:16 2:5
**19103** 2:10

### 2

**2** 3:15 4:4,9
**20** 76:9 79:8,17
**2005** 16:20 17:14 20:5,10

**2006** 15:2 21:5,10
**2011** 20:6,10 22:1,8 23:14 27:16 28:10 29:3 30:23 32:22 34:6 36:21 37:1 38:2 62:17 76:14 78:19
**2012** 34:1,7 41:6 56:13 58:19,21,24 59:5,10 61:1,5 64:3,10 65:11 66:8 74:23 81:14
**2013** 1:10 35:2
**2014** 32:24
**21** 3:15 4:4
**215** 2:10
**218** 1:15 2:4
**21st** 56:13
**22** 3:14 61:4
**22nd** 74:23
**23** 1:10 4:5
**25** 11:14 16:9
**26** 13:10 54:4
**27** 64:10
**27th** 64:2
**28th** 58:19 61:1
**2nd** 78:19

### 3

**3** 3:16 4:9 65:9
**30th** 65:11 66:8
**3377** 1:23
**370** 1:23

### 4

**4** 3:14,19 4:5 5:14 65:18 66:1 71:7 78:10,13,18,18
**48** 1:17

### 5

**5** 3:15,20 43:2,9,14 58:16,16 67:5
**50** 43:16,19
**56** 13:23
**5633500** 2:10
**5654055** 2:5

**5672** 1:23
**591** 1:23

### 6

**6** 3:6,13,15,16,19 3:20,22,22,23 4:1 4:3,5,6,8 5:14
**610** 2:5

### 7

**7** 3:23 9:24
**73** 3:6
**79** 3:6

### 8

**8** 4:1 64:2
**80** 76:8 79:6,7,11
**877** 1:23

### 9

**9** 1:17 4:3 56:3,11
**917** 1:23