# PLAINTIFF'S EXHIBIT 6

COPY

# In The Matter Of:

*Rubin vs.*
*Amerihealth Administrators, Inc., et al.*

*Dr. Gideon Hill*
*February 8, 2013*

*Media Court Reporting*
*216 West Front Street*
*Media, PA 19063*
*610.566.0805 fax 610.566.0318*
*www.mediacourtreporting.com*

Original File 020813hill_1.TXT

Min-U-Script®

Rubin vs.  Case 2:12-cv-03719-RK   Document 18-7   Filed 04/16/13   Page 3 of 42
Amerihealth Administrators, Inc., et al.                                    Dr. Gideon Hill
                                                                           February 8, 2013

Page 1

IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

— — —

DEBRA RUBIN          : No. 12-3719-RK
:
vs.          :
:
AMERIHEALTH          :
ADMINISTRATORS, INC.   :
and          :
CROZER CHESTER MEDICAL :
CENTER          :

— — —

Oral deposition of DR. GIDEON HILL, taken on behalf of the Plaintiff, in the Law Offices of Dugan, Brinkmann, Maginnis and Pace, 1880 John F. Kennedy Boulevard, Philadelphia, Pennsylvania, on Friday, February 8, 2013 commencing at or about 11:00 a.m., before Maureen R. Gallagher, Registered Professional Reporter and Notary Public.

— — —

MEDIA COURT REPORTING
216 West Front Street
Media, Pennsylvania 19063
610.566.0805   (f) 610.566.0318
www.mediacourtreporting.com

Page 2

APPEARANCES:

BERNARD, MEZZANOTTE, PINNIE and SEELAUS, LLP
BY: MARK S. PINNIE, ESQUIRE
The Williamson House
218 West Front Street
P.O. Box 289
Media, Pennsylvania 19063
(610) 565-4055
Counsel for Plaintiff

DUGAN, BRINKMANN, MAGINNIS AND PACE
BY: GERALD J. DUGAN, ESQUIRE
1880 John F. Kennedy Boulevard
Suite 1400
Philadelphia, Pennsylvania 19103
(215) 563-3500
Counsel for Defendant

Page 3

(It is stipulated and agreed by and between counsel that the reading, signing, sealing, filing and certification of the within deposition be waived; and that all objections, except as to the form of the question, be reserved until the time of trial.)

— — —

DR. GIDEON HILL, having been duly sworn was examined and testified as follows:

COURT REPORTER: Usual stipulations?

MR. DUGAN: Yes. What that means is that I can't object to questions because they're not relevant. It's just I can only object if the question has an improper form, so relevancy is not really an issue in a deposition.

BY MR. PINNIE:

Q. Dr. Hill, good morning. I introduced myself previously. My name is Mark Pinnie and I represent Debra Rubin in a suit that she has brought against Amerihealth. I'm going to be asking you a series of questions today. I'm going to assume that

Page 4

you've had your deposition taken before; is that right?

A. Yes.

Q. So the usual things about waiting for me to finish my question and not saying uh-huh or uh-unh you probably know already. If at any time you don't understand my question, ask me, and hopefully I'll be able to rephrase it and make it more understandable. You know you have the right to take a break whenever you want. Can I ask you, by whom are you employed today?

A. I'm an employee of Amerihealth Administrators, which is a subsidiary of Independence Blue Cross.

Q. And your attorney has handed me a curriculum vitae of you. Is that something that you had supplied him?

A. Yes.

Q. And I just want to get the status of Amerihealth and what Amerihealth is. So why don't you explain to me. I understand there's some interaction between Amerihealth and IBC. Could you give me an explanation of that?

A. Amerihealth Administrators is a third party administrator, and what that means is for groups

Rubin vs. Case 2:12-cv-03719-RK    Document 18-7    Filed 04/16/13    Page 4 of 42
Amerihealth Administrators, Inc., et al.

Dr. Gideon Hill
February 8, 2013

Page 5

that are self-insured, rather than purchasing an insurance plan from our parent company, they choose to hold the risk themselves. And we, as a third party, administrator the health plan for them so that they don't -- if you're a self-insured plan you don't -- and you happen to sell copiers, you don't want to have a claims office paying claims. So you contract with a third party administrator to provide all of the services that an insurance plan would provide, if you were fully insured.

Q. And so you would -- and in this case Ms. Rubin's husband is employed at Crozer Chester. Amerihealth would administer all of the health related issues associated with their health plan, from folks at Crozer; is that basically -- would that basically be it?

A. We provide claims payment services, customer service, and the -- we provide patient care management services, which includes our utilization review and case management.

Q. So in a situation such as this, where someone has made an application for a certain type of treatment, that review process of whether that treatment is appropriate under your plan, would go

Page 6

through Amerihealth; is that correct?

A. Yes.

Q. And I want to flip through here, and one of the documents that Mr. Dugan was kind enough to provide me with, was the actual plan.

MR. PINNIE: Let's go off the record for a second.

(Whereupon there was a short off the record discussion.)

MR. PINNIE: I'm not going to mark this document for any particular reason. Mr. Dugan, in rule 26F disclosures, put numbers at the bottom of them, and the beginning number of this particular document is 151.

BY MR. PINNIE:

Q. And I'm just going to show it to you in a moment and ask you whether you might recognize this as a Crozer Keystone Medical Benefits Plan?

MR. DUGAN: For the record, there's bate stamp numbers.

THE WITNESS: This appears to be the plan for the group.

BY MR. PINNIE:

Q. And this is essentially what protocols exist

Page 7

between Amerihealth and folks that are covered under the Crozer Keystone Health System; is that right?

A. I'm sorry?

Q. This is basically -- the document, that outlines when a person from Crozer Keystone wants medical benefits, what Amerihealth standards apply?

A. Well, this is the plan document, and that is the document that is given to the members and it describes the limitations and the coverage of their health plan.

Q. I should step back for just a moment and go briefly through your CV which we may attach in the end. But it looks like, from 2005 to the present, you have acted as the Vice-President of Managed Care Services and as the Regional Medical Director for Amerihealth; is that correct?

A. Yes.

Q. And prior to that, between 1996 and 2005, you acted as the Senior Medical Director for Independence Blue Cross; is that right?

A. Yes.

Q. Are your duties with Amerihealth different than the duties that you had with IBC?

Page 8

A. With respect to my patient care management role, yes. When I was with Independence Blue Cross I was in charge of the utilization review program and the Medical Directors that were employed to do the program. At Amerihealth Administrators I'm in charge of the entire medical management, Patient Care Management Department.

Q. And I'm doing this a little bit backwards, but it looks like the last time that you actively practiced medicine was back in 1994 through 1996 with the Health Spring Medical Group?

A. That is correct.

Q. And what was your -- what did you primarily -- what practice -- what did your practice primarily consist of?

A. I am board certified in family medicine. So I saw patients of all ages, pediatrics, women's health and adult medicine.

Q. And before that, in 1992 to 1994, with Greater Atlantic Health Service, what kind of medicine did you practice?

A. It is the same.

Q. So, fundamentally, between '92 and '96 you acted as a family practitioner?

Rubin vs.
Amerihealth Administrators, Inc., et al.
Case 2:12-cv-03719-RK    Document 18-7    Filed 04/16/13    Page 5 of 42
Dr. Gideon Hill
February 8, 2013

Page 9

A.  Well, before that as well in the Air Force for four years.

Q.  Okay.  So between '88 and '92 in Remstein --

A.  Yes.

Q.  -- you performed.  And you finished medical school in what year?

A.  1983.

Q.  And that was from Jefferson.  And does your CV accurately reflect your medical background, correct?

A.  Yes.

Q.  Getting back to the interaction between IBC and Amerihealth, at some point in this process standards from IBC were utilized in assessing Ms. Rubin's claims.  Is that something that typically occurs with Amerihealth?  In other words, does Amerihealth adhere to the standards of IBC?

A.  Yes.

Q.  And is that -- are those, as best you can recall, are those standards outlined in the medical benefits plan document that I have showed you?

A.  The plan document references the medical management program that we provide, and describes, in general terms, how it works.  The medical

Page 10

policy, individual medical policy, is not contained in a planned document.  That is available on the internet to members and for the use of the review staff.

Q.  So this is fundamental, this is described as a summary plan description, correct?

A.  Yes.

Q.  I want to get to what your role was in this particular level of appeals.  And I want to ask you whether or not, in your time with Independence Blue Cross, that you were -- were you involved in appeals, much as this, where a person had asked for treatment and it was rejected and they were asking that that be appealed?

A.  Absolutely, yes.

Q.  Would you say, I hate to try to get people to quantify it, is there any way you can say whether or not that was a regular occurrence at the time you worked at IBC or is it something that -- or could you give us a percentage of the amount of your time that you were involved with appeal related issues?

A.  Well, I think it would be safe to say that I have looked at thousands of appeals, over my 17

Page 11

years with the company.

Q.  And that, and again, I'm just covering between '96 and 2005.  Between 2005 and the present have you similarly reviewed significant numbers of appeals in working with Amerihealth?

A.  I would say it's probably, of the thousands, probably half during the first nine years and half during the subsequent.  So a lot, yes.

Q.  In this particular appeal did you exercise any independent medical -- did you make any independent medical decisions about what occurred and transpired during the course of this appeal?

A.  Well, let me just, let's get the terminology correct.  The first step would be a review where an initial request came through.  And then we would have two levels of appeal, when the first request wasn't done.  So we had a review and two appeals.

Q.  Let's --

A.  I was not involved, I made no decisions on this case at any of those levels.

Q.  Okay.

MR. DUGAN: Just so we know, he's a corporate designee witness.

MR. PINNIE: Yes, I recognize that.

Page 12

BY MR. PINNIE:

Q.  And I just wanted to -- I kind of perceived that from the documentation, that you really weren't exercising any type of independent medical -- making any independent medical decisions.  I just wanted to clarify that.  And it sounds like you have great familiarity with the appeals process, but let's go through the specifics of Ms. Rubin's, and have you take a look at those.

I have shown your attorney a document that we'll get marked as Hill-1.

(Whereupon the court reporter marked the document as Hill-1 for identification purposes.)

BY MR. PINNIE:

Q.  And Dr. Hill, I have given you a document that we have marked as Hill-1, and that's a number of pages that are bate stamped 10 through 20.  And as I understand it, this represents the chronology of what transpired with regard to Ms. Rubin's claim, in short form, what would appear on a computer screen.  Is that your understanding of what this represents?

A.  Yes.

Page 13

Q. Do you know, does one person, would one person input all of the data that we find in here or does it depend on who is getting what, as far as how things are imputed?

A. What you see here, under the phrase case comments, on your page number 10, are a series of entries and they are done by different people who are participating in the review process with different tasks. And on the top line of each entry you will actually see a date, time stamp and then initials of the person who is making the entry.

Q. So for instance, the February 10th one, it has Shapri Bryan. Was she the person who made the entry?

A. Yes. We, in addition to the initials, which are computer generated, the individual is asked to also put their full name, just for convenience sake, along with their telephone numbers.

Q. So when we look at the second page that's bate stamped number 11, towards the bottom, there's an entry, it looks like from A. Ramos, M.D.; is that correct?

A. Yes.

Q. And does that entry represent the first time

Page 14

that Amerihealth made a decision with regard to the application by Ms. Rubin for this ketamine treatment?

A. Yes. What happened here, if I can just take you back a little bit. The note by Shapri Bryan, that we spoke of, was with the initial phone call that came in requesting a five day infusion. And that was then turned over to Susan McKenna, who is one of our nurses.

And she gathered additional clinical information, and determined that it needed to be referred to a Medical Director. Then you saw, the next note is the one that you mentioned by A. Ramos, Andreas Ramos, who is a full-time employee of Amerihealth. And there you see his evaluation of the request and the decision that he made, along with a clinical rationale.

Q. And to kind of put what he indicated in a short form, that it was denied based on Dr. Ramos' view that this was an investigational or an experimental type treatment; is that correct?

A. Yes.

Q. The language that Dr. Ramos also gives a reason and a clinical rationale, and it appears to

Page 15

me that the language contained there is similar, if not identical, to language that is contained in a medical policy bulletin from IBC. And maybe we can stop and I can show you that.

MR. DUGAN: Sure. I can put a copy in front of the doctor.

MR. PINNIE: That's good.

MR. DUGAN: Here's the policy and that was marked as exhibit 11 at the deposition of Ms. Rubin.

MR. PINNIE: Exactly right.

BY MR. PINNIE:

Q. So I'm going to ask you -- first of all, let me ask you in general about the medical policy bulletins. Can you tell by looking at that document when this medical policy bulletin was in effect?

A. Yes.

Q. Okay.

A. If you look at the last page and this doesn't appear to have your bates numbering, but at the top it says page 16 of 16. It says virgin effective date, and that would be January 4 of 2012. Often these policies are reviewed over -- and updated on

Page 16

-- well, I should say they are reviewed, and if necessary, updated on an annual basis.

MR. PINNIE: Okay. Can we go off the record?

(Whereupon there was a short off the record discussion.)

BY MR. PINNIE:

Q. At the very first page of the document, where it says complex regional pain syndrome, in the third paragraph there's an indication that this medical policy document describes the status, medical technology at the time the document was developed, since that time new technology may have emerged or new medical literature may have been published. This medical policy bulletin will be reviewed regularly and be updated as scientific and medical literature becomes available. And there's another two sentence.

But does -- is it your understanding that this medical policy bulletin, with regard to CRPS is an evolving one, where as new literature and information becomes available that what follows from it may be changed?

A. Yes.

Page 17

Q. In your experience have you seen medical policy bulletin information changed as new information becomes available?

A. Absolutely, many times.

Q. And we have described that this particular document was updated as of 1/4/2012. Do you have an understanding of whether or not the standards for CRPS have changed under the medical policy bulletin from Amerihealth or IBC? Has this document changed since January 4 of 2012?

A. Not to my knowledge.

Q. Do you know who does the monitoring of the medical technology information that comes out with, specifically with regard to CRPS, who does that?

A. There is a -- Independence Blue Cross has a medical policy department. I don't know the exact size, but it's a considerable number of people, who are engaged in the research and development of these policies.

Q. So, going back to the chronology, we talked about Dr. Ramos doing a first level review, and according to the protocols of Amerihealth, what would be the next step if someone wished to challenge that first review?

Page 18

A. Any time a denial is issued the first opportunity is what we refer to as a peer-to-peer discussion. And that would give the requesting physician provider an opportunity to have a phone conversation with the Medical Director who made the decision.

That is something that is voluntary, it's offered as a part of our routine process. And the Medical Director at that time, if the information is given, clarifies the request, and makes it apparent that the criteria are met, then an overturn can occur, it will be approved and that would be the end of the process.

If there is a -- if after the peer-to-peer occurs, if it's upheld the member and/or the provider are notified of the possibility for an appeal.

Q. And in these circumstances do you have a -- first of all, I should ask you this. Before you came to the deposition today did you have an opportunity to review the file, namely the information that Mr. Dugan had given me with regard to Ms. Rubin's claim?

A. Yes.

Page 19

Q. And was some of that documentation these computer notes?

A. Well, I should say, I don't know exactly what Mr. Dugan, you know, has entirely in all of his records. What I did was, I looked at our medical management system, which contains the notes that we're referring here, to the bates numbering 11 through 20. And I also reviewed our policies and just, in general, got myself up to date on the technology and the science.

Q. Did you have an understanding on whether or not there was a peer-to-peer discussion between the folks from Amerihealth and someone from Dr. Schwartzman's office? I'm looking at the bate stamp number 12 --

MR. DUGAN: It starts on page 11, where CMC placed a call to Schwartzman's office, right here. It's on the second page of this exhibit. CMC placed a call to Dr. Schwartzman.

THE WITNESS: What we see there on page 11, what you just referenced, Mr. Dugan, is the preliminary before the first review, which is at the bottom of that page. Dr.

Page 20

Ramos entered that. So after that I would look to see if we have a peer-to-peer. And I don't see any documentation that there was one. I don't believe that there was one.

BY MR. PINNIE:

Q. In looking at it, it looks like there was maybe contact with Dr. Schwartzman's nurse. I couldn't find anything that said that there was an actual discussion.

A. In addition to the letters that we send out notifying the member or the provider of the denial, we also make a phone call the day before the close of business letting them know that their request was not approved. And that's when the peer-to-peer is offered. It does not appear that Dr. Schwartzman's office took advantage of that opportunity.

Q. And as best as I can tell, while there was some dialogue between Ms. Rubin and Amerihealth, it appears to me that, and this is bate stamp page 14, that there was an actual, I'm going to call it a first level, I guess it's not a first level denial. Would it be called a first level appeal rejection that happened on March 28th?

Page 21

A. Yes. Actually let me take you back to -- on page 12, February 13th, you can see there is a note there with the initial PAD, Patty DeLucia is the appeals nurse that handled this case. So she began the comments discussion with the member at that point explaining how the appeals process works. And there was then, what -- we referenced page 14?

Q. Page 14, yes, at the top, it indicates that E/I denial upheld by Gideon Hill?

A. Yes, right.

Q. And I want to -- there's, in more extensive fashion, there is a, from previous exhibit 5, there is a provider, a peer review determination. I might have Mr. Dugan show you.

MR. DUGAN: This is exhibit 5 from Ms. Rubin's deposition.

MR. PINNIE: Go off the record for a second.

(Whereupon there was a short off the record discussion.)

BY MR. PINNIE:

Q. And Dr. Hill, we were taking a look at exhibit 5, that is titled Provider Peer Review Determination, and we're thinking that the second

Page 22

page will have your signature on it. But let's just go through it a little bit and I just want to ask you a few questions.

A. May I just jump in here?

Q. Sure.

A. I would like to mention that I actually made a mistake earlier. I had said I had not had any prior decision-making with this case, and as I said, there are thousands of appeals. Actually in looking here, I do see that I did the first level internal review on this case. So I need to correct myself. I was involved with this case.

Q. And that's okay. And so after Dr. Ramos looked at it you looked at it, we'll say independently, but you took a look at what Dr. Ramos did and agreed with what he said?

A. Yes. After we got the appeal where it includes additional documentation?

Q. Yes.

A. It invariably does. I then sat down, and took another look at it, and at that time you can see my note, I did uphold that.

Q. And is that what is reflected in the March 28th, letter or was that earlier that you did that?

Page 23

A. Well, my review was done on March 26th, and you can see my note there on bates page 13, uphold same clinical rationale, and then the letter that you're referencing --

Q. The date is the 28th?

A. Yes, March 28th, yes, there it is. That would be -- that was -- this is a letter that was generated as a result of my appeal review.

Q. That's kind of what I was getting at initially. In agreeing with what Dr. Ramos said, were you exercising some level of independent -- making some type of medical assessment of this situation in agreeing with what Dr. Ramos said?

A. Maybe I can explain how the appeal process works. Dr. Ramos does his review and it is done, and the decision is made. Usually a couple of days to, it can be even many months later, a request will come through.

The appeals nurse handles it and then they present the entire case to me. And my process, at that time, is to look at the case as if it's the first time it's being looked at. And I go through the appeal documents, the medical records that have been sent in for the appeal and look at

Page 24

the policy again. And really try to do an objective reconsideration to assure that we have not, you know, missed something and inadvertently disapproved something -- not approved something that we should have approved.

Q. Did you have, prior to Ms. Rubin's appeal, any experience in looking at claims dealing with intravenous ketamine infusion?

A. Over the years I have seen many of these cases, yes.

Q. Did you see them back in your IBC time as well?

A. Yes.

Q. If you had to say how many requests for IV ketamine you've dealt with, is there any range you could give me, more than five?

A. More than five, yes. I would probably say I have looked at this between 30 and 50 times.

Q. In those 30 to 50 times, have you ever, at your level of review, have you ever approved, and I'm just -- intravenous ketamine infusion therapy on behalf of Amerihealth or IBC?

A. I think the question you're asking me is have I ever approved intravenous ketamine for chronic

Page 25

regional pain syndrome?

Q. Yes.

A. The answer to that is, no, I have not.

Q. And outside the IV ketamine, have you ever approved ketamine treatment at all for CRPS?

A. We don't -- no.

Q. Going back to the document of March 28th, when I look at the second paragraph. It gives the rationale as to why this would be considered experimental and investigative. If I can paraphrase or, I believe it contains the rationale. And it gives an indication that the request is being excluded based on medical policy guidelines, which include the safety and efficacy of these services has not been established in the medical community.

Is that something that you took from what Dr. Ramos did or was that something that you determined from your own independent investigation?

A. Well, I went through the independent review process that I described, where I take a new fresh look at everything. And as you can see in my note that I referenced earlier, where I wrote uphold and the same clinical rationale, that is an internal

Page 26

process that I used to trigger a letter that will have the same clinical rationale that was previously sent into the provider.

Q. Okay. And then when we go down to the clinical rationale component of this, is that utilizing the same clinical rationale that you believe was applied by Dr. Ramos to the denial?

A. I'm not sure I understand what you're getting at.

Q. Sure. I thought you had just testified that you were confirming the clinical rationale that was made based on Dr. Ramos' denial. Is that right or wrong?

A. What I was trying to say was I wanted to -- I was indicating in my note that the appeal letter that would be sent out should have the exact same clinical rationale, which means that I felt that Dr. Ramos' decision was correct initially.

Q. And then in, we'll call it your clinical rationale, but in the clinical rationale contained in the March 28th letter, there is an indication that the intravenous ketamine is considered E/I, if we can shorthand that for experimental/investigational, and it also indicates

Page 27

that a search of the medical literature produced no RCTs involving the use of intravenous ketamine in CRPS. And why don't you, for the record, tell us what an RCT is?

A. That would be a randomized clinical trial.

Q. And if you were going to do a layman's description of a randomized clinical trial, it would be?

A. That's a standard scientific process where you divide a group of people who are under -- who are being tested, and you divide them into two groups, randomly. And one group knows -- one group will receive the treatment and the other will receive what we call a placebo.

So in this instance, it would be one group would receive the intravenous ketamine and the other group would receive an infusion of say normal saline solution and nobody would know which was getting. And then that -- you would analyze the affect of the drug versus the reported affect of the placebo.

Q. And in authoring the letter did you make an independent search of the medical literature that led you to that conclusion, that there were no RCTs

Page 28

involving intravenous ketamine?

A. No.

Q. Who did that?

A. That's what the medical policy department is for. They -- we centralize the research process to ensure accuracy and consistency.

Q. And so with -- and would that be what would be reflected in the medical policy bulletin?

A. Yes.

Q. And just finalizing what was contained in that paragraph, there's an indication that existing studies are poor quality, and intravenous ketamine has not been shown to improve med health outcome and finally the intravenous ketamine has not been approved by the FDA.

That is all language that is contained in the medical policy bulletin, correct?

A. Yes.

Q. So, getting -- once again, getting back to whether or not you exercised any independent medical judgment, you were fundamentally using what was contained in the IBC, you were more an administrative applicator of the IBC policy when you sent this letter out, correct?

Page 29

MR. DUGAN: Objection, to the form.

BY MR. PINNIE:

Q. Sure. You didn't exercise any -- did you exercise any independent medical judgment in writing this letter?

A. Well, I did not author the letter. The letters are system generated, based upon the various criteria that are in the case and the denial, and the rationale. So these are assembled for efficiency by our medical management system.

So, the independent medical judgment is not involved in writing a letter. It's in the decision that is made that leads to the letter. And at that point, as I described a while ago, I sit down, review all of the evidence a second time, to ensure that the decision that the first reviewer made was in accordance with our policy.

MR. PINNIE: Off the record.

(Whereupon there was a short off the record discussion.)

BY MR. PINNIE:

Q. We're going to find the back of that letter, but do you think in the end your signature would have appeared at the end of this letter?

Page 30

A. Yes, undoubtedly.

Q. When we go to the next stage of review with regard to Ms. Rubin's appeal, I believe that -- well, why don't you -- Ms. Rubin, as I understand it, or as the notes reflect, requested that there be a second level of review?

A. Yes.

Q. Can you explain, for the record, what that second level of review entailed, specifically in this case?

A. On second level review it is an external review. It goes to an independent utilization review organization. That is a company that is set up to provide independent medical review for just -- for this purpose as well as a number of other reasons that they might be required.

The process is very much like what we have already described. We find the independent utilization review organization that we're going to send out. At this point, at second level, it is a matched specialty review. So the reviewer will be a person who is familiar with this particular subject matter. And so it would be somebody who would be perhaps a neurologist or an

Page 31

anesthesiologist or a pain specialist.

Q. And in looking at the records that have been provided in exhibit 8, it appears that a Dr. John Glass, a neurologist, reviewed this. Is that accurate?

MR. DUGAN: And that's exhibit 8 to Ms. Rubin's deposition.

BY MR. PINNIE:

Q. Yes.

A. Yes.

Q. And have you had the occasion -- and is Dr. Glass employed by National Medical Reviews or is he a subcontractor for them, do you know?

A. I don't know.

Q. And have you used NMR in the past for doing reviews such as this?

A. Yes.

Q. In your experience, in your wealth of experience, have you had occasions where a review with NMR would have resulted in a favorable determination for a patient?

A. Yes.

Q. And is there any way to quantify, with regard to when NMR takes a look at an appeal, how many

Page 32

times they will rule in favor of the patient or rule in favor of IBC? Do you know?

A. We don't track that.

Q. But in your experience, do you know whether or not any other ketamine applications have been forwarded to NMR for review?

A. I don't know specifically.

Q. And I may have asked you this, and I'm sorry if I did. Have you had any occasion to review any reports that were author by Dr. Glass?

A. I don't know Dr. Glass. And, typically, when these reports come back from National Medical Review, we only verify -- our nurses only verify that -- they verify I should say, that the doctor is licensed and board special, is board certified in the specialty. I don't take particular note of the identity of the provider.

Q. And just to briefly put on the record what Dr. Glass found, the first page we see the reasons for the previous determination. And that speaks for itself. And then the fourth block down, under determination, there is a -- it's a denial/uphold previous denial, correct?

A. Yes.

Page 33

Q. And on the next page, I'll call it the second page of Dr. Glass' report, he gives his history that has been provided to him, and he gives his rationale, correct?

A. Yes.

Q. And at the bottom of the page he actually list references in making the determination, correct?

A. Yes.

Q. So to the best of your understanding, this document encompasses all of the things that Dr. Glass looked at in upholding the original denial, correct?

A. The one thing not referenced in the references here, is the fact that he has received a complete file of the medical records, what our transactions included. So I think it would be safe to assume that in addition to these documents he also reviewed the medical records, and our documents at length.

Q. Yes. And I think we will find a lot of that under the history component, but I appreciate the clarification. I was really more going on what type of journals, and what other types of policies he referred to. In his rationale, I think for the

Page 34

first time, but he makes discussion of inpatient hospitalization for IV ketamine. Do you know whether he was tasked with making the determination as to whether or not inpatient hospitalization was appropriate as opposed to outpatient providing ketamine treatment?

A. I don't know that specifically.

Q. Okay. I mean he talks -- and his first sentence is, inpatient hospitalization is not medically necessary and ketamine can be provided safely and effectively in the outpatient setting. Do you -- I'm sorry, you wanted to expand on a prior answer?

A. Yes. If I may direct your attention to under rationale, he does say that there's no evidence of inpatient treatment that is anymore effective than outpatient treatment. Perhaps the most important thing is what follows. Furthermore, there is no evidence in the peer review medical literature that ketamine is superior to other forms of treatment for complex regional pain syndrome. And he goes on to list other methods.

Q. And that peer review medical literature that he describes, we have identified is described at

Page 35

the bottom of that page, correct?

A. And in addition, I would imagine it includes the references that we supplied to him in the medical policy.

Q. And he actually list that as number one in the IBC medical policy, as one of the things that he considered.

A. If we may though, we should go on a little further. So he then says, based on the provided documentation this member's inpatient hospitalization for IV ketamine was not medically necessary. Additionally, under her medical policy request -- under her medical policy request is considered experimental/investigational and is a benefit exclusion.

Q. And he is basing that on the history that has been provided to him and the documents that he has made reference to at the bottom of that page, as best you know?

A. Yes.

Q. Okay.

A. And I think the point I would like to highlight here is, these -- often these consultants are -- well, almost always they are people who are

Page 36

in practice, and they do this as a sideline with the independent utilization review. So sometimes the wording of their responses is a little awkward, and in this particular case, I think he doesn't real clearly articulate the fact that the fundamental question here is that the ketamine is a benefit exclusion, because it is deemed to be experimental/investigational by our policy.

Therefore, the further question of whether ketamine should be administered in the inpatient or the outpatient setting is really a mute point, because no matter where ketamine is to be administered, it is excluded because it's considered to be E/I.

Q. And I'm going to object and move to strike as non-responsive and based on speculation, the last part of the answer.

And so after Dr. Glass forwarded information on to Amerihealth, it is my understanding then that a letter was issued by Amerihealth, on the same date, I believe that is number, exhibit number 7, that is a second appeal review determination. Do you see that document?

A. Dated April 30th?

Page 37

Q.  Yes.

A.  Yes.

Q.  And at the bottom of that page it -- I won't say it is signed, but it has your name at the bottom; is that right?

A.  Yes.

Q.  And we have talked about this distinction before. I won't ask you whether you authored that, because you actually were taking information provided by Dr. Glass and putting it down or transmitting it under the Amerihealth heading?

A.  Yes.

Q.  And it appears -- and would you typically use the same language that Dr. Glass used in providing the rationale?  I would -- it's not a trick question.  I think it outlines the -- strike that. Don't answer that.  It does.

A.  Well, the same distinction that I made earlier in the comment that you didn't like, there is -- the important point is not highlighted here.

Q.  And that important point is what you think the confusion lies between Dr. Glass and what he was suppose to ultimately answer?

A.  Well, he answered two questions, when he was

Page 38

really only asked one.

Q.  And really it is losing the distinction between inpatient and outpatient hospitalization as opposed to ketamine being experimental and investigational?

A.  And excluded.

Q.  And excluded.  That's clear.

A.  Sorry about that.

Q.  And now I want to take us to the final -- so after this appeal review determination was made is it your understanding that Ms. Rubin, once again, challenged the findings that had been provided?

A.  Yes.

Q.  And once that occurred what did that trigger as far as Amerihealth's procedures?  Was there another level of review, and a decision number 4, rendered by Amerihealth on May 30th?

A.  Yes.

Q.  Okay.  And so before that report was ultimately provided, is it by MCMC?

A.  Yes.

Q.  Okay.  And why don't you tell us for the record, who MCMC was and what they were charged to do?

Page 39

A.  MCMC is another independent utilization review organization, and they conducted another level of review.

Q.  I wanted to ask you, as a general proposition, the MCMC person, at the end of this is reviewer number 49854.  Is it typical that someone from this review organization would not reveal their identity?

A.  That is the policy of some independent utilization review organizations.

Q.  So in the end this person indicates that he is board certified in neurology, et cetera, et cetera. Is there a way for you to find out the -- or me to find out the credentials of 49854?

A.  I don't know for sure.  But we certainly would be willing to assist you in trying to discover that.

Q.  Have you ever, in the past, gone and asked them, you know, I would like to see the CV of the reviewer?  Have you ever done that before?

A.  No.  We generally only contract with organizations that are accredited in one form or another by one of the accrediting bodies, NCQA or URAC.  And they are responsible for maintaining

Page 40

credentials as long as they're accredited.

Q.  So, prior to this, do you have an understanding of what was forwarded to this reviewer?

A.  The practice -- specifically I don't know. The practice, in our appeals department, is to send the exact same appeal packet that was sent to the first level appeal, and any additional documentation that either the provider or the member has provided, if any.

Q.  Okay.  And in these, under these circumstances the provider rendered their decision back on May 30th, correct?

A.  Yes.

Q.  There is -- this decision was rendered on the 30th, and I wanted to go back to Hill-1 and ask you to look at, I just want to kind of go through who was putting in some of the entries, okay, because you probably have a better understanding of it. And I guess starting on page 18, bate stamped at the bottom 18.

A.  Yes.

Q.  There is a, on May 3rd it looks like there was a notice of an IRO request letter from MCMC.  And

Page 41

MCMC was sending you folks something back? That's at the top of the page.

A. I just need a minute for some context here.

Q. Sure.

A. So on April 30th, we notified Ms. Rubin of the first level appeal that had been upheld. And we then, in accordance with policy, we offered her the second level and she indicated she wanted to proceed with that.

Q. So that's when -- that triggered you're contacting MCMC?

A. Yes.

Q. And so the comment at the top of that page, it says ETPLB, is that the person who made that entry?

A. That is, ET is for eastern time, PLB are the initials of the appeals nurse who was handling the case.

Q. You told us before, what is her name?

A. Well, in this case it's a different nurse, this is Patty Buckley.

Q. And then the next comment, which again appears from PLB, is that she had received notice from MCMC that the member submitted additional information to them as part of the IRO appeal review. And that

Page 42

they were forwarding that information to you to review for reconsideration.

When they sent that down to you folks, do you know who reviewed it?

A. Yes.

Q. Who was that?

A. Me, I did.

Q. And do you remember what it was that was sent down?

A. I don't specifically recall. The documentation here indicates that there is a duplicate copy of a letter we had looked at previously and a new professional journal article.

Q. And that's a 2011 journal?

A. Yes.

Q. And that was, likewise, authored by Dr. Schwartzman, according to the note, correct?

A. Yes.

Q. And so when MCMC is contacting you folks saying we have a new -- we've got the old letter and a new article, and you review, I won't say both of those things, but you are made aware of them, correct?

A. I looked at them.

Page 43

Q. And so based on that, is MCMC asking you whether or not they should reconsider what they authored already under -- do you know whether they've authored the May 30th report or are they waiting to hear from you before they author it?

A. Yes. What they did here was, they realized that we -- there was information that we had not seen. And they extended us the opportunity to look at it. It came in, and in accordance with our policy, we will look at anything that a member submits.

And if I -- if there had been something that was compelling there, I would have overturned it and approved it right then, and we could have, you know, proceeded. As you see my documentation, I reviewed the information submitted, information is not of the nature that would allow us to overturn the appeal. And I said please continue, send the appeal for external review.

Q. So do you know whether or not you authorized them or whether or not, in concluding, in finalizing the letter of May 30th, whether they considered the new article of 2011, the 2011 article by Dr. Schwartzman or they did not consider

Page 44

it?

A. By they you mean MCMC?

Q. Yes.

A. I do not know.

Q. Okay. But in your view the new article did not change your mind with regard to whether or not the ketamine was experimental or investigational?

A. That is correct.

Q. And this is a hard question to answer. If they had reviewed the new article, the 2011 article, do you think they would have made reference to it in their report of May 30, 2012? Because they don't.

A. I can't comment as to what they may or may not have reviewed.

Q. Because under references, I'm -- maybe we can look at it, the third page of -- third and fourth pages of their report. They make reference to a Sigterman study, a Koffler study, and that's on the fourth page, the Schwartzman study of 2009, and another Sigterman of 2009. Do you see that?

A. Yes.

Q. And, once again, having read thousands, done many of these, would you expect if they considered

Rubin vs.
Amerihealth Administrators, Inc., et al.
Case 2:12-cv-03719-RK    Document 18-7    Filed 04/16/13    Page 14 of 42
Dr. Gideon Hill
February 8, 2013

Page 45

that article, they would have placed it in their references?

A.  Yes.  I don't know why it's not there.

Q.  I just want to go back for just a moment on the May 30th screening notes, I guess I'll call them.

A.  Yes.

Q.  And after you gave an indication that you reviewed the additional information submitted, I believe that what happened was that you took a look at the report from MCMC and confirmed that the case was not medically necessary, correct?

A.  Yes.

Q.  I want to go to the MCMC report, which is number 4 of the exhibits from the prior deposition. And as best you can tell, this gives the rational for the reviewer as to why he was denying the claim, correct?

A.  Yes.

Q.  And he, at the second page, gives a description of medically necessary, which is word for word from the medically necessary definition contained in the Crozer Keystone Health System document, correct?

Page 46

A.  In the plan document.

Q.  In the plan document, yes.  And that gives an indication, it's medical treatment as determined and prescribed by a qualified appropriate health care provider, that is consistent with symptoms, diagnosis or treatment of a medical condition and consistent with generally accepted standards of practice.

Now, in this particular case Ms. Rubin had forwarded a letter by a Dr. Roderick Spears, who is a neurologist.  And I will go to that in a minute.  But Dr. Spears fundamentally says in his letter that he believes that under her particular circumstances that the use of ketamine was appropriate.

Is there any reason why that indication, from a neurologist, would not make the ketamine treatment medically necessary under this definition?

A.  Yes.

Q.  What is that reason?

A.  Because the question on the table is not whether it's medically necessary, it's whether it's a covered benefit.  If something is not a benefit,

Page 47

it doesn't matter whether it is necessary or not, it's not covered under the plan.

Something that is medically necessary that is not covered under the plan, can be provided by other financial means.

Q.  And so we're back to that fine distinction because it is fundamentally then, because it has been considered to be an experimental or investigational protocol that it is being rejected?

A.  Because it's E and I it has not been approved because it is a benefit exclusion.

Q.  And that's what I -- and I think you've clarified it for me, because to me when I look at medically necessary, a doctor has said she should get it, and that should resolve it.  However, what you've indicated is that because it is an excluded benefit under EI, that is the reason for the rejection?

A.  Correct.

Q.  And when we get to the guts of the decision by the reviewer, I won't use his number.  The fourth paragraph down, he talks about there being no documented practice parameter regarding CRPS. Would that be the RCTs that we described before or

Page 48

is that something different?

A.  In this case the practice parameter refers to something that is more commonly known as clinical guidelines.  When there is general agreement among the medical community that something is appropriate, we go through a process of outlining and defining what are called best practices.  And then that is widely disseminated among practitioners so that we can have consistency across the field of providers and practitioners.

The fact that there are no best practices, and no clinical guidelines for the ketamine infusion, is telling that this is not a widely accepted treatment.

Q.  Is that what he means when he talks about no Class 1 or Class 2 study?

A.  Exactly.  Well, let me -- he says those sentences, there are no practice parameters.  So he is saying A, there are no clinical guidelines. And then he is saying that the literature shows no Class 1 and Class 2 studies and those are the randomized clinical trials that we spoke of before.

The key elements being randomized, double blinded, controlled, placebo studies.  That

Page 49

is the gold standard of a study. And he is saying there are none of them that have been done that have demonstrated that ketamine is any better than a placebo infusion.

Q. And when he again, and I'm again, trying to get into his head, when he makes that or reaches that conclusion, he has, as best as you can understand, made reference to the references of studies that he list at the bottom of page 3 and the top of page 4?

A. That appears to be the case.

Q. Again, using your custom and practice, this reviewer looked at those particular studies and reached this conclusion that ketamine should still be considered to be investigational or experimental?

A. Yes.

Q. I want to go back because I missed asking you a question. Do you know whether or not the prior reviewer, Dr. Glass, had a specific understanding that Ms. Rubin had suffered from several brain aneurysms?

A. I do not know.

Q. And is our best way of determining that by

Page 50

looking at what he says he reviewed in his report, under the items reviewed? I'm trying to figure out, the only way we can tell what Dr. Glass reviewed is what he put in his report, correct?

A. Yes.

Q. And then with this May 30th report from MCMC, the internal appeals process had been exhausted, correct?

A. Yes.

Q. And what was left was for a person to file outside of the system?

A. A civil action?

Q. Yes.

A. Yes.

Q. I had asked you before about your review of ketamine treatments and I think you indicated in all of your reviews that you have never -- the appeals that you were involved with that you never approved ketamine treatment, correct?

A. That is correct.

Q. And do you know, whether on appeal, any applicant had been successful in obtaining the ketamine treatments for CRPS?

A. I'm not aware of any instances.

Page 51

Q. How many people are there like you that review appeals within Amerihealth?

A. Myself and Dr. Ramos.

Q. And do you -- and in your discussions with Dr. Ramos, do you know whether or not he has ever been involved in a situation where ketamine has been approved for CRPS?

A. I don't think we have ever specifically spoken about CRPS and ketamine.

Q. In the end, and we have kind of been going back and forth, but in the end was it you that ultimately decided that ketamine was experimental or investigational or was it Dr. Glass and the independent reviewer that decided that, or was it all of you?

A. Well, it depends upon which point in the time line. There are four doctors who looked at the information in the case and compared it to the criteria outlined in the policy, and all four of these doctors have said it is not a covered benefit.

Q. And that would be Dr. Ramos, Dr. Glass, the MCMC reviewer and yourself?

A. Yes.

Page 52

Q. And you, in looking at the data and looking at the guidelines, you also made the determination that it was E/I?

A. Yes.

Q. I don't know if Mr. Dugan has shared with you, one of the items that Ms. Rubin had referred to in her appeal letter of April 22nd was a decision by the Pennsylvania Department of Health. And at her deposition she expanded on that and actually showed the decision from the Pennsylvania Department. Have you seen that?

A. Yes.

Q. And maybe I can -- and this has been previously marked as Rubin something one.

MR. DUGAN: By the way, that person is not a member of this network, it's another insurance company.

MR. PINNIE: Yes.

MR. DUGAN: We have some privacy issues that we have to protect.

BY MR. PINNIE:

Q. Yes, and I'm not going to refer to the member by name, but maybe I'm just going to show you that. Is that the documentation that you had an

Page 53

opportunity to review?

A.  Yes.

Q.  And my short form assessment, and certainly your lawyer can object and you can correct me, has the Department of Health, in reviewing a specific individual, who will remain nameless, approved ketamine treatment for CRPS?

MR. DUGAN: Not the Department of Health.

BY MR. PINNIE:

Q.  The top of the letter is the Pennsylvania Department of Health. So who was it?

MR. DUGAN: Permedion did the independent review.

BY MR. PINNIE:

Q.  So enlighten me.

A.  First of all, I need to say I know nothing about this member, I know nothing about their benefit plan. So, you are asking me to comment on something that I am at a large disadvantage in terms of trying to make an honest assessment.

Q.  Yes.

A.  To answer the specific question, it appears as if the decision to approve the benefit was made by

Page 54

a company called Health America.

Q.  Yes. And in that independent review that was, as you described, was performed by Permedion. Was Permedion a company similar to MCMC?

A.  I don't know.

Q.  And you have never used them?

A.  Yes, I never had.

Q.  In this individual, who is, I believe identifies themselves at the conclusion, a Dr. David Sand. He reaches the -- and he opines that in regard to the ketamine infusion, the health plan considered it to be experimental or investigational realm of treatment options for refractory CRPS, however, the literature cited in the health plan policy for IV ketamine was out of date and did not include all of the literature cited below.

Based on the discussion below and the fact that anesthetic dose IV ketamine is now supported by level 1 data in the literature, the reviewee feels that the -- the reviewer feels that the enrollee does meet the criteria to receive this form of treatment. This reviewer then found that based on the literature that was reviewed that ketamine was not experimental or investigational.

Page 55

Is this -- has this documentation ever been provided to any of the individuals that reviewed this particular case?

A.  This is something that I don't know if I should even be looking at. This is another patient, another company I know nothing about, and I'm kind of uncomfortable being asked to draw conclusions about this when I don't know anything about who the individuals are, who the company is, what their status is and what the benefit plan and the medical necessity policies are and the exclusions are for the member.

Q.  Okay. And I appreciate that. What I'm trying to use the document for actually is probably the next two sentences contained in that, where Dr. Sand indicates that the health plan deemed the use of IV ketamine not to be medically necessary, also stated that it was against the health plan's policy because it was considered experimental and investigational. This is not an accurate statement and goes against the available medical literature. And he goes on to describe the medical literature, including the Sigterman study.

Once again, was the Sigterman study, as

Page 56

best you can understand, reviewed in rejecting the claim of Ms. Rubin?

MR. DUGAN: Just so we're clear, I am certainly not instructing him not to answer, but we do, obviously, have some privacy issues here that I think need to be protected, and in terms of, although relevancy is not the proper objection in a deposition, I think this is a document that should, legitimately cannot be part of this process. I can't stop you from asking the question.

BY MR. PINNIE:

Q.  I understand that. And in reviewing this particular case it's a person asking for ketamine treatment, a carrier denying it because it's experimental, it's not medically necessary or it's experimental and investigational. And this person is opining that the medical literature is in favor of the use of ketamine, as not being -- it goes against the available medical literature.

From all of the medical literature that you have reviewed, and the other reviewers, that you've utilized have reviewed, you would disagree

Page 57

with that statement, that the medical literature supports the fact that it's experimental and investigational; is that right?

A. There's a double negative there so let me just say, from what I have looked at, and my understanding is there is not a preponderance of evidence in the peer review clinical literature that would suggest that IV ketamine is efficacious in the treatment of chronic regional pain syndrome.

Q. That's fair enough. Do you know whether or not Medicaid approves the use of ketamine treatment for CRPS?

A. I don't know about Medicaid.

Q. You don't know?

A. No.

Q. Are you aware of any medical providers who permit the use of ketamine for CRPS treatment?

A. I do not know of any.

Q. If you would give me one minute, I want to flip through all these yellow notes and I think I might be finished.

(Whereupon there was a short recess.)

BY MR. PINNIE:

Q. In your review of either this case or other

Page 58

cases in using the utilization of ketamine for CRPS, have you actually reviewed the medical literature with regard to this?

A. In the early days, when this first became popular and was being promoted by Dr. Schwartzman in 2001, 2, 3, I do specifically remember taking a look at it. In preparation for today, I went back onto the internet and found a number of these papers and read the statement about the study and the conclusions, the synopsis of the study.

Q. But when decisions were being rendered by Dr. Ramos, Dr. Glass and the reviewer you had not -- you did not review the article that they made reference to back when these decisions were coming into Ms. Rubin?

A. No. For the purpose of efficiency in conducting these reviews, that is why the medical policy department is there to constantly monitor, look for updates, for definitely the annual rewrite. But if something earth shaking were to come up in between the annual rewrites we have, in the past, issued a new update of the policy and begun to approve X, Y or Z.

Q. And you don't know whether the medical policy

Page 59

department has reviewed the newer 2011 Schwartzman study, do you?

A. Specifically, I don't.

MR. PINNIE: I have no further questions.

BY MR. DUGAN:

Q. Doctor, I have some. You were asked to look at a document, which we do not believe is either relevant or discoverable because of privacy issues, but you were asked some questions and I do want to ask one about it. If you look at the references page, and specifically in the content of this document, there are references to two studies on page 4 of 7. One is the Sigterman study and one is the Schwartzman study. Do you see that?

A. Yes.

Q. And then in the references you will see the Sigterman study is referenced and the Schwartzman study is referenced. Do you see that?

A. Yes.

Q. If you look at the IBC medical policy, which was issued a year later, and I will represent to you that there are 141 articles that are cited as support for medical policy, I just counted them.

Page 60

Am I correct that when you turn to the 13th page of 16, both of those articles, the identical articles are cited in the IBC medical policy, the Schwartzman article from 2009 from Pain --

A. Yes, 147.

Q. And Sigterman from Pain 2009, 145?

A. The identical articles are cited in both.

Q. The reason I ask that is, Doctor, in terms of the 141 articles that are cited in support of the IBC medical policy related to the reference to intravenous ketamine, would you explain to us in terms of how medical policy is developed, whether or not the efforts are made to include all of the literature and then to analyze where the weight of the literature falls?

A. Do you want a yes or no or a discursive answer?

Q. A discursive answer.

A. Absolutely, and the goal of the medical policy department is to cast as far and wide as they can, looking at, what I said earlier, the peer review clinical literature, which is the gold standard. They take it all in. And basically it's like a balance. And you're sort of saying okay, where

Page 61

does the evidence lie, and it's, you know, generally it's pretty clear, it's one way or the other. And that's what would contribute to the decision that the policy then communicates.

Q. I am correct, therefore, that the medical policy board that developed the medical policy bulletin, 08.00.57B, which was effective January 4, 2012, in their analysis included the articles that are cited in the document previously talked about?

A. Yes.

Q. Would you explain to us how it is that a medical policy is developed and the steps that it takes to arrive at a medical policy, such as the medical policy in this case relative to ketamine?

A. New technologies are, when they come on the horizon, and it's determined it's clear there's going to be interest in it and, that the physicians are interested in using it, that would trigger the review that I described just a few moments ago, where they go out and look for all the relevant information.

They bring it back, it is assigned to one reviewer, who digests that information, brings out the, I guess, catalogs the studies that

Page 62

indicate this is a good study, this says yes, this one is not such a good study, but it says yes, a bad study that says yes and a bad study that says no. So you basically have two variables there and four conditions.

And that's all weighted and put together, and as I mentioned earlier, at that point a draft of the policy is written, looking very much like the medical policy we have here, with all of the appendages, and the information, that is then circulated amongst the members of the medical policy committee at Independence Blue Cross.

And it is -- there is an opportunity for comment and discussion. And once the comment and the discussion is reviewed by the medical policy department, the draft is rewritten, and all those things are taken into effect, and they then present that draft, let's call it the second draft, they present it to a meeting of the committee where additional discussion is encouraged. And it is done parliamentary procedure.

So after discussion a motion is made to close discussion. And then a motion is made to vote, they vote, and the policy is either passed or

Page 63

not passed.

Q. Do you know whether the medical policies, before they're finalized, actually are sent out to various state medical boards to look at?

A. Well, once the policy has been passed it is then submitted -- once the committee has approved the second draft, it's then sent out to experts, national experts, and they comment, revise, edit and indicate whether they feel that the policy reflects the current status of medical thought. It then comes back, it's finally written in the final version reflecting the comments of the expert reviewers, and then it's presented again to the medical policy committee for the discussion and the parliamentary procedure for vote. And then at that point, if it's approved, it is considered a final policy with an effective date of some date after that.

Q. And am I correct that the medical policy in this case, which is 08.00.57B, in fact, in reference to intravenous ketamine for treatment of CRPS, contains within that same medical policy the following language, "In addition, intravenous ketamine has not been approved by the FDA for use

Page 64

in CRPS." What is the significance of FDA approval or disapproval?

MR. PINNIE: Objection, to form.

BY MR. DUGAN:

Q. You can answer.

A. One very common point to be evaluated -- or that is considered in the evaluation of coverage is what the Food and Drug Administration has approved to be on the label, is the expression, of the medication. The FDA label includes things for which the research has indicated that the drug is both safe and effective. And if it is not on the label and if it does not have an FDA indication, is probably a better way of stating that, that is a -- is one very strong reason for not approving coverage for an off label use and it would be often classified as experimental and investigational.

Q. Two more questions. The first is, at any point in this process is the cost of the treatment requested ever considered?

A. No.

Q. Do you have any knowledge, at all, in the part you played in this, as to what the cost of IV infusion of ketamine for CRPS is?

Page 65

A.  I have no idea.

Q.  And the last question is, if you can explain to us what the rationale is as it relates to the members that are in the network, the purpose of having a designation of something being experimental or investigative as it relates to the members themselves?

A.  There is a considerable and rather disturbing history of medical devices and medications that have been used and have been found to be harmful to members.  We, as a part of our quality process, the medical policy committee, or medical policy process, vets new technology to assure that it is, in fact, what the manufacturer or the proponent claims it to be.  So we view this really as a part of a quality process to insure that we're only approving drugs that are safe and efficacious.

MR. DUGAN: That's all I have, Doctor, thank you.

MR. PINNIE: One followup.

BY MR. PINNIE:

Q.  In the Amerihealth System are there any drugs that are permitted to be utilized by members that are not FDA approved?

Page 66

A.  There are.

Q.  How many?

A.  Offhand, I don't know.

Q.  So it's not an absolute, it's a "it depends"?

A.  It is not an absolute.  Those are generally drugs that are for cancer treatment.

MR. DUGAN: Can I ask you a question about off label use versus FDA approved?

BY MR. DUGAN:

Q.  What is the distinction in terms of a drug being used for an off label purpose, are you familiar with that?

A.  Yes.  Off label, as I say, in -- there is FDA approval, there's a list of things that the Food and Drug Administration says this is absolutely an indication for this drug.  There, over time there are -- well, let me -- the process of getting an FDA indication is very time consuming and very expensive.

So, what often will happen is, as the medical community becomes familiar with a drug and what can be done, there are, on occasion, off label uses do develop.  And that is usually where you've got a large concessus of the medical community that

Page 67

says, yes, this is something that really works.  So you have that scenario.

There are many things that we use that historically, long before the FDA was ever around, were generally accepted.  Now a perfect example of that is aspirin, which has no FDA indication for anything.  But yet we use it widely.

And I think the third category is what I said, is oncologic, which is one of the best documented subspecialties of medicine where the research is ongoing and constant.  And there will -- sometimes they will discover combination of drugs that are lifesaving, and the medical community agrees to start using them in an off label way, because of the -- because of what is at stake.

Q.  The drugs, however, while off label usages, are FDA approved drugs for --

A.  Something else, absolutely, yes.

MR. DUGAN: That's all I have.  Thank you.

BY MR. PINNIE:

Q.  And it's your understanding that the use of ketamine in non CRPS circumstances is fairly

Page 68

widespread, correct?

A.  There are a number of indications that the FDA has for ketamine, and yes, it is used widely.  For example, in the administration of anesthesia in the inpatient setting for surgery.

Q.  In particular with regard to burn victims, that it is widely utilized by -- with burn victims in the anesthetic realm, correct?

A.  I don't specifically know about the use for burns, but it is widely used for temporary control of severe pain.

MR. PINNIE: Thank you.

MR. DUGAN: Thank you, Doctor.  I appreciate it.

_ _ _

(Witness excused.)

(Deposition concluded.)

_ _ _

Page 69

INDEX

WITNESS                      PAGE
DR. GIDEON HILL

By Mr. Pinnie            3, 65, 67
By Mr. Dugan             59, 66


EXHIBITS
NO.                          PAGE
Hill-1    Chronology of Claim        12

Page 70

CERTIFICATION

I, MAUREEN R. GALLAGHER, hereby certify that the testimony and the proceedings in the foregoing matter taken on February 8, 2013, are contained fully and accurately in the stenographic notes taken by me, and that pages 1 to 69, inclusive, of this testimony are a true and correct transcript of the same.


MAUREEN R. GALLAGHER
Registered Professional
Reporter
Notary Public

The foregoing certification of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or direction of the certifying shorthand reporter.

— — —

Rubin vs. Case 2:12-cv-03719-RK     Document 18-7     Filed 04/16/13     Page 21 of 42
Amerihealth Administrators, Inc., et al.
Dr. Gideon Hill
February 8, 2013

**0**

08.00.57B (2)
61:7;63:20

**1**

1 (4)
48:16,21;54:19;70:7
1/4/2012 (1)
17:6
10 (2)
12:18;13:6
10th (1)
13:12
11 (5)
13:20;15:9;19:7,16,
22
11:00 (1)
1:17
12 (3)
19:15;21:2;69:12
13 (1)
23:2
13th (2)
21:2;60:1
14 (3)
20:20;21:7,8
1400 (1)
2:8
141 (2)
59:23;60:9
145 (1)
60:6
147 (1)
60:5
151 (1)
6:14
16 (3)
15:22,22;60:2
17 (1)
10:24
18 (2)
40:20,21
1880 (1)
1:15
19063 (1)
1:23
1983 (1)
9:7
1992 (1)
8:19
1994 (2)
8:10,19
1996 (2)
7:19;8:10

**2**

2 (3)
48:16,21;58:6
20 (2)

12:18;19:8
2001 (1)
58:6
2005 (4)
7:14,19;11:3,3
2009 (4)
44:20,21;60:4,6
2011 (5)
42:14;43:23,23;
44:10;59:1
2012 (4)
15:23;17:10;44:12;
61:8
2013 (2)
1:16;70:5
215 (1)
2:9
22nd (1)
52:7
26F (1)
6:12
26th (1)
23:1
289 (1)
2:4
28th (6)
20:24;22:24;23:5,6;
25:7;26:21

**3**

3 (3)
49:9;58:6;69:6
30 (3)
24:18,19;44:12
30th (9)
36:24;38:17;40:13,
16;41:5;43:4,22;45:5;
50:6
3rd (1)
40:23

**4**

4 (7)
15:23;17:10;38:16;
45:15;49:10;59:14;61:7
49854 (2)
39:6,14

**5**

5 (3)
21:12,15,23
50 (2)
24:18,19
563-3500 (1)
2:9
565-4055 (1)
2:5
59 (1)
69:7

**6**

610 (1)
2:5
65 (1)
69:6
66 (1)
69:7
67 (1)
69:6
69 (1)
70:7

**7**

7 (2)
36:22;59:14

**8**

8 (4)
1:16;31:3,6;70:5
88 (1)
9:3

**9**

92 (2)
8:23;9:3
96 (2)
8:23;11:3

**A**

able (1)
4:8
absolute (2)
66:4,5
Absolutely (5)
10:15;17:4;60:19;
66:15;67:19
accepted (3)
46:7;48:14;67:5
accordance (3)
29:17;41:7;43:9
according (2)
17:22;42:17
accredited (2)
39:22;40:1
accrediting (1)
39:23
accuracy (1)
28:6
accurate (2)
31:5;55:20
accurately (2)
9:9;70:6
across (1)
48:10
acted (3)
7:15,20;8:24
action (1)

50:12
actively (1)
8:9
actual (3)
6:5;20:9,21
actually (11)
13:10;21:1;22:6,9;
33:6;35:5;37:9;52:9;
55:14;58:2;63:3
addition (5)
13:15;20:10;33:17;
35:2;63:23
additional (6)
14:10;22:18;40:8;
41:23;45:9;62:20
Additionally (1)
35:12
adhere (1)
9:17
administer (1)
5:13
administered (2)
36:10,13
Administration (3)
64:8;66:15;68:4
administrative (1)
28:23
administrator (3)
4:24;5:4,8
ADMINISTRATORS (4)
1:6;4:12,23;8:5
adult (1)
8:18
advantage (1)
20:16
affect (2)
27:20,20
again (11)
11:2;24:1;28:19;
38:11;41:21;44:23;
49:5,5,12;55:24;63:13
against (4)
3:22;55:18,21;56:21
ages (1)
8:17
ago (2)
29:14;61:19
agreed (2)
3:1;22:16
agreeing (2)
23:10,13
agreement (1)
48:4
agrees (1)
67:14
Air (1)
9:1
allow (1)
43:17
almost (1)
35:24
along (2)
13:18;14:16

although (1)
56:7
always (1)
35:24
America (1)
54:1
Amerihealth (30)
3:23;4:12,19,19,21,
23;5:13;6:1;7:1,7,17,
23;8:5;9:13,16,17;11:5;
14:1,15;17:9,22;19:13;
20:19;24:22;36:19,21;
37:11;38:17;51:2;65:22
Amerihealth's (1)
38:15
among (2)
48:4,8
amongst (1)
62:11
amount (1)
10:20
analysis (1)
61:8
analyze (2)
27:19;60:14
and/or (2)
18:16;70:18
Andreas (1)
14:14
anesthesia (1)
68:4
anesthesiologist (1)
31:1
anesthetic (2)
54:18;68:8
aneurysms (1)
49:22
annual (3)
16:2;58:19,21
answered (1)
37:24
anymore (1)
34:16
apparent (1)
18:11
appeal (25)
10:21;11:9,12,16;
18:17;20:23;22:17;
23:8,14,23,24;24:6;
26:15;30:3;31:24;
36:22;38:10;40:7,8;
41:6,24;43:18,19;
50:21;52:7
appealed (1)
10:14
appeals (15)
10:9,12,24;11:5,17;
12:7;21:4,6;22:9;23:19;
40:6;41:16;50:7,18;
51:2
appear (3)
12:21;15:21;20:15
APPEARANCES (1)

Rubin vs.
Amerihealth Administrators, Inc., et al.
Case 2:12-cv-03719-RK    Document 18-7    Filed 04/16/13    Page 22 of 42
Dr. Gideon Hill
February 8, 2013

2:1
appeared (1)
29:24
appears (8)
6:21;14:24;20:20;
31:3;37:13;41:21;
49:11;53:23
appendages (1)
62:10
applicant (1)
50:22
application (2)
5:22;14:2
applications (1)
32:5
applicator (1)
28:23
applied (1)
26:7
apply (2)
7:7;70:16
appreciate (3)
33:21;55:13;68:14
appropriate (5)
5:24;34:5;46:4,15;
48:6
approval (2)
64:1;66:14
approve (2)
53:24;58:23
approved (20)
18:12;20:14;24:4,5,
20,24;25:5;28:15;
43:14;47:10;50:19;
51:7;53:6;63:6,16,24;
64:8;65:24;66:8;67:18
approves (1)
57:11
approving (2)
64:15;65:17
April (3)
36:24;41:5;52:7
around (1)
67:4
arrive (1)
61:13
article (10)
42:13,21;43:23,24;
44:5,10,11;45:1;58:13;
60:4
articles (6)
59:23;60:2,2,7,9;61:8
articulate (1)
36:5
aspirin (1)
67:6
assembled (1)
29:9
assessing (1)
9:14
assessment (3)
23:12;53:3,21
assigned (1)

61:22
assist (1)
39:16
associated (1)
5:14
assume (2)
3:24;33:16
assure (2)
24:2;65:13
Atlantic (1)
8:20
attach (1)
7:13
attention (1)
34:14
attorney (2)
4:14;12:10
author (3)
29:6;32:10;43:5
authored (4)
37:8;42:16;43:3,4
authoring (1)
27:22
authorized (1)
43:20
available (6)
10:2;16:17,22;17:3;
55:21;56:21
aware (3)
42:22;50:24;57:16
awkward (1)
36:3

**B**

back (22)
7:12;8:10;9:12;14:5;
17:20;21:1;24:11;25:7;
28:19;29:22;32:12;
40:12,16;41:1;45:4;
47:6;49:18;51:11;58:7,
14;61:22;63:11
background (1)
9:9
backwards (1)
8:8
bad (2)
62:3,3
balance (1)
60:24
based (9)
14:19;25:13;26:12;
29:7;35:9;36:16;43:1;
54:17,23
basically (5)
5:15,16;7:5;60:23;
62:4
basing (1)
35:16
basis (1)
16:2
bate (6)
6:19;12:18;13:19;

19:14;20:20;40:20
bates (3)
15:21;19:7;23:2
became (1)
58:4
becomes (4)
16:17,22;17:3;66:21
began (1)
21:4
beginning (1)
6:13
begun (1)
58:23
behalf (2)
1:13;24:22
believes (1)
46:13
below (2)
54:16,17
benefit (10)
35:15;36:7;46:24,24;
47:11,17;51:21;53:19,
24;55:10
Benefits (3)
6:18;7:7;9:21
BERNARD (1)
2:2
best (11)
9:19;20:18;33:9;
35:19;45:16;48:7,11;
49:7,24;56:1;67:9
better (3)
40:19;49:3;64:14
bit (3)
8:8;14:5;22:2
blinded (1)
48:24
block (1)
32:21
Blue (6)
4:13;7:21;8:2;10:10;
17:15;62:12
board (5)
8:16;32:15,15;39:12;
61:6
boards (1)
63:4
bodies (1)
39:23
both (4)
42:21;60:2,7;64:12
bottom (10)
6:13;13:20;19:24;
33:6;35:1,18;37:3,5;
40:21;49:9
Boulevard (1)
1:15
Box (1)
2:4
brain (1)
49:21
break (1)
4:10

briefly (2)
7:13;32:18
bring (1)
61:22
brings (1)
61:23
Brinkmann (1)
1:14
brought (1)
3:22
Bryan (2)
13:13;14:5
Buckley (1)
41:20
bulletin (9)
15:3,16;16:15,20;
17:2,9;28:8,17;61:7
bulletins (1)
15:15
burn (2)
68:6,7
burns (1)
68:10
business (1)
20:13

**C**

call (10)
14:6;19:17,19;20:12,
21;26:19;27:14;33:1;
45:5;62:18
called (3)
20:23;48:7;54:1
came (4)
11:15;14:7;18:20;
43:9
can (37)
3:15;4:10;9:19;
10:17;14:4;15:3,4,5,15;
16:3;18:12;20:18;21:2;
22:21;23:2,14,17;25:10,
22;26:23;30:8;34:10;
44:16;45:16;47:4;48:9;
49:7;50:3;52:13;53:4,4;
56:1;60:20;64:5;65:2;
66:7,22
cancer (1)
66:6
care (5)
5:18;7:16;8:1,7;46:5
carrier (1)
56:16
case (25)
5:11,20;11:20;13:5;
21:4;22:8,11,12;23:20,
21;29:8;30:10;36:4;
41:17,19;45:11;46:9;
48:2;49:11;51:18;55:3;
56:15;57:24;61:14;
63:20
cases (2)
24:10;58:1

cast (1)
60:20
catalogs (1)
61:24
category (1)
67:8
centralize (1)
28:5
certain (1)
5:22
certainly (3)
39:15;53:3;56:4
certification (2)
3:3;70:15
certified (3)
8:16;32:15;39:12
certify (1)
70:4
certifying (1)
70:18
cetera (2)
39:12,12
challenge (1)
17:24
challenged (1)
38:12
change (1)
44:6
changed (4)
16:23;17:2,8,10
charge (2)
8:3,6
charged (1)
38:23
CHESTER (2)
1:7;5:12
choose (1)
5:2
chronic (2)
24:24;57:9
chronology (3)
12:19;17:20;69:12
circulated (1)
62:11
circumstances (4)
18:18;40:11;46:14;
67:24
cited (7)
54:14,16;59:23;60:3,
7,9;61:9
civil (1)
50:12
claim (5)
12:20;18:23;45:18;
56:2;69:12
claims (6)
5:7,7,17;9:15;24:7;
65:15
clarification (1)
33:22
clarified (1)
47:13
clarifies (1)

18:10
**clarify (1)**
12:6
**Class (4)**
48:16,16,21,21
**classified (1)**
64:17
**clear (4)**
38:7;56:3;61:2,16
**clearly (1)**
36:5
**clinical (20)**
14:10,17,24;23:3;
25:24;26:2,5,6,11,17,
19,20;27:5,7;48:3,12,
19,22;57:7;60:22
**close (2)**
20:12;62:23
**CMC (2)**
19:17,19
**combination (1)**
67:12
**coming (1)**
58:14
**commencing (1)**
1:17
**comment (8)**
37:19;41:13,21;
44:14;53:19;62:14,14;
63:8
**comments (3)**
13:6;21:5;63:12
**committee (5)**
62:12,19;63:6,14;
65:12
**common (1)**
64:6
**commonly (1)**
48:3
**communicates (1)**
61:4
**community (5)**
25:16;48:5;66:21,24;
67:14
**company (8)**
5:2;11:1;30:13;
52:17;54:1,4;55:6,9
**compared (1)**
51:18
**compelling (1)**
43:13
**complete (1)**
33:14
**complex (2)**
16:9;34:21
**component (2)**
26:5;33:21
**computer (3)**
12:21;13:16;19:2
**concessus (1)**
66:24
**concluded (1)**
68:17

**concluding (1)**
43:21
**conclusion (4)**
27:24;49:7,14;54:9
**conclusions (2)**
55:8;58:10
**condition (1)**
46:6
**conditions (1)**
62:5
**conducted (1)**
39:2
**conducting (1)**
58:17
**confirmed (1)**
45:11
**confirming (1)**
26:11
**confusion (1)**
37:22
**consider (1)**
43:24
**considerable (2)**
17:17;65:8
**considered (14)**
25:9;26:22;35:7,14;
36:14;43:23;44:24;
47:8;49:15;54:12;
55:19;63:16;64:7,20
**consist (1)**
8:15
**consistency (2)**
28:6;48:9
**consistent (2)**
46:5,7
**constant (1)**
67:11
**constantly (1)**
58:18
**consultants (1)**
35:23
**consuming (1)**
66:18
**contact (1)**
20:7
**contacting (2)**
41:11;42:19
**contained (10)**
10:1;15:1,2;26:20;
28:10,16,22;45:23;
55:15;70:6
**contains (3)**
19:6;25:11;63:22
**content (1)**
59:12
**context (1)**
41:3
**continue (1)**
43:18
**contract (2)**
5:8;39:21
**contribute (1)**
61:3

**control (2)**
68:10;70:18
**controlled (1)**
48:24
**convenience (1)**
13:17
**conversation (1)**
18:5
**copiers (1)**
5:6
**copy (2)**
15:5;42:12
**corporate (1)**
11:23
**cost (2)**
64:19,23
**counsel (1)**
3:2
**counted (1)**
59:24
**couple (1)**
23:16
**course (1)**
11:12
**COURT (4)**
1:1,22;3:12;12:12
**coverage (3)**
7:10;64:7,16
**covered (5)**
7:1;46:24;47:2,4;
51:20
**covering (1)**
11:2
**credentials (2)**
39:14;40:1
**criteria (4)**
18:11;29:8;51:19;
54:21
**Cross (6)**
4:13;7:21;8:2;10:11;
17:15;62:12
**CROZER (7)**
1:7;5:12,15;6:18;7:2,
6;45:23
**CRPS (18)**
16:21;17:8,14;25:5;
27:3;47:23;50:23;51:7,
9;53:7;54:13;57:12,17;
58:2;63:22;64:1,24;
67:24
**current (1)**
63:10
**curriculum (1)**
4:14
**custom (1)**
49:12
**customer (1)**
5:17
**CV (3)**
7:13;9:8;39:19

**D**

**data (3)**
13:2;52:1;54:19
**date (8)**
13:10;15:23;19:9;
23:5;36:21;54:15;
63:17,17
**Dated (1)**
36:24
**David (1)**
54:10
**day (2)**
14:7;20:12
**days (2)**
23:16;58:4
**dealing (1)**
24:7
**dealt (1)**
24:15
**Debra (1)**
3:22
**decided (2)**
51:12,14
**decision (15)**
14:1,16;18:6;23:16;
26:18;29:13,16;38:16;
40:12,15;47:20;52:7,
10;53:24;61:4
**decision-making (1)**
22:8
**decisions (5)**
11:11,19;12:5;58:11,
14
**deemed (2)**
36:7;55:16
**defining (1)**
48:7
**definitely (1)**
58:19
**definition (2)**
45:22;46:19
**DeLucia (1)**
21:3
**demonstrated (1)**
49:3
**denial (9)**
18:1;20:11,22;21:9;
26:7,12;29:9;32:23;
33:11
**denial/uphold (1)**
32:22
**denied (1)**
14:19
**denying (2)**
45:17;56:16
**Department (13)**
8:7;17:16;28:4;40:6;
52:8,10;53:5,8,12;
58:18;59:1;60:20;62:16
**depend (1)**
13:3
**depends (2)**
51:16;66:4
**deposition (12)**

1:12;3:4,18;4:1;15:9;
18:20;21:16;31:7;
45:15;52:9;56:9;68:17
**describe (1)**
55:22
**described (9)**
10:5;17:5;25:21;
29:14;30:18;34:24;
47:24;54:3;61:19
**describes (4)**
7:10;9:23;16:11;
34:24
**description (3)**
10:6;27:7;45:21
**designation (1)**
65:5
**designee (1)**
11:23
**determination (10)**
21:13,24;31:21;
32:20,22;33:7;34:3;
36:23;38:10;52:2
**determined (4)**
14:11;25:19;46:3;
61:16
**determining (1)**
49:24
**develop (1)**
66:23
**developed (4)**
16:13;60:12;61:6,12
**development (1)**
17:18
**devices (1)**
65:9
**diagnosis (1)**
46:6
**dialogue (1)**
20:19
**different (5)**
7:23;13:7,9;41:19;
48:1
**digests (1)**
61:23
**direct (2)**
34:14;70:17
**direction (1)**
70:18
**Director (5)**
7:16,20;14:12;18:5,9
**Directors (1)**
8:4
**disadvantage (1)**
53:20
**disagree (1)**
56:24
**disapproval (1)**
64:2
**disapproved (1)**
24:4
**disclosures (1)**
6:12
**discover (2)**

Rubin vs.
Amerihealth Administrators, Inc., et al.
Case 2:12-cv-03719-RK   Document 18-7   Filed 04/16/13   Page 24 of 42
Dr. Gideon Hill
February 8, 2013

**discoverable (1)** 39:16;67:12
59:9
**discursive (2)**
60:16,18
**discussion (16)**
6:9;16:6;18:3;19:12;
20:9;21:5,20;29:20;
34:1;54:17;62:14,15,20,
22,23;63:14
**discussions (1)**
51:4
**disseminated (1)**
48:8
**distinction (5)**
37:7,18;38:2;47:6;
66:10
**DISTRICT (1)**
1:1
**disturbing (1)**
65:8
**divide (2)**
27:10,11
**doctor (7)**
15:6;32:14;47:14;
59:7;60:8;65:18;68:13
**doctors (2)**
51:17,20
**document (28)**
6:11,14;7:5,8,9;9:21,
22;10:2;12:10,13,16;
15:16;16:8,11,12;17:6,
10;25:7;33:10;36:23;
45:24;46:1,2;55:14;
56:9;59:8,13;61:9
**documentation (10)**
12:3;19:1;20:3;
22:18;35:10;40:9;
42:11;43:15;52:24;55:1
**documented (2)**
47:23;67:10
**documents (5)**
6:4;23:23;33:17,18;
35:17
**done (9)**
11:17;13:7;23:1,15;
39:20;44:23;49:2;
62:21;66:22
**dose (1)**
54:18
**double (2)**
48:24;57:4
**down (8)**
22:20;26:4;29:15;
32:21;37:10;42:3,9;
47:22
**DR (50)**
1:12;3:10,20;12:16;
14:19,23;17:21;19:13,
19,24;20:7,15;21:22;
22:13,15;23:10,13,15;
25:18;26:7,12,18;31:3,
11;32:10,11,18;33:2,10;

36:18;37:10,14,22;
42:16;43:24;46:10,12;
49:20;50:3;51:3,4,13,
22,22;54:9;55:15;58:5,
11,12;69:4
**draft (5)**
62:8,16,18,18;63:7
**draw (1)**
55:7
**drug (7)**
27:20;64:8,11;66:10,
15,16,21
**drugs (6)**
65:17,22;66:6;67:13,
17,18
**Dugan (31)**
1:14;2:7;3:13;6:4,12,
19;11:22;15:5,8;18:22;
19:4,16,22;21:14,15;
29:1;31:6;52:5,15,19;
53:8,13;56:3;59:6;64:4;
65:18;66:7,9;67:20;
68:13;69:7
**duly (1)**
3:10
**duplicate (1)**
42:12
**during (3)**
11:7,8,12
**duties (2)**
7:23,24

**E**

**E/I (4)**
21:9;26:22;36:14;
52:3
**earlier (6)**
22:7,24;25:23;37:18;
60:21;62:7
**early (1)**
58:4
**earth (1)**
58:20
**eastern (1)**
41:15
**edit (1)**
63:8
**effect (2)**
15:17;62:17
**effective (5)**
15:22;34:16;61:7;
63:17;64:12
**effectively (1)**
34:11
**efficacious (2)**
57:8;65:17
**efficacy (1)**
25:14
**efficiency (2)**
29:10;58:16
**efforts (1)**
60:13

**EI (1)**
47:17
**either (4)**
40:9;57:24;59:8;
62:24
**elements (1)**
48:23
**else (1)**
67:19
**emerged (1)**
16:14
**employed (4)**
4:11;5:12;8:4;31:12
**employee (2)**
4:12;14:14
**encompasses (1)**
33:10
**encouraged (1)**
62:20
**end (8)**
7:14;18:13;29:23,24;
39:5,11;51:10,11
**engaged (1)**
17:18
**enlighten (1)**
53:16
**enough (2)**
6:4;57:10
**enrollee (1)**
54:21
**ensure (2)**
28:6;29:16
**entailed (1)**
30:9
**entered (1)**
20:1
**entire (2)**
8:6;23:20
**entirely (1)**
19:4
**entries (2)**
13:7;40:18
**entry (6)**
13:9,11,14,21,24;
41:14
**ESQUIRE (1)**
2:7
**essentially (1)**
6:24
**established (1)**
25:15
**et (3)**
39:12,12;41:15
**ETPLB (1)**
41:14
**evaluated (1)**
64:6
**evaluation (2)**
14:15;64:7
**even (2)**
23:17;55:5
**evidence (5)**
29:15;34:15,19;57:7;

61:1
**evolving (1)**
16:21
**exact (3)**
17:16;26:16;40:7
**Exactly (3)**
15:11;19:3;48:17
**examined (1)**
3:11
**example (2)**
67:5;68:4
**except (1)**
3:5
**excluded (5)**
25:13;36:13;38:6,7;
47:16
**exclusion (3)**
35:15;36:7;47:11
**exclusions (1)**
55:12
**excused (1)**
68:16
**exercise (3)**
11:9;29:3,4
**exercised (1)**
28:20
**exercising (2)**
12:4;23:11
**exhausted (1)**
50:7
**exhibit (8)**
15:9;19:19;21:12,15,
22;31:3,6;36:22
**exhibits (1)**
45:15
**exist (1)**
6:24
**existing (1)**
28:11
**expand (1)**
34:12
**expanded (1)**
52:9
**expect (1)**
44:24
**expensive (1)**
66:19
**experience (5)**
17:1;24:7;31:18,19;
32:4
**experimental (15)**
14:21;25:10;38:4;
44:7;47:8;49:16;51:12;
54:12,24;55:19;56:17,
18;57:2;64:17;65:6
**experimental/investigational (3)**
26:24;35:14;36:8
**expert (1)**
63:12
**experts (2)**
63:7,8
**explain (6)**
4:20;23:14;30:8;

60:11;61:11;65:2
**explaining (1)**
21:6
**explanation (1)**
4:22
**expression (1)**
64:9
**extended (1)**
43:8
**extensive (1)**
21:11
**external (2)**
30:11;43:19

**F**

**fact (7)**
33:14;36:5;48:11;
54:18;57:2;63:20;65:14
**fair (1)**
57:10
**fairly (1)**
67:24
**falls (1)**
60:15
**familiar (3)**
30:22;66:12,21
**familiarity (1)**
12:7
**family (2)**
8:16,24
**far (3)**
13:3;38:15;60:20
**fashion (1)**
21:12
**favor (3)**
32:1,2;56:19
**favorable (1)**
31:20
**FDA (13)**
28:15;63:24;64:1,10,
13;65:24;66:8,13,18;
67:4,6,18;68:2
**February (4)**
1:16;13:12;21:2;70:5
**feel (1)**
63:9
**feels (2)**
54:20,20
**felt (1)**
26:17
**few (2)**
22:3;61:19
**field (1)**
48:10
**figure (1)**
50:2
**file (3)**
18:21;33:15;50:10
**filing (1)**
3:3
**final (3)**
38:9;63:11,16

**finalized (1)**
63:3
**finalizing (2)**
28:10;43:22
**finally (2)**
28:14;63:11
**financial (1)**
47:5
**find (7)**
13:2;20:8;29:22;
30:18;33:20;39:13,14
**findings (1)**
38:12
**fine (1)**
47:6
**finish (1)**
4:5
**finished (2)**
9:5;57:21
**first (25)**
11:7,14,16;13:24;
15:13;16:8;17:21,24;
18:1,19;19:23;20:22,22,
23;22:10;23:22;29:16;
32:19;34:1,8;40:8;41:6;
53:17;58:4;64:18
**five (3)**
14:7;24:16,17
**flip (2)**
6:3;57:20
**folks (6)**
5:15;7:1;19:13;41:1;
42:3,19
**following (1)**
63:23
**follows (3)**
3:11;16:22;34:18
**followup (1)**
65:20
**Food (2)**
64:8;66:14
**Force (1)**
9:1
**foregoing (2)**
70:5,15
**form (9)**
3:5,16;12:21;14:19;
29:1;39:22;53:3;54:22;
64:3
**forms (1)**
34:20
**forth (1)**
51:11
**forwarded (4)**
32:6;36:18;40:3;
46:10
**forwarding (1)**
42:1
**found (4)**
32:19;54:22;58:8;
65:10
**four (4)**
9:2;51:17,19;62:5

**fourth (4)**
32:21;44:17,20;47:21
**fresh (1)**
25:21
**Friday (1)**
1:16
**front (1)**
15:6
**full (1)**
13:17
**full-time (1)**
14:14
**fully (2)**
5:10;70:6
**fundamental (2)**
10:5;36:6
**fundamentally (4)**
8:23;28:21;46:12;
47:7
**further (3)**
35:9;36:9;59:4
**Furthermore (1)**
34:18

## G

**Gallagher (2)**
1:18;70:3
**gathered (1)**
14:10
**gave (1)**
45:8
**general (5)**
9:24;15:14;19:9;
39:4;48:4
**generally (5)**
39:21;46:7;61:2;
66:5;67:5
**generated (3)**
13:16;23:8;29:7
**GERALD (1)**
2:7
**GIDEON (4)**
1:12;3:10;21:9;69:4
**given (4)**
7:9;12:16;18:10,22
**gives (8)**
14:23;25:8,12;33:2,3;
45:16,20;46:2
**Glass (15)**
31:4,12;32:10,11,19;
33:11;36:18;37:10,14,
22;49:20;50:3;51:13,
22;58:12
**Glass' (1)**
33:2
**goal (1)**
60:19
**goes (5)**
30:12;34:21;55:21,
22;56:20
**gold (2)**
49:1;60:22

**good (4)**
3:20;15:7;62:1,2
**great (1)**
12:7
**Greater (1)**
8:19
**group (7)**
6:22;8:11;27:10,12,
12,16,17
**groups (2)**
4:24;27:11
**guess (4)**
20:22;40:20;45:5;
61:24
**guidelines (5)**
25:13;48:4,12,19;
52:2
**guts (1)**
47:20

## H

**half (2)**
11:7,7
**handed (1)**
4:14
**handled (1)**
21:4
**handles (1)**
23:19
**handling (1)**
41:16
**happen (2)**
5:6;66:20
**happened (3)**
14:4;20:24;45:10
**hard (1)**
44:9
**harmful (1)**
65:10
**hate (1)**
10:16
**head (1)**
49:6
**heading (1)**
37:11
**health (20)**
5:4,13,14;7:2,11;
8:11,18,20;28:13;
45:23;46:4;52:8;53:5,9,
12;54:1,11,14;55:16,18
**hear (1)**
43:5
**hereby (1)**
70:3
**Here's (1)**
15:8
**highlight (1)**
35:23
**highlighted (1)**
37:20
**HILL (7)**
1:12;3:10,20;12:16;

21:9,22;69:4
**Hill-1 (5)**
12:11,13,17;40:16;
69:12
**historically (1)**
67:4
**history (4)**
33:2,21;35:16;65:9
**hold (1)**
5:3
**honest (1)**
53:21
**hopefully (1)**
4:7
**horizon (1)**
61:16
**hospitalization (5)**
34:2,4,9;35:11;38:3
**House (1)**
2:3
**husband (1)**
5:12

## I

**IBC (17)**
4:21;7:24;9:12,14,17;
10:19;15:3;17:9;24:11,
22;28:22,23;32:2;35:6;
59:21;60:3,10
**idea (1)**
65:1
**identical (3)**
15:2;60:2,7
**identification (1)**
12:13
**identified (1)**
34:24
**identifies (1)**
54:9
**identity (2)**
32:17;39:8
**imagine (1)**
35:2
**important (3)**
34:17;37:20,21
**improper (1)**
3:16
**improve (1)**
28:13
**imputed (1)**
13:4
**inadvertently (1)**
24:3
**INC (1)**
1:6
**include (3)**
25:14;54:16;60:13
**included (2)**
33:16;61:8
**includes (4)**
5:19;22:18;35:2;
64:10

**including (1)**
55:23
**inclusive (1)**
70:8
**Independence (6)**
4:13;7:21;8:2;10:10;
17:15;62:12
**independent (20)**
11:10,10;12:4,5;
23:11;25:19,20;27:23;
28:20;29:4,11;30:12,14,
18;36:2;39:1,9;51:14;
53:14;54:2
**independently (1)**
22:15
**indicate (2)**
62:1;63:9
**indicated (5)**
14:18;41:8;47:16;
50:16;64:11
**indicates (5)**
21:8;26:24;39:11;
42:11;55:16
**indicating (1)**
26:15
**indication (11)**
16:10;25:12;26:21;
28:11;45:8;46:3,16;
64:13;66:16,18;67:6
**indications (1)**
68:2
**individual (4)**
10:1;13:16;53:6;54:8
**individuals (2)**
55:2,9
**information (19)**
14:11;16:22;17:2,3,
13;18:10,22;36:19;
37:9;41:23;42:1;43:7,
16,16;45:9;51:18;
61:21,23;62:10
**infusion (8)**
14:7;24:8,21;27:17;
48:13;49:4;54:11;64:24
**initial (3)**
11:15;14:6;21:3
**initially (2)**
23:10;26:18
**initials (3)**
13:11,15;41:16
**inpatient (8)**
34:1,4,9,16;35:10;
36:11;38:3;68:5
**input (1)**
13:2
**instance (2)**
13:12;27:15
**instances (1)**
50:24
**instructing (1)**
56:4
**insurance (3)**
5:2,9;52:17

Rubin vs.
Amerihealth Administrators, Inc., et al.

Dr. Gideon Hill
February 8, 2013

**insure (1)**
65:16
**insured (1)**
5:10
**interaction (2)**
4:21;9:12
**interest (1)**
61:17
**interested (1)**
61:18
**internal (3)**
22:11;25:24;50:7
**internet (2)**
10:3;58:8
**into (5)**
26:3;27:11;49:6;
58:15;62:17
**intravenous (12)**
24:8,21,24;26:22;
27:2,16;28:1,12,14;
60:11;63:21,23
**introduced (1)**
3:20
**invariably (1)**
22:20
**investigation (1)**
25:19
**investigational (12)**
14:20;38:5;44:7;
47:9;49:15;51:13;
54:12,24;55:20;56:18;
57:3;64:17
**investigative (2)**
25:10;65:6
**involved (7)**
10:11,21;11:19;
22:12;29:12;50:18;51:6
**involving (2)**
27:2;28:1
**IRO (2)**
40:24;41:24
**issue (1)**
3:17
**issued (4)**
18:1;36:20;58:22;
59:22
**issues (5)**
5:14;10:22;52:19;
56:6;59:9
**items (2)**
50:2;52:6
**IV (9)**
24:14;25:4;34:2;
35:11;54:15,18;55:17;
57:8;64:23

**J**

**January (3)**
15:23;17:10;61:7
**Jefferson (1)**
9:8
**John (2)**

1:15;31:3
**journal (2)**
42:13,14
**journals (1)**
33:23
**judgment (3)**
28:21;29:4,11
**jump (1)**
22:4

**K**

**Kennedy (1)**
1:15
**ketamine (54)**
14:2;24:8,15,21,24;
25:4,5;26:22;27:2,16;
28:1,12,14;32:5;34:2,6,
10,20;35:11;36:6,10,12;
38:4;44:7;46:14,17;
48:13;49:3,14;50:16,19,
23;51:6,9,12;53:7;
54:11,15,18,24;55:17;
56:15,20;57:8,11,17;
58:1;60:11;61:14;
63:21,24;64:24;67:24;
68:3
**key (1)**
48:23
**Keystone (4)**
6:18;7:2,6;45:23
**kind (8)**
6:4;8:20;12:2;14:18;
23:9;40:17;51:10;55:7
**knowledge (2)**
17:11;64:22
**known (1)**
48:3
**knows (1)**
27:12
**Koffler (1)**
44:19

**L**

**label (10)**
64:9,10,13,16;66:8,
11,13,22;67:15,17
**language (6)**
14:23;15:1,2;28:16;
37:14;63:23
**large (2)**
53:20;66:24
**last (4)**
8:9;15:20;36:16;65:2
**later (2)**
23:17;59:22
**Law (1)**
1:13
**lawyer (1)**
53:4
**layman's (1)**
27:6

**leads (1)**
29:13
**led (1)**
27:24
**left (1)**
50:10
**legitimately (1)**
56:10
**length (1)**
33:19
**letter (23)**
22:24;23:3,7;26:1,15,
21;27:22;28:24;29:5,6,
12,13,22,24;36:20;
40:24;42:12,20;43:22;
46:10,13;52:7;53:11
**letters (2)**
20:10;29:7
**letting (1)**
20:13
**level (18)**
10:9;17:21;20:22,22,
23;22:10;23:11;24:20;
30:6,9,11,20;38:16;
39:2;40:8;41:6,8;54:19
**levels (2)**
11:16,20
**licensed (1)**
32:15
**lie (1)**
61:1
**lies (1)**
37:22
**lifesaving (1)**
67:13
**likewise (1)**
42:16
**limitations (1)**
7:10
**line (2)**
13:9;51:17
**list (5)**
33:6;34:22;35:5;
49:9;66:14
**literature (23)**
16:14,17,21;27:1,23;
34:19,23;48:20;54:14,
16,19,23;55:21,22;
56:19,21,22;57:1,7;
58:3;60:14,15,22
**little (5)**
8:8;14:5;22:2;35:8;
36:3
**LLP (1)**
2:2
**long (2)**
40:1;67:4
**look (25)**
12:9;13:19;15:20;
20:2;21:22;22:15,21;
23:21,24;25:8,22;
31:24;40:17;43:8,10;
44:17;45:10;47:13;

58:7,19;59:7,11,21;
61:20;63:4
**looked (12)**
10:24;19:5;22:14,14;
23:22;24:18;33:11;
42:12,24;49:13;51:17;
57:5
**looking (12)**
15:15;19:14;20:6;
22:10;24:7;31:2;50:1;
52:1,1;55:5;60:21;62:8
**looks (5)**
7:14;8:9;13:21;20:6;
40:23
**losing (1)**
38:2
**lot (2)**
11:8;33:20

**M**

**Maginnis (1)**
1:14
**maintaining (1)**
39:24
**makes (3)**
18:11;34:1;49:6
**making (5)**
12:5;13:11;23:12;
33:7;34:3
**Managed (1)**
7:15
**management (8)**
5:19,20;8:1,6,7;9:23;
19:6;29:10
**manufacturer (1)**
65:14
**many (9)**
17:4;23:17;24:9,14;
31:24;44:24;51:1;66:2;
67:3
**March (6)**
20:24;22:23;23:1,6;
25:7;26:21
**Mark (2)**
3:21;6:10
**marked (5)**
12:11,12,17;15:9;
52:14
**matched (1)**
30:21
**matter (4)**
30:23;36:12;47:1;
70:5
**Maureen (2)**
1:17;70:3
**may (18)**
7:13;16:13,14,23;
22:4;32:8;34:14;35:8;
38:17;40:12,23;43:4,
22;44:12,14,14;45:5;
50:6
**maybe (6)**

15:3;20:7;23:14;
44:16;52:13,23
**McKenna (1)**
14:8
**MCMC (16)**
38:20,23;39:1,5;
40:24;41:1,11,22;
42:19;43:1;44:2;45:11,
14;50:6;51:23;54:4
**MD (1)**
13:21
**mean (2)**
34:8;44:2
**means (6)**
3:13;4:24;26:17;
47:5;48:15;70:17
**med (1)**
28:13
**MEDIA (2)**
1:22,23
**Medicaid (2)**
57:11,13
**MEDICAL (99)**
1:7;6:18;7:7,16,20;
8:4,6,11;9:5,9,20,22,24;
10:1;11:10,11;12:4,5;
14:12;15:3,14,16;16:11,
12,14,15,17,20;17:1,8,
13,16;18:5,9;19:5;
23:12,23;25:13,15;27:1,
23;28:4,8,17,21;29:4,
10,11;30:14;31:12;
32:12;33:15,18;34:19,
23;35:4,6,12,13;46:3,6;
48:5;55:11,21,22;56:19,
21,22;57:1,16;58:2,17,
24;59:21,24;60:3,10,12,
19;61:5,6,12,13,14;
62:9,11,15;63:2,4,10,
14,19,22;65:9,12,12;
66:21,24;67:13
**medically (11)**
34:10;35:11;45:12,
21,22;46:18,23;47:3,14;
55:17;56:17
**medication (1)**
64:10
**medications (1)**
65:9
**medicine (5)**
8:10,16,18,20;67:10
**meet (1)**
54:21
**meeting (1)**
62:19
**member (10)**
18:15;20:11;21:5;
40:10;41:23;43:10;
52:16,22;53:18;55:12
**members (7)**
7:9;10:3;62:11;65:4,
7,11,23
**member's (1)**

Rubin vs.
Amerihealth Administrators, Inc., et al.
Case 2:12-cv-03719-RK   Document 18-7   Filed 04/16/13   Page 27 of 42
Dr. Gideon Hill
February 8, 2013

mention (1)
22:6

mentioned (2)
14:13;62:7

met (1)
18:11

methods (1)
34:22

MEZZANOTTE (1)
2:2

might (4)
6:17;21:14;30:16;
57:21

mind (1)
44:6

minute (3)
41:3;46:12;57:19

missed (2)
24:3;49:18

mistake (1)
22:7

moment (3)
6:17;7:12;45:4

moments (1)
61:19

monitor (1)
58:18

monitoring (1)
17:12

months (1)
23:17

more (8)
4:8;21:11;24:16,17;
28:22;33:22;48:3;64:18

morning (1)
3:20

most (1)
34:17

motion (2)
62:22,23

move (1)
36:15

much (3)
10:12;30:17;62:8

mute (1)
36:12

myself (4)
3:20;19:9;22:12;51:3

**N**

name (5)
3:21;13:17;37:4;
41:18;52:23

nameless (1)
53:6

namely (1)
18:21

National (3)
31:12;32:12;63:8

nature (1)
43:17

NCQA (1)
39:23

necessary (13)
16:2;34:10;35:12;
45:12,21,22;46:18,23;
47:1,3,14;55:17;56:17

necessity (1)
55:11

need (4)
22:11;41:3;53:17;
56:6

needed (1)
14:11

negative (1)
57:4

network (2)
52:16;65:4

neurologist (4)
30:24;31:4;46:11,17

neurology (1)
39:12

new (14)
16:13,14,21;17:2;
25:21;42:13,20,21;
43:23;44:5,10;58:22;
61:15;65:13

newer (1)
59:1

next (6)
14:13;17:23;30:2;
33:1;41:21;55:15

nine (1)
11:7

NMR (4)
31:15,20,24;32:6

nobody (1)
27:18

non (1)
67:24

none (1)
49:2

non-responsive (1)
36:16

normal (1)
27:18

Notary (2)
1:19;70:13

note (9)
14:5,13;21:2;22:22;
23:2;25:22;26:15;
32:16;42:17

notes (6)
19:2,6;30:5;45:5;
57:20;70:7

notice (2)
40:24;41:22

notified (2)
18:16;41:5

notifying (1)
20:11

number (16)
6:14;12:17;13:6,20;
17:17;19:15;30:15;

35:5;36:22,22;38:16;
39:6;45:15;47:21;58:8;
68:2

numbering (2)
15:21;19:7

numbers (4)
6:12,20;11:4;13:18

nurse (5)
20:7;21:4;23:19;
41:16,19

nurses (2)
14:9;32:13

**O**

object (4)
3:14,16;36:15;53:4

Objection (3)
29:1;56:8;64:3

objections (1)
3:5

objective (1)
24:2

obtaining (1)
50:22

obviously (1)
56:5

occasion (3)
31:11;32:9;66:22

occasions (1)
31:19

occur (1)
18:12

occurred (2)
11:11;38:14

occurrence (1)
10:18

occurs (2)
9:16;18:15

off (15)
6:6,8;16:3,5;21:17,
19;29:18,19;64:16;
66:8,11,13,22;67:14,17

offered (3)
18:8;20:15;41:7

Offhand (1)
66:3

office (4)
5:7;19:14,17;20:16

Offices (1)
1:14

Often (4)
15:23;35:23;64:16;
66:20

old (1)
42:20

once (8)
28:19;38:11,14;
44:23;55:24;62:14;
63:5,6

oncologic (1)
67:9

one (31)

6:3;13:1,1,12;14:9,
13;16:21;20:4,4;27:12,
12,15;33:13;35:5,6;
38:1;39:22,23;52:6,14;
57:19;59:11,14,14;61:2,
23;62:2;64:6,15;65:20;
67:9

ongoing (1)
67:11

only (7)
3:15;32:13,13;38:1;
39:21;50:3;65:16

onto (1)
58:8

opines (1)
54:10

opining (1)
56:19

opportunity (7)
18:2,4,21;20:17;43:8;
53:1;62:13

opposed (2)
34:5;38:4

options (1)
54:13

Oral (1)
1:12

organization (4)
30:13,19;39:2,7

organizations (2)
39:10,22

original (1)
33:11

out (13)
17:13;20:10;26:16;
28:24;30:20;39:13,14;
50:3;54:15;61:20,24;
63:3,7

outcome (1)
28:13

outlined (2)
9:20;51:19

outlines (2)
7:6;37:16

outlining (1)
48:6

outpatient (5)
34:5,11,17;36:11;
38:3

outside (2)
25:4;50:11

over (5)
10:24;14:8;15:24;
24:9;66:16

overturn (2)
18:12;43:18

overturned (1)
43:13

own (1)
25:19

**P**

Pace (1)
1:14

packet (1)
40:7

PAD (1)
21:3

page (35)
13:6,19;15:20,22;
16:8;19:16,18,21,24;
20:20;21:2,7,8;22:1;
23:2;32:19;33:1,2,6;
35:1,18;37:3;40:20;
41:2,13;44:17,20;
45:20;49:9,10;59:12,
14;60:1;69:3,11

pages (3)
12:18;44:18;70:7

pain (8)
16:9;25:1;31:1;
34:21;57:9;60:4,6;
68:11

papers (1)
58:9

paragraph (4)
16:10;25:8;28:11;
47:22

parameter (2)
47:23;48:2

parameters (1)
48:18

paraphrase (1)
25:11

parent (1)
5:2

parliamentary (2)
62:21;63:15

part (7)
18:8;36:17;41:24;
56:10;64:22;65:11,15

participating (1)
13:8

particular (14)
6:11,14;10:9;11:9;
17:5;30:22;32:16;36:4;
46:9,13;49:13;55:3;
56:15;68:6

party (3)
4:23;5:4,8

passed (3)
62:24;63:1,5

past (3)
31:15;39:18;58:22

patient (6)
5:18;8:1,6;31:21;
32:1;55:6

patients (1)
8:17

Patty (2)
21:3;41:20

paying (1)
5:7

payment (1)
5:17

**pediatrics (1)** 8:17

**peer (6)** 21:13,23;34:19,23; 57:7;60:21

**peer-to-peer (5)** 18:2,15;19:12;20:2, 14

**Pennsylvania (5)** 1:16,23;52:8,10; 53:11

**people (6)** 10:16;13:7;17:17; 27:10;35:24;51:1

**perceived (1)** 12:2

**percentage (1)** 10:20

**perfect (1)** 67:5

**performed (2)** 9:5;54:3

**perhaps (2)** 30:24;34:17

**Permedion (3)** 53:13;54:3,4

**permit (1)** 57:17

**permitted (1)** 65:23

**person (14)** 7:6;10:12;13:1,1,11, 13;30:22;39:5,11; 41:14;50:10;52:15; 56:15,18

**Philadelphia (1)** 1:15

**phone (3)** 14:6;18:4;20:12

**phrase (1)** 13:5

**physician (1)** 18:4

**physicians (1)** 61:17

**PINNIE (35)** 2:2;3:19,21;6:6,10, 15,23;11:24;12:1,15; 15:7,11,12;16:3,7;20:5; 21:17,21;29:2,18,21; 31:8;52:18,21;53:10, 15;56:13;57:23;59:4; 64:3;65:20,21;67:22; 68:12;69:6

**placebo (4)** 27:14,21;48:24;49:4

**placed (3)** 19:17,19;45:1

**Plaintiff (1)** 1:13

**plan (23)** 5:2,4,5,9,14,24;6:5, 18,22;7:8,11;9:21,22;

10:6;46:1,2;47:2,4; 53:19;54:11,14;55:10, 16

**planned (1)** 10:2

**plan's (1)** 55:18

**played (1)** 64:23

**PLB (2)** 41:15,22

**please (1)** 43:18

**PO (1)** 2:4

**point (13)** 9:13;21:6;29:14; 30:20;35:22;36:12; 37:20,21;51:16;62:7; 63:16;64:6,19

**policies (6)** 15:24;17:19;19:8; 33:23;55:11;63:2

**policy (58)** 10:1,1;15:3,8,14,16; 16:11,15,20;17:2,8,16; 24:1;25:13;28:4,8,17, 23;29:17;35:4,6,12,13; 36:8;39:9;41:7;43:10; 51:19;54:15;55:18; 58:18,22,24;59:21,24; 60:3,10,12,19;61:4,6,6, 12,13,14;62:8,9,12,15, 24;63:5,9,14,17,19,22; 65:12,12

**poor (1)** 28:12

**popular (1)** 58:5

**possibility (1)** 18:16

**practice (11)** 8:14,14,21;36:1;40:5, 6;46:8;47:23;48:2,18; 49:12

**practiced (1)** 8:10

**practices (2)** 48:7,12

**practitioner (1)** 8:24

**practitioners (2)** 48:9,10

**preliminary (1)** 19:23

**preparation (1)** 58:7

**preponderance (1)** 57:6

**prescribed (1)** 46:4

**present (5)** 7:14;11:3;23:20;

62:17,19

**presented (1)** 63:13

**pretty (1)** 61:2

**previous (3)** 21:12;32:20,23

**previously (5)** 3:21;26:3;42:13; 52:14;61:9

**primarily (2)** 8:13,14

**prior (7)** 7:19;22:8;24:6; 34:13;40:2;45:15;49:19

**privacy (3)** 52:19;56:5;59:9

**probably (7)** 4:6;11:6,7;24:17; 40:19;55:14;64:14

**procedure (2)** 62:21;63:15

**procedures (1)** 38:15

**proceed (1)** 41:9

**proceeded (1)** 43:15

**proceedings (1)** 70:4

**process (22)** 5:23;9:13;12:8;13:8; 18:8,13;21:6;23:14,21; 25:21;26:1;27:9;28:5; 30:17;48:6;50:7;56:11; 64:19;65:11,13,16; 66:17

**produced (1)** 27:1

**Professional (3)** 1:18;42:13;70:12

**program (3)** 8:3,5;9:23

**promoted (1)** 58:5

**proper (1)** 56:8

**proponent (1)** 65:14

**proposition (1)** 39:4

**protect (1)** 52:20

**protected (1)** 56:7

**protocol (1)** 47:9

**protocols (2)** 6:24;17:22

**provide (7)** 5:9,10,17,18;6:5; 9:23;30:14

**provided (11)**

31:3;33:3;34:10;35:9, 17;37:10;38:12,20; 40:10;47:4;55:2

**provider (10)** 18:4,16;20:11;21:13, 23;26:3;32:17;40:9,12; 46:5

**providers (2)** 48:10;57:16

**providing (2)** 34:5;37:14

**Public (2)** 1:19;70:13

**published (1)** 16:15

**purchasing (1)** 5:1

**purpose (4)** 30:15;58:16;65:4; 66:11

**purposes (1)** 12:14

**put (7)** 6:12;13:17;14:18; 15:5;32:18;50:4;62:6

**putting (2)** 37:10;40:18

## Q

**qualified (1)** 46:4

**quality (3)** 28:12;65:11,16

**quantify (2)** 10:17;31:23

## R

**Ramos (17)** 13:21;14:14,14,23; 17:21;20:1;22:13,16; 23:10,13,15;25:18; 26:7;51:3,5,22;58:12

**Ramos' (3)** 14:19;26:12,18

**randomized (4)** 27:5,7;48:22,23

**randomly (1)** 27:12

**range (1)** 24:15

**rather (2)** 5:1;65:8

**rational (1)** 45:16

**rationale (19)** 14:17,24;23:3;25:9, 11,24;26:2,5,6,11,17,20, 20;29:9;33:4,24;34:15; 37:15;65:3

**RCT (1)** 27:4

**RCTs (3)** 27:2,24;47:24

**reached (1)** 49:14

**reaches (2)** 49:6;54:10

**read (2)** 44:23;58:9

**reading (1)** 3:2

**real (1)** 36:5

**realized (1)** 43:6

**really (9)** 3:17;12:3;24:1; 33:22;36:11;38:1,2; 65:15;67:1

**realm (2)** 54:13;68:8

**reason (7)** 6:11;14:24;46:16,21; 47:17;60:8;64:15

**reasons (2)** 30:16;32:19

**recall (2)** 9:20;42:10

**receive (5)** 27:13,13,16,17;54:21

**received (2)** 33:14;41:22

**recess (1)** 57:22

**recognize (2)** 6:17;11:24

**reconsider (1)** 43:2

**reconsideration (2)** 24:2;42:2

**record (13)** 6:6,9,19;16:4,6; 21:17,20;27:3;29:18, 20;30:8;32:18;38:23

**records (5)** 19:5;23:23;31:2; 33:15,18

**refer (2)** 18:2;52:22

**reference (7)** 35:18;44:12,18;49:8; 58:14;60:10;63:21

**referenced (6)** 19:22;21:7;25:23; 33:13;59:18,19

**references (10)** 9:22;33:7,13;35:3; 44:16;45:2;49:8;59:11, 13,17

**referencing (1)** 23:4

**referred (3)** 14:12;33:24;52:6

**referring (1)**

Rubin Case 2:12-cv-03719-RK    Document 18-7    Filed 04/16/13    Page 29 of 42
Amerihealth Administrators, Inc., et al.
Dr. Gideon Hill
February 8, 2013

refers (1)
48:2
reflect (2)
9:9;30:5
reflected (2)
22:23;28:8
reflecting (1)
63:12
reflects (1)
63:10
refractory (1)
54:13
regard (11)
12:20;14:1;16:20;
17:14;18:22;30:3;
31:23;44:6;54:11;58:3;
68:6
regarding (1)
47:23
Regional (5)
7:16;16:9;25:1;
34:21;57:9
Registered (2)
1:18;70:12
regular (1)
10:18
regularly (1)
16:16
rejected (2)
10:13;47:9
rejecting (1)
56:1
rejection (2)
20:23;47:18
related (3)
5:14;10:22;60:10
relates (2)
65:3,6
relative (1)
61:14
relevancy (2)
3:17;56:8
relevant (3)
3:15;59:9;61:20
remain (1)
53:6
remember (2)
42:8;58:6
Remstein (1)
9:3
rendered (4)
38:17;40:12,15;58:11
rephrase (1)
4:8
report (10)
33:2;38:19;43:4;
44:12,18;45:11,14;50:1,
4,6
reported (1)
27:20
Reporter (4)
1:18;3:12;12:12;

70:19
REPORTING (1)
1:22
reports (2)
32:10,12
represent (3)
3:21;13:24;59:22
represents (2)
12:19,23
reproduction (1)
70:16
request (10)
11:15,16;14:16;
18:10;20:13;23:17;
25:12;35:13,13;40:24
requested (2)
30:5;64:20
requesting (2)
14:7;18:3
requests (1)
24:14
required (1)
30:16
research (4)
17:18;28:5;64:11;
67:11
reserved (1)
3:6
resolve (1)
47:15
respect (1)
8:1
responses (1)
36:3
responsible (1)
39:24
result (1)
23:8
resulted (1)
31:20
reveal (1)
39:7
review (57)
5:20,23;8:3;10:3;
11:14,17;13:8;17:21,
24;18:21;19:23;21:13,
23;22:11;23:1,8,15;
24:20;25:20;29:15;
30:2,6,9,11,12,13,14,19,
21;31:19;32:6,9,13;
34:19,23;36:2,23;38:10,
16;39:1,3,7,10;41:24;
42:2,21;43:19;50:15;
51:1;53:1,14;54:2;57:7,
24;58:13;60:21;61:19
reviewed (23)
11:4;15:24;16:1,16;
19:8;31:4;33:18;42:4;
43:16;44:10,15;45:9;
50:1,2,4;54:23;55:3;
56:1,23,24;58:2;59:1;
62:15
reviewee (1)

54:20
reviewer (15)
29:16;30:21;39:5,20;
40:4;45:17;47:21;
49:13,20;51:14,23;
54:20,22;58:12;61:23
reviewers (2)
56:23;63:13
reviewing (2)
53:5;56:14
Reviews (4)
31:12,16;50:17;58:17
revise (1)
63:8
rewrite (1)
58:20
rewrites (1)
58:21
rewritten (1)
62:16
right (11)
4:2,9;7:3,21;15:11;
19:18;21:10;26:12;
37:5;43:14;57:3
risk (1)
5:3
Roderick (1)
46:10
role (2)
8:2;10:8
routine (1)
18:8
Rubin (13)
3:22;14:2;15:10;
20:19;30:4;38:11;41:5;
46:9;49:21;52:6,14;
56:2;58:15
Rubin's (9)
5:12;9:15;12:9,20;
18:23;21:16;24:6;30:3;
31:7
rule (3)
6:12;32:1,2

**S**

safe (4)
10:23;33:16;64:12;
65:17
safely (1)
34:11
safety (1)
25:14
sake (1)
13:18
saline (1)
27:18
same (13)
8:22;23:3;25:24;26:2,
6,16;36:21;37:14,18;
40:7;63:22;70:9,17
Sand (2)
54:10;55:16

sat (1)
22:20
saw (2)
8:17;14:12
saying (6)
4:5;42:20;48:19,20;
49:1;60:24
scenario (1)
67:2
school (1)
9:6
Schwartzman (9)
19:20;42:17;43:24;
44:20;58:5;59:1,15,18;
60:4
Schwartzman's (4)
19:14,17;20:7,16
science (1)
19:10
scientific (2)
16:16;27:9
screen (1)
12:22
screening (1)
45:5
sealing (1)
3:3
search (2)
27:1,23
second (17)
6:7;13:19;19:18;
21:18,24;25:8;29:15;
30:6,9,11,20;33:1;
36:22;41:8;45:20;
62:18;63:7
SEELAUS (1)
2:2
self-insured (2)
5:1,5
sell (1)
5:6
send (4)
20:10;30:20;40:6;
43:19
sending (1)
41:1
Senior (1)
7:20
sent (9)
23:24;26:3,16;28:24;
40:7;42:3,8;63:3,7
sentence (2)
16:18;34:9
sentences (2)
48:18;55:15
series (2)
3:23;13:6
service (2)
5:18;8:20
services (5)
5:9,17,19;7:16;25:15
set (1)
30:13

setting (3)
34:11;36:11;68:5
several (1)
49:21
severe (1)
68:11
shaking (1)
58:20
Shapri (2)
13:13;14:5
shared (1)
52:5
short (8)
6:8;12:21;14:19;
16:5;21:19;29:19;53:3;
57:22
shorthand (2)
26:23;70:19
show (4)
6:16;15:4;21:14;
52:23
showed (2)
9:21;52:9
shown (2)
12:10;28:13
shows (1)
48:20
sideline (1)
36:1
signature (2)
22:1;29:23
signed (1)
37:4
significance (1)
64:1
significant (1)
11:4
signing (1)
3:2
Sigterman (7)
44:19,21;55:23,24;
59:14,18;60:6
similar (2)
15:1;54:4
similarly (1)
11:4
sit (1)
29:15
situation (3)
5:21;23:13;51:6
size (1)
17:17
solution (1)
27:18
somebody (1)
30:23
someone (4)
5:21;17:23;19:13;
39:6
sometimes (2)
36:2;67:12
sorry (4)
7:4;32:8;34:12;38:8

19:7

Min-U-Script®

**sort (1)**
60:24
**sounds (1)**
12:6
**speaks (1)**
32:20
**Spears (2)**
46:10,12
**special (1)**
32:15
**specialist (1)**
31:1
**specialty (2)**
30:21;32:16
**specific (3)**
49:20;53:5,23
**specifically (11)**
17:14;30:9;32:7;
34:7;40:5;42:10;51:8;
58:6;59:3,12;68:9
**specifics (1)**
12:8
**speculation (1)**
36:16
**spoke (2)**
14:6;48:22
**spoken (1)**
51:8
**Spring (1)**
8:11
**staff (1)**
10:4
**stage (1)**
30:2
**stake (1)**
67:16
**stamp (4)**
6:20;13:10;19:15;
20:20
**stamped (3)**
12:18;13:20;40:20
**standard (3)**
27:9;49:1;60:22
**standards (6)**
7:7;9:14,17,20;17:7;
46:7
**start (1)**
67:14
**starting (1)**
40:20
**starts (1)**
19:16
**state (1)**
63:4
**stated (1)**
55:18
**statement (3)**
55:20;57:1;58:9
**STATES (1)**
1:1
**stating (1)**
64:14
**status (4)**

4:18;16:11;55:10;
63:10
**stenographic (1)**
70:6
**step (3)**
7:12;11:14;17:23
**steps (1)**
61:12
**still (1)**
49:14
**stipulated (1)**
3:1
**stipulations (1)**
3:12
**stop (2)**
15:4;56:11
**strike (2)**
36:15;37:16
**strong (1)**
64:15
**studies (7)**
28:12;48:21,24;49:9,
13;59:13;61:24
**study (18)**
44:19,19,20;48:16;
49:1;55:23,24;58:9,10;
59:2,14,15,18,19;62:1,
2,3,3
**subcontractor (1)**
31:13
**subject (1)**
30:23
**submits (1)**
43:11
**submitted (4)**
41:23;43:16;45:9;
63:6
**subsequent (1)**
11:8
**subsidiary (1)**
4:13
**subspecialties (1)**
67:10
**successful (1)**
50:22
**suffered (1)**
49:21
**suggest (1)**
57:8
**suit (1)**
3:22
**Suite (1)**
2:8
**summary (1)**
10:6
**superior (1)**
34:20
**supplied (2)**
4:16;35:3
**support (2)**
59:24;60:9
**supported (1)**
54:19

**supports (1)**
57:2
**suppose (1)**
37:23
**Sure (7)**
15:5;22:5;26:8,10;
29:3;39:15;41:4
**surgery (1)**
68:5
**Susan (1)**
14:8
**sworn (1)**
3:10
**symptoms (1)**
46:5
**syndrome (4)**
16:9;25:1;34:21;57:9
**synopsis (1)**
58:10
**System (7)**
7:2;19:6;29:7,10;
45:23;50:11;65:22

**T**

**table (1)**
46:22
**talked (3)**
17:20;37:7;61:9
**talks (3)**
34:8;47:22;48:15
**tasked (1)**
34:3
**tasks (1)**
13:9
**technologies (1)**
61:15
**technology (5)**
16:12,13;17:13;
19:10;65:13
**telephone (1)**
13:18
**telling (1)**
48:13
**temporary (1)**
68:10
**terminology (1)**
11:13
**terms (6)**
9:24;53:21;56:7;60:8,
12;66:10
**tested (1)**
27:11
**testified (2)**
3:11;26:10
**testimony (2)**
70:4,8
**therapy (1)**
24:21
**Therefore (2)**
36:9;61:5
**thinking (1)**
21:24

**third (7)**
4:23;5:3,8;16:10;
44:17,17;67:8
**though (1)**
35:8
**thought (2)**
26:10;63:10
**thousands (4)**
10:24;11:6;22:9;
44:23
**times (4)**
17:4;24:18,19;32:1
**titled (1)**
21:23
**today (4)**
3:24;4:11;18:20;58:7
**together (1)**
62:7
**told (1)**
41:18
**took (5)**
20:16;22:15,20;
25:17;45:10
**top (7)**
13:9,15;21;21:8;41:2,
13;49:10;53:11
**towards (1)**
13:20
**track (1)**
32:3
**transactions (1)**
33:15
**transcript (2)**
70:9,16
**transmitting (1)**
37:11
**transpired (2)**
11:12;12:20
**treatment (26)**
5:23,24;10:13;14:3,
21;25:5;27:13;34:6,16,
17,20;46:3,6,18;48:14;
50:19;53:7;54:13,22;
56:16;57:9,11,17;
63:21;64:19;66:6
**treatments (2)**
50:16,23
**trial (3)**
3:7;27:5,7
**trials (1)**
48:22
**trick (1)**
37:15
**trigger (3)**
26:1;38:14;61:18
**triggered (1)**
41:10
**true (1)**
70:8
**try (2)**
10:16;24:1
**trying (6)**
26:14;39:16;49:5;

50:2;53:21;55:13
**turn (1)**
60:1
**turned (1)**
14:8
**two (9)**
11:16,17;16:18;
27:11;37:24;55:15;
59:13;62:4;64:18
**type (5)**
5:22;12:4;14:21;
23:12;33:23
**types (1)**
33:23
**typical (1)**
39:6
**typically (3)**
9:15;32:11;37:13

**U**

**uh-unh (1)**
4:5
**ultimately (3)**
37:23;38:20;51:12
**uncomfortable (1)**
55:7
**under (21)**
5:24;7:2;13:5;17:8;
27:10;32:21;33:21;
34:14;35:12,13;37:11;
40:11;43:3;44:16;
46:13,18;47:2,4,17;
50:2;70:17
**understandable (1)**
4:9
**undoubtedly (1)**
30:1
**UNITED (1)**
1:1
**unless (1)**
70:17
**up (3)**
19:9;30:14;58:21
**update (1)**
58:22
**updated (4)**
15:24;16:2,16;17:6
**updates (1)**
58:19
**upheld (3)**
18:15;21:9;41:6
**uphold (3)**
22:22;23:2;25:23
**upholding (1)**
33:11
**upon (2)**
29:7;51:16
**URAC (1)**
39:24
**usages (1)**
67:17
**use (17)**

10:3;27:2;37:13;
46:14;47:21;55:14,16;
56:20;57:11,17;63:24;
64:16;66:8;67:3,7,23;
68:9
**used (8)**
26:1;31:15;37:14;
54:6;65:10;66:11;68:3,
10
**uses (1)**
66:23
**using (5)**
28:21;49:12;58:1;
61:18;67:14
**Usual (2)**
3:12;4:4
**Usually (2)**
23:16;66:23
**utilization (8)**
5:19;8:3;30:12,19;
36:2;39:1,10;58:1
**utilized (4)**
9:14;56:24;65:23;
68:7
**utilizing (1)**
26:6

## V

**variables (1)**
62:4
**various (2)**
29:8;63:4
**verify (3)**
32:13,13,14
**version (1)**
63:12
**versus (2)**
27:20;66:8
**vets (1)**
65:13
**Vice-President (1)**
7:15
**victims (2)**
68:6,7
**view (3)**
14:20;44:5;65:15
**virgin (1)**
15:22
**vitae (1)**
4:15
**voluntary (1)**
18:7
**vote (3)**
62:24,24;63:15

## W

**waiting (2)**
4:4;43:5
**waived (1)**
3:4
**wants (1)**

7:6
**way (9)**
10:17;31:23;39:13;
49:24;50:3;52:15;61:2;
64:14;67:15
**wealth (1)**
31:18
**weight (1)**
60:14
**weighted (1)**
62:6
**weren't (1)**
12:4
**whenever (1)**
4:10
**Whereupon (6)**
6:8;12:12;16:5;
21:19;29:19;57:22
**wide (1)**
60:20
**widely (6)**
48:8,14;67:7;68:3,7,
10
**widespread (1)**
68:1
**Williamson (1)**
2:3
**willing (1)**
39:16
**wished (1)**
17:23
**within (3)**
3:4;51:2;63:22
**WITNESS (5)**
6:21;11:23;19:21;
68:16;69:3
**women's (1)**
8:17
**word (2)**
45:21,22
**wording (1)**
36:3
**words (1)**
9:16
**worked (1)**
10:19
**working (1)**
11:5
**works (4)**
9:24;21:6;23:15;67:1
**writing (2)**
29:5,12
**written (2)**
62:8;63:11
**wrong (1)**
26:13
**wrote (1)**
25:23
**wwwmediacourtreportingcom (1)**
1:24

## Y

**year (2)**
9:6;59:22
**years (4)**
9:2;11:1,7;24:9
**yellow (1)**
57:20

RUBIN, DEBRA ID:05051249-02

**Due:** 06/13/2012 11:59 PM ET    **Priority:** Routine    **Stage:** CLOSED
**From:** Patricia Buckley    **To:** Patricia Buckley    **Case event:** 36
**Outcome author:** Patricia Buckley    **Outcome:** Auto Findings    **Billing role:**

### Route To/activity number (18)
**Type:** Patient Care Management    **Reason:** Appeal Follow-up
**Due:** 06/13/2012 11:59 PM ET    **Priority:** Routine    **Stage:** CLOSED
**From:** Patricia Buckley    **To:** Appeals    **Case event:** 38
**Outcome author:** Patricia Buckley    **Outcome:** Entered in Error    **Billing role:**

### Route To/activity number (19)
**Type:** Patient Care Management    **Reason:** Appeal Follow-up
**Due:** 06/13/2012 11:59 PM ET    **Priority:** Routine    **Stage:** CLOSED
**From:** Patricia Buckley    **To:** Patricia Buckley    **Case event:** 39
**Outcome author:** Patricia Buckley    **Outcome:** Auto Findings    **Billing role:**

**Case Comments:**

02/10/2012 03:28 PM ET SJB
Comment: INTAKE NOTE
PCS/PCC: Shapri Bryan, PCS ext 64673 (215-657-8900)
Patient Name: Debra Rubin
Patient Phone#: 610 999-8327
Patient Name and additional Demo(s) Verified (select one):
                DOB
Demo verification Additional Comments:
Call Type: Phone-In
Caller: Debra Rubin
Relationship: Patient
Calling On Behalf Of: self
Caller Telephone#: 610 999-8327 ext:

DRG REVIEW: N/A
Member Prime w/AHA: Yes
Fax ID:   Fax Received Date:   Received Time:

Comments: calling to req an exception for '5 day infusion for medication'
not yet scheduled. Xferd to pcc queue.

Dept Policy used for Determ:
Verbal Disclaimer given: N/A
Phone Recording Script Given:   Consent:

02/10/2012 05:01 PM ET TTK
Comment: PRECERT-PROCEDURE / ADMIT REVIEW NOTE    Fri 10 February 2012
PCC: Susan McKenna, PCC CC ext 4688 (215-657-8900)
        CASE CONTACTS: (prn)
            NAME: Debra Rubin
            PHONE: (610) 999-8327    EXT:
            ROLE: UR
FAX ID: n/a
Patient Name and Additional Demo(s) Verified (select one): DOB

DRG Review:  Initial-Elect-Med Nec Rev

PROCEDURE REVIEW:
ADMIT DATE:  not yet scheduled, awaiting authorization
PROCEDURE DATE:  not yet scheduled, awaiting authorization



RUBIN, DEBRA ID:05051249-02

PLACE OF SERV:  Inpt

HPI:  Comments: Received call from patient requesting OON exception for "5 days of infusion at Hahnemann for pain". Pt reports she lives in pain 24hrs, 7 days a week without relief and that she has a brain injury from two aneurysms that ruputured.  Pt reports that her PCP is Dr. Karen Scoles at 610-499-7180.

CMC placed call to office of Dr. Schwartzman (ordering neurologist) at 215 762-6915 and spoke to nurse Lynn:

Patient was seen once on 10/10/2011

Diagnosis:
1. complex regional pain syndrome
2. brachial plexus sensitization upper truck, lateral cord, and lateral trunk
3. cervical plexus sensitization C2-C4.

Treatment Plan: IV Ketamine protocols inpatient. Patient has had the required clearances by cardiac and neuropsychology.

D(X):  355.9 - COMPLEX REGIONAL PAIN SYNDROME

PROCED REQ:  UNCLASSIFIED DRUGS - J3490 (IV Ketamine)
Criteria Notes:  RN reviewed IBC medical policy 08.00.57b - referred to medical director for medical necessity of IV Ketamine and inpatient admission for the same.

INPT STAY REVIEW FOR PROCEDURE:  DRG facility

PRECON EXCEPTIONS & REQUIREMENTS:
STATE: PENNSYLVANIA
STATE MDR LICENSE EXCEPTIONS: None
STATE UM EXCEPTIONS: ICHP- PA Act 106 coverage of substance abuse services when prescribed by a PA licensed provider
STATE SPECIFIC LETTER:    no, except PA Act 106

(reference case X120410133 for OON exception review)

02/10/2012 05:04 PM ET AAR
Comment:

---

MDR PRECERT REVIEW        .  . 10 February .2012   (Friday)
MDR: A. Ramos, M.D.
STATE:
REVIEW LEVEL: 1RV  (1st review)
AXIS 1 REQUEST: Pain Management  J3490 (IV Ketamine)
    MDR DET-DENY-Investigational/ experimental
    REASON: X01 EXP-Medical Policy: Experimental trx is BENEFIT EXCLUSION. Request is exp'l for this dx based on health plan medical policy because safety/ efficacy not established. Although trx plan is deemed necessary or advisable by treating physician, if benefit exclusions exist, coverage not available under this health benefit plan.
    CLIN RATIONALE:  Per medical policy, Intravenous ketamine is considered experimental/investigational and, therefore, not covered, for treatment of CRPS.

A search of the medical literature produced no RCTs involving the use of intravenous ketamine in CRPS. Existing studies investigating ketamine are of poor quality or address only non-CRPS pain. Therefore, intravenous ketamine in CRPS has not been shown to improve the net health outcome. In addition, intravenous ketamine has not been approved by the FDA for use in CRPS.

MEDICAL POLICY:  08.00.57b

---

02/13/2012 11:44 AM ET TTK
Comment:  NON-CERT NOTICE ENTRY        Mon 13 February 2012

RUBIN, DEBRA  ID:05051249-02

PCC: Tahir Thomas-Kinsey, PCC UM ext 4665 (215-657-8900)
PHONE RECORDING SCRIPT GIVEN: yes  CONSENT: yes

REASON:   Experimental/investigative based on the medical policy guideline

PROCEDURE(s) denied: Inpatient admission for UNCLASSIFIED DRUGS - J3490 (IV
Ketamine)

NON-CERT INFORMATION PROVIDED:
    1. Notification of the UR Decision made by AMH medical director.
    2. Clinical rationale for decision as entered above in the MDR note
will be provided upon request.
    3. How to initiate:
        -Peer to Peer discussions (within 5-day post-D/C window)
        -Level 1 Appeals.
NOTIFICATIONS MADE: (Name or Name and title)

Provider Office: Office of Dr. Schwartzman at 215 762-6915 - transferred to
Bessie and LVMM.

Spoke to member, Debra Rubin (610) 999-8327 - member requested appeal
information - CMC transferred member to Appeals queue.
02/13/2012 11:46 AM ET  D01 - Case Not Medically Necessary

02/13/2012 12:12 PM ET PAD
Comment:  Received trsf call, member calling to get information about
filing an appeal.  Discussed with member appeal process, her options.
Informed her of what information that we have received.  She states not sure
what to do and why denied as E/I since all of her drs that she has seen
(PCP, Neuro, Ortho and director of interventional pain medicine- all Crozer
physicians) are reommending this infusion for her dx.  Informed her based
on our medical policy this is deemed E/I.   Discussed previous treatment
she has had she said her neurologist said that a nerve block may help but
she would need to stop her physical therapy she is receiving for 10 wks -
(pt was going to PT for foot injury).   She does not want to file an appeal
yet.  She wants to gather more information to submit with an appeal or have
the provider appeal first , she would like a copy of the medical policy and
consultants rationale.  Informed her that we will have that sent.  Gave her
our 800 # and appeal extension if any further questions or guidance needed
for an appeal.  Verb understanding.
02/13/2012 12:21 PM ET  D01 - Case Not Medically Necessary

02/14/2012 03:13 PM ET SKL
Comment:  Medical Policy 08.00.57b and Clinical Rationale sent to member at
address on file.
02/14/2012 03:14 PM ET  D01 - Case Not Medically Necessary

02/29/2012 11:42 AM ET ANE
Comment:  MISCELLANEOUS/CALL NOTE
PCS/PCC: Andrea Eichenlaub, PCS ext 64675 (215-657-8900)

Patient Name and Additional Demo(s) Verified (select one): Agreement/ID#
Demo verification Additional Comments:

Contact Name: debra rubin
Caller Telephone #: (610) 999-8327   Ext:

Relationship: Patient

Phone Recording Script Given: N/A  Consent: N/A

DRG REVIEW: N/A

Dept Policy used for Determ: N/A

Comments: intake-ck'g to  see if ltr has been recvd from tx'g neurologist
for appeal, not recvd at this time, pt req clarification of appeal processes
and levels, trna to appeal q

RUBIN, DEBRA ID:05051249-02

Verbal Disclaimer given: N/A
02/29/2012 11:48 AM ET  D01 - Case Not Medically Necessary

02/29/2012 11:58 AM ET PLB
Comment: Rec'd call from member- transferred from intake- spoke w/Debra Rubin, reviewed appeals process with member and denial reason at her request, she advised that she met w/ her neurologist at Crozer and he will be initiating the appeal and he is sending a letter to do this- she was unsure if he mailed or faxed the letter or when it was specifically sent- advised her that I do not yet see that this was received, she is going to f/u w/ her Dr regarding this- provided her w/ UM dept fax # also. Encouraged her to contact us if she has any further questions.
02/29/2012 12:03 PM ET  D01 - Case Not Medically Necessary
03/07/2012 03:53 PM ET  D01 - Case Not Medically Necessary

03/21/2012 10:04 AM ET PLB
Comment: Pre service provider appeal
State: PA
HCR: yes
CRD: 3/19/12

Referring Attending: Roderick Spears, MD  Specialty: Neurology
Treating provider for requested service: Robert Schwartzman, MD
Specialty:Neurology

Pre- service provider appeal submitted by attending referring member for this treatment: HAN Neurological Associates. Included with appeal request is letter of medical necessity. Initial UM admission denial per Andres Ramos, MD: "X01 EXP-Medical Policy: Experimental trx is BENEFIT EXCLUSION. Request is exp'l for this dx based on health plan medical policy because safety/ efficacy not established. Although trx plan is deemed necessary or advisable by treating physician, if benefit exclusions exist, coverage not available under this health benefit plan."

Appeal Chart review:

Dx: Complex Regional Pain Syndrome

Requested Service: J3490 (IV Ketamine)- and associated admission for administration

HPI: Letter of medical necessity indicates that this 55 yo female is being seen by Crozer neurology for treatment of chronic migraine and CRPS of the left lower limb. She has been receiving PT 3 x/wk and was recently discharged for "lack of progress" and noted to be taking " potent pain medications". Pain Management advised that nerve blocks could be done "but didn't feel that was superior to going into Dr. Robert Schwartzman's program at Drexel to receive Ketamine infusions for CRPS." Letter further then further discusses Ketamine treatment plan and also notes there is a 2 year waiting list for Dr Scwartzman currently for this treatment.

Medical Policy reviewed: Complex Regional Pain Syndrome (CRPS) Parenteral Treatments 08.00.57b

Forwarded appeal to (AHA) peer consultant for E/I review of IV Ketamine treatment for CRPS.

03/21/2012 10:05 AM ET  D01 - Case Not Medically Necessary

03/26/2012 07:04 AM ET GH
Comment: L1A

Uphold
Same clin rat

ghill md
03/26/2012 07:06 AM ET  D01 - Case Not Medically Necessary

RUBIN, DEBRA  ID:05051249-02

03/28/2012 11:26 AM ET PLB
Comment:  Rec'd above noted 3/26/12 rendered peer consultant determination
of E/I denial uphold by Gideon Hill, MD, Specialty: Family Practice:

"  MDR DET-DENY-Investigational/ experimental
 REASON: X01 EXP-Medical Policy: Experimental trx is BENEFIT EXCLUSION.
Request is exp'l for this dx based on health plan medical policy because
safety/ efficacy not established. Although trx plan is deemed necessary or
advisable by treating physician, if benefit exclusions exist, coverage not
available under this health benefit plan.
CLIN RATIONALE:  Per medical policy, Intravenous ketamine is considered
experimental/investigational and, therefore, not covered, for treatment of
CRPS.  A search of the medical literature produced no RCTs involving the
use of
intravenous ketamine in CRPS. Existing studies investigating ketamine are
of
poor quality or address only non-CRPS pain. Therefore, intravenous ketamine

in CRPS has not been shown to improve the net health outcome. In addition,
intravenous ketamine has not been approved by the FDA for use in CRPS.
   MEDICAL POLICY:  08.00.57b"

 CICS updated and case file sent to imaging, based on HCR pre-service
requested called HAN Neurological Associates (office of Roderick Spears, MD)
610-874-1184- remained on hold for 7 minutes and then given option for VM-
selected option and left VM noting denial upheld on appeal, clinical
rationale, additional member appeal rights remaining and letter forthcoming.
Appeal dept # provider for call back as needed.
03/28/2012 11:27 AM ET  D01 - Case Not Medically Necessary

03/28/2012 02:01 PM ET ANE
Comment:  MISCELLANEOUS/CALL NOTE
PCS/PCC: Andrea Eichenlaub, PCS ext 64675 (215-657-8900)

Patient Name and Additional Demo(s) Verified (select one): Agreement/ID#
Demo verification Additional Comments:

Contact Name: debra rubin
Caller Telephone #: (610) 999-8327   Ext:

Relationship: Patient

Phone Recording Script Given: N/A   Consent: N/A

DRG REVIEW: Initial-Elect-Med Nec Rev

Dept Policy used for Determ: N/A

Comments: intake-called re:ltr of appeal recvd, tran  to appeal q

Verbal Disclaimer given: N/A
03/28/2012 02:01 PM ET  D01 - Case Not Medically Necessary

03/28/2012 02:11 PM ET PLB
Comment:  Rec'd call from member, transferred from intake as noted in above
documemtation, spoke w/Debra Rubln, checking on status of appeal,  explalned
denial uphold on provider pre-service appeal, provided clinical rationale,
explained that she has right to copy of information that provider submitted
for his level of appeal, explained member appeal rights and ERO appeal
option. Caller did not elect to Initiate appeal at this time nor dld she
request copy of what provider submitted on his level of appeal at this tlme,
she stated that she wants to wait to receive her determination letter and
stated that she is going to confer w/the insurance commission and her
attorney and will get back to us. Advised her to contact us if she has any
additional questions.
03/28/2012 02:16 PM ET  D01 - Case Not Medically Necessary

04/20/2012 03:38 PM ET PLB
Comment:  HCR Pre-service member appeal (CRD 4/18/12)

RUBIN, DEBRA ID:05051249-02

State:PA

Treating provider for requested service: Robert Schwartzman, MD
Specialty:Neurology

Dx: Complex Regional Pain Syndrome

Requested Service: J3490 (IV Ketamine)- and associated admission for
administration

Included in member's submitted appeal request for IP IV Ketamine treatment
for her CRPS is copy of provider appeal determination letter, mbr's appeal
letter, bulleted timeline by mbr of her CRPS/RSD Injury history and several
professional journal/research articles. Called and spoke w/member Debra
Rubin (610) 999-8327, phone recording script provided and consent obtained,
confirmed that we are in receipt of her appeal request, member does want
information that provider submitted on his appeal included along with her
information for review on member appeal, she would also like a copy of this
information via email and per our dept procedure for this- provided her with
my email address and Instructed her to note request of Information In body
of email, and the email address she sends it from will be the one to which I
return the requested documents, member did also confirm that she does wish
for the appeal review to proceed prior to her reciept/review of the
requested information from the provider appeal noting that she is familiar
with what was submitted because she did review it at the provider's office
but did not obtain a copy, noted anticipated TAT and ERO appeal rights
available to member if denial upheld. She verbalized understandlng of the
information provided.

Medical Policy reviewed: Complex Reglonal Pain Syndrome (CRPS) Parenteral
Treatments 08.00.57b

Forwarded appeal to (NMR- Neurology) peer consultant for E/I review of IV
Ketamine treatment for CRPS.
04/20/2012 03:39 PM ET  D01 - Case Not Medically Necessary

04/20/2012 03:40 PM ET PLB
Comment:  Plan document also included in appeal file sent for review.
04/20/2012 03:40 PM ET  D01 - Case Not Medically Necessary

04/20/2012 05:02 PM ET PAD
Comment:  VM message left on appeal queue extension at 4:05 pm , member
calling requesting to hold off on sending the appeal for consultant review
(neurology) she wants to send in a corrected letter.  Her cb number is
610-999-8327

TCT member Debra Rubin, 610-999-8327, left message that we received her
message and that we will not send the appeal for review at this time.  left
our fax number for her to send corrected letter

Review of case revealed case sent to NMR
TCT NMR  215-352-7800 x 119,  received vm (maria) trsf to operator, spoke
to June,  informed her to hold off on sending this appeal to consultant,
member is submitting corrected letter and has requested It not to be
assigned at this time for neurology review.  June will hold the case until
Monday when assigned coordinator will follow up with her whether to proceed
, (If corrected letter received)
Left assigned AC message regarding above
04/20/2012 05:19 PM ET  D01 - Case Not Medically Necessary

04/23/2012 11:11 AM ET PLB
Comment:  Rec'd 4/23/2012 10:16 AM email from member, confirming email
address for the disclosure of 2/21/12 letter provider, Dr Spears, submitted
with his appeal request. Responded according to current PCM desktop
procedure "Sending Confidential Emails to Members"- included as attachment
the appropriate cover-letter and copy of Roderlck C. Spears, MD letter dated
2/21/12. Member also noted in her email that her corrected appeal request
submission will be faxed over today to dept as had been noted in above

RUBIN, DEBRA ID:05051249-02

documentation per her call on Friday 4/20/12. Did also receive back a response from member via email confirming receipt of my "requested documemts" email.Copies of emails exchanged and cover letter saved in appeal file.
04/23/2012 11:11 AM ET D01 - Case Not Medically Necessary

04/23/2012 11:22 AM ET PLB
Comment: Addendum: Mbr's email address is Debrarubin@aol.com.
04/23/2012 11:22 AM ET D01 - Case Not Medically Necessary

04/23/2012 03:06 PM ET TJ
Comment: INTAKE NOTE
PCS/PCC: Tonya Jones, PCS ext 64617 (215-657-8900)
Patient Name: Debra Rubin
Patient Phone#: unknown
Patient Name and additional Demo(s) Verified (select one):
         Subscriber Name
Demo verification Additional Comments: DOB
Call Type: Fax-In
Caller: Debra Rubin
Relationship: Patient
Calling On Behalf Of: self
Caller Telephone#: unknown ext:

DRG REVIEW: N/A
Member Prime w/AHA: unknown
Fax ID: I120410135-024 Fax Received Date: 4/23/2012 Received Time: 2:26:00 PM

Comments: rec'd fax from server, routed to appeal fax review

Dept Policy used for Determ: N/A
Verbal Disclaimer given: N/A
Phone Recording Script Given: N/A  Consent: N/A
04/23/2012 03:07 PM ET D01 - Case Not Medically Necessary

04/24/2012 10:17 AM ET PLB
Comment: Rec'd 4/23/12 fax from member- 5 pages in total- she is requesting that her letter of 4/12/12 be withdrawn from appeal in that it is not the final version and to accept this fax as the final version of her appeal letter. This 5 page letter of appeal does not include any of the attachments that were submitted with initial letter of appeal that withdrew- specifically the bulleted timeline by mbr of her CRPS/RSD injury history and several
professional journal/research articles, but at the bottom of the new letter it notes that there are enclosures of research articles. Also, had previously advised member that our email was limited to provision of requested documents related to provider appeal as per HCR, but did receive additional email also last evening from member requesting confirmation that fax was received. Called member at her noted contact number: 610.999.8327- and left VM requesting return call,reiterated call back number.
04/24/2012 10:19 AM ET D01 - Case Not Medically Necessary

04/24/2012 10:44 AM ET PLB
Comment: Rec'd return VM from member, called her back at same number previously noted, spoke w/Debra Rubin, phone recording script provided and consent obtained, she confirmed that only new letter was faxed to us yesterday (5 pages in total), she would like to include the articles and the timeline from her initial submission but only wants the letter she had written removed and replaced with this current letter. She confirmed again to include Dr Spears letter from his appeal that I emailed her with her appeal request file and there is nothing additional that she wishes to submit and asks that I proceed with the peer consultant appeal review at thsi time, noted that I would contact her once a determination is available.
04/24/2012 10:50 AM ET D01 - Case Not Medically Necessary

04/24/2012 02:01 PM ET PLB
Comment: Appeal file (Provider letter submitted on provider appeal, current mbr letter of appeal, attachments from 4/18/12 CRD mbr appeal

RUBIN, DEBRA ID:05051249-02

submission, Medical Policy 08.00.57b, Benefit plan Booklet, case summary) forwarded to (NMR- Neurology) peer consultant for pre-service member appeal review.
04/24/2012 02:02 PM ET  D01 - Case Not Medically Necessary

04/24/2012 02:07 PM ET PLB
Comment: Did also advise NMR via VM to Maria Burns, appeals contact at NMR, to disregard file sent 4-20-12 as had been noted to June McClernon on that date and only include records/file being submitted today for peer consultant mbr appeal review.
04/24/2012 02:10 PM ET  D01 - Case Not Medically Necessary

04/27/2012 01:52 PM ET PLB
Comment: PCM apopeals dept rec'd via certified mail 4/27/12 another copy of member's letter of appeal- on the letter Is a handwritten post it note that states "You already have the copy that was faxed; This is my follow up on the certified letter",added this certified mailing copy in appeal file.
04/27/2012 01:57 PM ET  D01 - Case Not Medically Necessary

04/30/2012 09:42 AM ET PLB
Comment: Rec'd 4/27/12 rendered peer consultant determination rendered by Jon Glass, MD, Board Certification: Neurology- denial upheld:
"Rationale:
Inpatient hospitalization for IV Ketamine was not medically necessary. Ketamine can be provided safely and effectively in the outpatient setting. Dr. Schwartzman provided reports of 2 placebo-controlled randomized studies (references 1 and 2) indicating benefit of ketamine over placebo. Reference 1 reflected inpatient treatment and reference 2 reflected outpatient treatment. There is no evidence that inpatient treatment is any more effective than outpatient treatment. Furthermore, there is no evidence in the peer-reviewed medical literature that ketamine is superior to other forms of treatment for complex regional pain syndrome, including pharmacological pain management, or spinal cord stimulation, intrathecal analgesia, or spinal cord stimulation. Based on the provided documentation, this member's inpatient hospitalization for IV Ketamine was not medically necessary. Additionally, under her Medical policy request is considered experimental/investigational & is a benefit exclusion.

Determination:
Therefore, based on clinical findings, documentation & Medical Policy, inpatient admission for IV Ketamine for treatment of CRPS is considered experimental/investigational for this member."

CICS updated and case file sent to imaging. Pre-service/HCR member appeal: member Debra Rubin, 610-999-8327, phone recording script provided and consent obtained, advised her of member appeal denial determination, read her peer consultant's clinical rationale, confirmed that it will also be In determination letter that she receives, discussed records disclosure- she has already received provider's records submitted on provider appeal as well as did keep copies of records of what she submitted on her appeal, explained external appeal option w/IRO, caller telephonically requesting IRO external appeal option at this time, verbalized understanding that appeal file will be forwarded to them along with her external appeal review request and they will contact her as well regarding if any additional information to be submitted to include with their review, noted IRO standard TAT. She verbalized understanding. Manual Member external review appeal acknowledgement letter prepared and forwarded to AA for mailing.
04/30/2012 09:48 AM ET  D01 - Case Not Medically Necessary

04/30/2012 10:56 AM ET PLB
Comment: Mbr external appeal review request submitted to IRO (MCMC) for processing.
04/30/2012 10:56 AM ET  D01 - Case Not Medically Necessary

05/02/2012 08:38 AM ET PLB
Comment: Attending, facility and mbr copies of mbr appeal determination letter forwarded to MCMC for inclusion in external IRO appeal review.
05/02/2012 08:40 AM ET  D01 - Case Not Medically Necessary

RUBIN, DEBRA ID:05051249-02

05/03/2012 04:28 PM ET PLB
Comment: Rec'd copy of Notice of IRO review request receipt letter from
MCMC to mbr, copy sent to imaging under precert #.
05/03/2012 04:30 PM ET D01 - Case Not Medically Necessary

05/30/2012 09:39 AM ET PLB
Comment: Rec'd notice from MCMC (CRD 5/30/12) that member did submit
additional information to them as part of their IRO appeal review and they
are forwarding this information to us at this time to review for
reconsideration- this 24 page fax contains cover sheet note from member,
additional copy of member's 4/22/12 letter and new professional 2011 journal
article entitled "The Use of Ketamine in Complex Regional Pain Syndrome:
Possible Mechanisms" by Dr Robert Schwartzman- forwarded for AHA VP Medical
Director Review for reconsideration review per PCM policy.
05/30/2012 09:39 AM ET D01 - Case Not Medically Necessary

05/30/2012 10:07 AM ET GH
Comment: MDR NOTE:

I have reviewed the addl info submitted. This informatmation is not of a
nature that would allow us to overturn the appeal.
Please send appeal for external review.

G Hill MD
05/30/2012 10:09 AM ET D01 - Case Not Medically Necessary

05/30/2012 01:17 PM ET PLB
Comment: Reviewed AHA VP Medical Director (Gideon Hill, MD, Specialty:
Family Practice) reconsideration response- emailed IRO MCMC determination
outcome.
05/30/2012 01:17 PM ET D01 - Case Not Medically Necessary

05/30/2012 01:24 PM ET PLB
Comment: Correction- determination was not emailed to MCMC- called
individual who had faxed over information for review from MCMC- Beth (Team
3) 888-313-6267 and left VM with outcome- requested call back to confirm
that this reconsideration determination was received and they are proceeding
w/ external appeal review- direct call back number provided.
05/30/2012 01:26 PM ET D01 - Case Not Medically Necessary
05/30/2012 01:27 PM ET D01 - Case Not Medically Necessary
05/30/2012 01:29 PM ET D01 - Case Not Medically Necessary

05/30/2012 01:53 PM ET PLB
Comment: Rec'd call back from Beth Cucci at MCMC- she confirmed that she
received my notice of reconsideration outcome and they are continuing with
their review and their determination will be provided shortly.
05/30/2012 01:54 PM ET D01 - Case Not Medically Necessary

05/30/2012 03:32 PM ET PLB
Comment: Rec'd 5/30/12 determination by MCMC peer reviewer for external
appeal-denial upheld per reviewer #49854,board certified in Neurology with
subcertification in Clinical Neurophysiology and Neuromuscular Medicine:
"The requested inpatient hospitalization for intravenous Ketamine (J3490)
treatment for date of service 02/10/2012 is considered
experimental/investigational (E/I) for this patient's clinical
scenario as defined by the Plan.
The Summary Plan Description indicates that "experimental/investigational"
indicates "Charges for any treatment, supply or medicine that is not
medically necessary or is considered unsafe,experimental or investigational
by the American Medical Association or the appropriate medical specialty
society."The Summary Plan Description states the following, "Medically
Necessary - medical treatment,
as determined and prescribed by a qualified, appropriate health care
provider, that is consistent with the symptoms, diagnosis or treatment of a
medical condition and consistent with generally accepted standards of
medical practice." An evaluation of the evidence based medicine available
regarding particular disorders and their treatments is a service that is
provided by the American Academy of Neurology (AAN). The AAN appoints a
panel of experts to review the medical literature in order to answer

RUBIN, DEBRA ID:05051249-02

commonly encountered clinical practice questions. These experts review the available literature and stratify the studies by the rigor under which they were conducted. Class I studies are the gold standard and reflect randomized, double-blind placebo-controlled trials. On the other end of the spectrum, Class IV studies reflect non-controlled trials or expert opinions. 'the standards by which the remainder of these studies is stratified may be found at http://www.aan.com for further details. Once these studies have been collected, the number of studies in each category is tabulated so that a recommendation may be given along with the strength of the recommendation. A recommendations indicate the highest level of confidence, B levels approximate "probably," C levels approximate "possible," and U levels recommend uncertainty due to lack of data. Even if a neurologist is not an AAN member, he or she should be aware of these parameters as their summaries are available for free and are generally accepted as authoritative. There is no documented practice parameter regarding the treatment of complex regional pain syndrome, (CRPS). Nonetheless, the same methods can be used. The reviewer found no Class I or Class II studies that ketamine was superior to placebo for the treatment of CRPS. The article by Sigtermans et al. demonstrated that intravenous (IV) ketamine provided short term pain relief that was no longer apparent at twelve weeks post treatment and that no functional improvement occurred at any time. Restated, no significant long term benefits were achieved. Thus, the role of IV ketamine in the treatment of CRPS has yet to be definitively established. As such, it is "experimental/investigational" at this time. Per the Summary Plan Description, this would indicate that this treatment is not medically necessary and not a covered benefit."
CICS updated and MCMC determination letter to member sent to imaging.
05/30/2012 03:51 PM ET  D01 - Case Not Medically Necessary


Activities
- System Update Case - Authorization
- System Update Case - Authorization
- Member Appeal Review
- Member Appeal Review
- Member Appeal Review
- Member Appeal Review
- Member Appeal Review
- Member Appeal Review
- Member Appeal Review
- Physician Review
- Member Appeal Review
- Update Case - Authorization
- Update Case - Authorization
- Member Appeal Review
- Member Appeal Review
- Member Appeal Review
- Member Appeal Review
- Member Appeal Review
- Member Appeal Review
- Member Appeal Review
- Member Appeal Review
- Member Appeal Review
- Update Case - Authorization
- Member Appeal Review
- Member Appeal Review
- Member Appeal Review
- Member Appeal Review
- Member Appeal Review
- System Update Case - Authorization
- System Update Case - Authorization
- Update Case - Authorization
- Update Case - Authorization
- Provider Appeal Review
- Provider Appeal Review
- Claim Review
- Claim Review
- Provider Appeal Review

RUBIN, DEBRA ID:05051249-02

- Update Case - Authorization
- Update Case - Authorization
- Update Case - Authorization
- System Update Case - Authorization
- Update Case - Authorization
- System Update Case - Authorization
- Member Appeal Review
- Start Case - Authorization
- Update Case - Authorization
- Physician Review
- Update Case - Authorization
- Update Case - Authorization
- System Update Case - Authorization
- Update Case - Authorization
- Start Case - Authorization