# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DEBRA L. RUBIN, | CIVIL ACTION |
| Plaintiff, | |
| v. | No. 12-3719 |
| AMERIHEALTH ADMINISTRATORS, INC. d/b/a AMERIHEALTH ADMINISTRATORS and CROZER-CHESTER MEDICAL CENTER, | |
| Defendants. | |

## MEMORANDUM

**ROBERT F. KELLY, Sr. J.**                                                                         **AUGUST 2, 2013**

Presently before the Court is the Motion for Summary Judgment filed by Defendants, Amerihealth Administrators, Inc. ("AmeriHealth") and Crozer-Chester Medical Center ("Crozer"), the Response in Opposition filed by Plaintiff, Debra L. Rubin, as well as the Replies thereto. For the reasons set forth below, we deny Defendants' Motion.

## I. BACKGROUND

Plaintiff, Debra Rubin, seeks a determination that she is entitled to certain medical benefits pursuant to a group health insurance plan (the "Plan") issued by Crozer, which provides health insurance coverage to its employees-subscribers and Plan members. (Am. Compl. ¶ 8.) Plaintiff's husband is an employee of Crozer, and she is a beneficiary of the employee benefit plan provided to her husband. (Id. ¶¶ 9-10.) The benefits for the Plan are issued by AmeriHealth under Group/Employer Account No. 087771. (Id. ¶ 11.) Crozer-Keystone Health System has retained AmeriHealth, a wholly owned subsidiary of Independence Blue Cross, as its claims

administrator. (Pl.'s Mem. Law Opp'n Defs.' Mot. for Summ. J. at 1.) Plaintiff seeks benefits pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, and a declaratory judgment that the Plan covers the treatments sought by her.[1] (Am. Compl. ¶¶ 30-42.) Additionally, Plaintiff seeks attorney fees and costs. (Id. ¶ 42.) The Plan constitutes an employee benefit plan pursuant to ERISA. (Id. ¶ 11.)

On June 17, 2011, Plaintiff alleges that she sustained physical injuries as a result of a slip and fall accident resulting in a diagnosis of Reflex Sympathetic Dystrophy, which is also known as Complex/Chronic Regional Pain Syndrome ("CRPS"), and affects her lower extremities. (Id. ¶¶ 13-14.) Plaintiff sought the treatment of Roderick Spears, a neurologist associated with Crozer Hospital, who confirmed that she was suffering from CRPS and agreed that a course of inpatient hospitalization for intravenous Ketamine would appropriately treat Plaintiff.[2] (Pl.'s Mem. Law Opp'n Defs.' Mot. for Summ. J. at 2.) Plaintiff states that "outpatient Ketamine is not an option because of [her] previous history of two ruptured brain aneurysms in April 2005 and three angiograms in July 2010, January 2011 and February 2011." (Pl.'s Mem. Law Opp'n Defs.' Mot. for Summ. J.; Ex. 2, p. 2.) Relying upon the opinions of her primary care physician, and Dr. Spears, Plaintiff explains that inpatient intravenous Ketamine treatment is her only option because it is a safer environment where her vital signs can be closely monitored by critical care doctors and an outpatient setting would be unsafe to administer the treatment. (Id.)

Plaintiff sought the referred treatment from Dr. Robert Schwartzman, who is affiliated

---

[1] Plaintiff brought her claims pursuant to ERISA and this Court has jurisdiction over her claims under 28 U.S.C. § 1331 and 29 U.S.C. § 1132(d)(e)&(f).

[2] "Ketamine is used as a human and veterinary anesthetic." (Defs.' Mem. Law Support Mot. for Summ. J. at 1 n.1.)

with Drexel/Hahnemann neurology. (Id.) Dr. Schwartzman is a Board-certified neurologist who specializes in chronic pain management. (Id.) He, also, established the first CRPS clinic in the United States and has conducted research and work regarding treatment for CRPS on a national and international level. (Id.)

Plaintiff submitted her request for the treatment to AmeriHealth. (Id.) On March 28, 2012, AmeriHealth denied Plaintiff's request for in-hospital Ketamine treatments advising her that the treatments were considered experimental and investigational. (Id. at 2, 5.) AmeriHealth relied upon the Summary Plan Description, which states that "benefits are not provided for certain kinds of treatment or services, even if your health care provider recommends them." (Def.'s Mem. Law Support Mot. for Summ. J. at 2; Ex. 2.) In addition, the Summary Plan Description provides that certain expenses are not covered, including "[c]harges for any treatment, supply or medicine that is not medically necessary or is considered unsafe, experimental or investigational by the American Medical Association or the appropriate medical specialty society." (Id.) This initial rejection permitted Plaintiff to appeal in writing within 180 days, and Plaintiff, in fact, pursued that appeal. (Pl.'s Mem. Law Opp'n Defs.' Mot. Summ. J. at 5.)

Plaintiff wrote a letter dated April 22, 2012 ("April 22, 2012 Letter"), to Dr. Gideon D. Hill, who at that time was Vice President of Managed Care Services and Regional Medical Director for AmeriHealth.[3] (Id.) Plaintiff's letter referenced the acceptance of a CRPS patient for intravenous Ketamine treatment through an external utilization review appeal with another

---

[3] Dr. Hill last actively practiced medicine in 1996 in the Board-certified area of family practice. (Pl.'s Mem. Law Opp'n Defs.' Mot. for Summ. J. at 5.) Dr. Hill, from 1996 until 2005, acted as the Senior Medical Director for Independence Blue Cross, and has been in his current role with AmeriHealth since 2005. (Id.)

insurer.[4] (Id.) Dr. Hill makes decisions on a claims such as Plaintiff's claim. (Id.)

Regarding Plaintiff's first appeal, Dr. Hill upheld AmeriHealth's denial confirming that the Medical Policy Bulletin 08.00.57a of Independence Blue Cross ("Medical Policy Bulletin"), entitled Complex Regional Pain Syndrome (CRPS) Parenteral Treatments, was utilized throughout the appeal process as justification for the fact that intravenous Ketamine therapy was experimental or investigational, and, therefore, not covered by AmeriHealth. (Id. at 6.; Ex. 6, p. 28.)

According to the appeal process, AmeriHealth forwarded Plaintiff's claim to an external reviewer named National Medical Reviews, Inc. (Id.) The claim was forwarded to Dr. John Glass, a neurologist. (Id.) Dr. Glass upheld the decision to reject Ketamine stating that "[i]npatient hospitalization for IV Ketamine was not medically necessary. Ketamine can be provided safely and effectively in the outpatient setting." (Id.; Ex. 8.) Additionally, Dr. Glass stated that "under [Plaintiff's] Medical policy request {sic} is considered experimental/investigational & is a benefit exclusion." (Id.) Dr. Glass relied upon the following documents: (1) IBC Medical Policy: Complex Regional Pain Syndrome (CRPS) Parenteral Treatments 08.00.57b; (2) an article by Sigtermans MJ, van Hilten JJ, Bauer MC, Arbous MS, Marinus J, Sarton EY, Dahan A. Ketamine Produces Effective and Long-Term Pain Relief in

---

[4] Specifically, Plaintiff referenced an external utilization review through the Pennsylvania Department of Health of an unnamed person which resulted in another Health Care Plan approving coverage for an inpatient admission for Ketamine infusions overturning the plan's original decision to deny coverage. (Pl.'s Mem. Law Opp'n Defs.' Mot. for Summ. J.; Ex. 6, p. 51-52.) From the records, an independent medical reviewer named Permedion, Inc. ("Permedion") reviewed the documentation concluding that "the inpatient admission for Ketamine infusion was considered medically necessary for the treatment of the enrollee's condition." (Id.; Ex. 11, p. 6.) Additionally, the medical reviewer stated that it is inaccurate to say that the use of intravenous Ketamine treatment is experimental or investigational because it "goes against available medical literature." (Id. at 8.) It appears that Plaintiff only referenced this decision in her April 22, 2012 Letter, and did not provide any documentation pertinent to it during the appeal process. (Pl.'s Mem. Law Opp'n Defs.' Mot. for Summ. J.; Ex. 6, p. 51-52.)

4

Patients With Complex Regional Pain Syndrome Type 1. Pain. 2009; 145:304-311 ("2009 Sigtermans Article"); (3) Schwartzman RJ, Alexander GM, Grothusen JR, Paylor T, Reichenberger E, Perreault M. Outpatient Intravenous Ketamine for the Treatment of Complex Regional Pain Syndrome: a Double-Blind Placebo Controlled Study. Pain. 2009;147:107-115 ("2009 Schwartzman Article"); and (4) Baron R, Binder A. Wasner G. Neuroptahic Pain: Diagnosis, Pathophysiological Mechanisms, and Treatment. Lancet Nerol. 2010; 9:807-819. (Id.) The determination by Dr. Glass stated "based on clinical findings, documentation & Medical Policy, inpatient admission for IV Ketamine for treatment of CRPS is considered experimental/investigational for this member." (Id.)

Plaintiff requested a final review of her claim. (Id. at 6.) Final review of Plaintiff's claim was submitted to an external reviewer named MCMC, LLC (Medical Care Ombudsman Program) ("MCMC"). (Id.) In conjunction with this appeal, Plaintiff submitted additional information as part of the appeal process. (Id.; Ex. 10.) Plaintiff submitted a new professional 2011 journal article entitled, "The Use of Ketamine in Complex Regional Pain Syndrome: Possible Mechanisms" written by Dr. Schwartzman, Guillermo M. Alexander, and John R. Grothusen ("2011 Schwartzman Article"). (Id.) It revisited the issue of the use of intravenous Ketamine treatment determining that its use was appropriate after specifically considering analyzed, double-blind, randomized controlled trials in the treatment of CRPS. (Id. at 7-8; Ex. 10.) Additionally, Plaintiff sent the MCMC Reviewer a copy of her April 22, 2012 Letter to Dr. Hill. (Id.)

On May 30, 2012, MCMC notified AmeriHealth that Plaintiff had, in fact, submitted additional information for consideration, specifically the 2011 Schwartzman Article. (Id. at 6;

Ex. 6, p. 40.) MCMC apparently sent the information to Dr. Hill to review for reconsideration. (Id.) In response, Dr. Hill indicated that he had reviewed the additional information submitted, and determined that the information was not of a nature that would allow AmeriHealth to overturn the appeal. (Id.; Ex. 6, p. 40.) Dr. Hill explained his action by stating that:

> And if I - if there had been something that was compelling there, I would have overturned it and approved it right then and we could have . . . proceeded. As you see my documentation, I reviewed the information submitted, information that is not of the nature that would allow us to overturn the appeal. And I said please continue, send the appeal for external review.

(Id.; Ex. 6, p. 43.) When asked whether he authorized the MCMC Reviewer to consider the 2011 Schwartzman Article, and whether it was indeed considered, Dr. Hill testified that he did not know. (Id.; Ex. 6, p. 43-44.) Dr. Hill testified that he could not comment about whether the MCMC Reviewer reviewed the new article. (Id.) Also, he stated that he did not know why the MCMC Reviewer did not reference the 2011 Schwartzman Article in the reference section of his or her final determination. (Id.; Ex. 6, p. 44-45.)

On May 30, 2012, MCMC provided its decision that the intravenous Ketamine treatment was inappropriate. (Defs.' Mot. for Summ. J.; Ex. 4.) Specifically, the Reviewer for MCMC stated that "the role of IV ketamine in the treatment of CRPS has yet to be definitively established. As such, it is 'experimental/investigational' at this time."[5] (Id.) Relying upon the Summary Plan Description, the MCMC Reviewer stated that such a finding "would indicate that this treatment is not medically necessary and not a covered benefit." (Id.) As references, the

---

[5] The MCMC Reviewer is unnamed. (Defs.' Mot. for Summ. J.; Ex. 4.) Although he or she only lists his or her reviewer identification number, the Reviewer lists his or her credentials to include board certification in Neurology with subcertification in Clinical Neurophysiology and Neuromuscular Medicine. (Id.)

6

MCMC reviewer stated that he or she relied upon four study articles, two of which were the 2009 Schwartzman Article and the 2009 Sigtermans Article.[6] (Id.) Notably, the MCMC Reviewer did not indicate that he or she reviewed the 2011 Schwartzman Article. Also, noteworthy is the fact that the MCMC Reviewer pointed out that "Class I studies are the gold standard and reflect randomized, double-blind placebo trials," and concluded that he or she "found no Class I or Class II studies that Ketamine was superior to placebo for the treatment of CRPS." (Id.) As previously mentioned, the 2011 Schwartzman Article specifically considered analyzed, double-blind, randomized controlled trials in the treatment of CRPS in finding that the use of intravenous Ketamine was appropriate. See *supra.* p. 5.

This lawsuit is based upon Plaintiff's assertion that the 2011 Schwartzman Article was not considered by the MCMC Reviewer due to Dr. Hill's directive that it should not be considered. Plaintiff argues that the medical issue of intravenous use of Ketamine treatment for CRPS is in the forefront of medical consideration, and is a state of continuing change. (Pl's Mem. Law Opp'n Defs.' Mot. for Summ. J. at 9.) She acknowledges that use of intravenous Ketamine is the subject of dispute within the medical community. (Id. at 2.) Plaintiff states that Dr. Hill's exercise of his own judgment in discounting new information associated with such a claim, and the MCMC Reviewer's non-consideration of the information, should be viewed as an arbitrary and capricious action warranting relief under ERISA. (Id.)

Defendants assert that there is disagreement in the medical community regarding the use

---

[6]Based upon review of thousands of appeals, Dr. Hill confirmed that the MCMC report would list the studies in reaching the conclusions set forth in the May 30, 2012 denial letter. (Pl.'s Mem. Law Opp'n Defs.' Mot. for Summ. J. at 7; Ex. 6, p. 44-45.) Defendant argues, however, that the lack of citation by the MCMC reviewer does not prove, or even imply, that those studies not cited were not considered. (Defs.' Mem. Law Support Mot. for Summ. J. at 2.)

7

of intravenous Ketamine treatment for CRPS and, therefore, the non-consensus in the medical community, and lack of acceptance by the applicable specialty medical society, fail to bring the treatment within the definition of medical necessity pursuant to the terms of the Keystone-Crozer plan. (Defs.' Mem. Law Support Mot. for Summ. J. at 9.) As such, Defendants assert that they are entitled to judgment as a matter of law because AmeriHealth correctly determined that inpatient intravenous Ketamine treatment for CRPS remains experimental and investigational and, therefore, their decision was not arbitrary or capricious. (Id.)

## II. LEGAL STANDARD

### A. *Summary Judgment*

Federal Rule of Civil Procedure 56(c) states that summary judgment is proper "if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." See Hines v. Consol. Rail Corp., 926 F.2d 262, 267 (3d Cir. 1991). The Court asks "whether the evidence presents a sufficient disagreement to require submission to the jury or whether . . . one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986). The moving party has the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "A fact is material if it could affect the outcome of the suit after applying the substantive law. Further, a dispute over a material fact must be 'genuine,' i.e., the evidence must be such 'that a reasonable jury could return a verdict in favor of the non-moving party.'" Compton v. Nat'l League of Prof'l Baseball Clubs, 995 F. Supp. 554, 561 n.14 (E.D. Pa. 1998).

Summary judgment must be granted "against a party who fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. Once the moving party has produced evidence in support of summary judgment, the non-moving party must go beyond the allegations set forth in its pleadings and counter with evidence that presents "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); see Big Apple BMW, Inc. v. BMW of N. Am. Inc., 974 F.2d 1358, 1362-63 (3d Cir. 1992). "More than a mere scintilla of evidence in its favor" must be presented by the non-moving party in order to overcome a summary judgment motion. Tziatzios v. United States, 164 F.R.D. 410, 411-12 (E.D. Pa. 1996). If the court determines that there are no genuine issues of material fact, then summary judgment will be granted. Celotex, 477 U.S. at 322.

### B. *Denial of Benefits Under ERISA*

The insurance plan at issue is an employee benefit plan, therefore, this action is governed by ERISA. See 29 U.S.C. §§ 1001 *et seq*. The standard of review for a denial of benefits under an ERISA plan is de novo unless the plan gives the administrator discretionary authority to interpret the terms of the plan. Viera v. Life Ins. Co. of N. Am, 642 F.3d 407, 413 (3d Cir. 2011) (citing Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989)). "If the plan gives the administrator or fiduciary discretionary authority to make eligibility determinations, we review its decisions under an abuse-of-discretion (or arbitrary and capricious) standard." Id. (citations omitted) "In the ERISA context, an 'abuse-of-discretion' standard of review is used interchangeably with an 'arbitrary and capricious' standard of review." Id. at 413 n.4 (citing Howley v. Mellon Fin. Corp., 625 F.3d 788, 793 n.6 (3d Cir. 2010)). Under the abuse-of-discretion standard, a court may only overturn an administrator's decision if it is "without reason,

9

unsupported by substantial evidence or erroneous as a matter of law." Id. (citing Miller v. Am. Airlines, Inc., 632 F.3d 837, 845 (3d Cir. 2011)).

In Metropolitan Life Ins. Co. v. Glenn, 554 U.S. 105 (2008), the United States Supreme Court "explained that in reviewing the lawfulness of benefit denials, judges should account for several different considerations of which a conflict of interest is one." Patrick v. Devon Health Servs., Inc., 828 F. Supp. 2d 781, 792-93 (E.D. Pa. 2011) (citing Glenn, 554 U.S. at 117); see also The Estate of Schwing v. The Lily Health Plan, 562 F.3d 522, 525-26 (3d Cir. 2009) (noting, after Glenn, that ERISA's governing standard requires plaintiff to show denial of benefits was arbitrary and capricious, with a conflict of interest as one factor ). "The factors may include procedural concerns about the administrator's decision-making process and structural concerns about the conflict of interest inherent in the way the ERISA-governed plan was funded." Id. at 793 n.14. "However, these factors are case-specific, and the facts of one case may present an entirely different set of considerations than for another case." Id. (citing Estate of Schwing, 562 F.3d at 526).

"The procedural inquiry focuses on how the administrator treated the particular claimant." Miller, 632 F.3d at 845 (citation omitted). "Specifically, in considering the process that the administrator used in denying benefits, we have considered numerous irregularities to determine whether . . . the administrator has given the court reason to doubt its fiduciary neutrality . . . by taking account of several different, often case-specific factors, reaching a result by weighing all together." Id. (citations omitted). A court may not substitute its judgment for that of the defendants in determining eligibility for plan benefits. Orvosh v. Program of Grp. Ins. for Salaried Emp. of Volkswagen of Am., Inc., 222 F.3d 123, 129 (3d Cir. 2000). The plaintiff

retains the burden to prove that she is entitled to benefits, and that the plan administrator's decision was arbitrary and capricious. Molinaro v. UPS Health & Welfare Package, No. 10-5791, 2013 WL 255042, at *3 (D.N.J. Jan. 23, 2013).

Regarding the proper remedy under ERISA, an important distinction emerges between an initial denial of benefits and a termination of benefits after they were already awarded. "In deciding whether to remand to the plan administrator or reinstate benefits, we note that it is important to consider the status quo prior to the unlawful denial or termination." Miller, 632 F.3d at 856-57 (citing Hackett v. Xerox Corp., 315 F.3d 771, 776 (7th Cir. 2003)). "As such, an important distinction emerges between an initial denial of benefits and a termination of benefits after they were already awarded." Id. "In a situation where benefits are improperly denied at the outset, it is appropriate to remand to the administrator for full consideration of whether the claimant is disabled." Id. "To restore the status quo, the claimant would be entitled to have the plan administrator reevaluate the case using reasonable discretion." Id. at 856-57. "In the termination context, however, a finding that a decision was arbitrary and capricious means that the administrator terminated the claimant's benefits unlawfully." Id. at 857. "Accordingly, benefits should be reinstated to restore the status quo." Id.

### III. DISCUSSION

In the present matter, Plaintiff concedes to the application of the abuse of discretion standard. (Pl.'s Mem. Law Opp'n Defs.' Mot. for Summ. J. at 9.) "'Whether a plan administrator's exercise of power is mandatory or discretionary depends upon the terms of the plan.'" See Viera, 642 F.3d at 413 (quoting Luby v. Teamsters Health, Welfare, & Pension Tr. Funds, 944 F.2d 1176, 1180 (3d Cir. 1991)). Here, the Plan gives the Plan Administrator

discretionary authority. (Defs.' Mot. for Summ. J.; Ex. 2, p. 22.) Consequently, the abuse of discretion standard is applicable.

The crux of Plaintiff's argument is that the Plan Administrator's exercise of his own judgment in discounting the updated 2011 Schwartzman Article supplied by Plaintiff for MCMC to review, and the MCMC Reviewer's nonconsideration of the information, was an arbitrary and capricious action. (Pl.'s Mem. Law Opp'n Defs.' Mot. for Summ. J. at 9-10.) Specifically, Plaintiff argues that the MCMC report was completed in a vacuum with the Plan Administrator directing that the new evidence submitted by Plaintiff not be considered. (Id. at 7.) Plaintiff argues that the 2011 Schwartzman Article directly addresses concerns listed by the MCMC Reviewer in his or her denial of Plaintiff's appeal. (Id.) Also, Plaintiff asserts that a conflict of interest is a factor to be considered in light of the allegations regarding the Plan Administrator's procedural irregularities in providing information to MCMC. (Id. at 4.)

Relying upon the Medical Policy Bulletin, Defendants assert that their denial of Plaintiff's claim was based upon medical data and literature and, therefore, was not arbitrary and capricious.[7] (Defs.' Mem. Law Support Mot. for Summ. J. at 6.) Defendants contend that medical data and literature confirm that inpatient intravenous Ketamine treatment continues to be investigated, and the appropriate doses and length of treatment remain at issue. (Id.) Defendants point out that its conclusions from the medical data and literature were the conclusions of the independent reviewers undertaken during the claim appeal process. (Id. at 7.) Also, Defendants assert that "[i]n addition to the fact that the Plan excludes treatments that are experimental or

---

[7]AmeriHealth Administrators is wholly-owned by AmeriHealth, Inc., which is wholly-owned by Independence Blue Cross. (Defs.' Mem. Law Support Mot. for Summ. J. at 6 n.12; Ex. 6.)

investigational, it also provides that covered services are those that are 'medically necessary.'" (Id.; Ex. 3, p. 79.)  Medical necessity is defined as services "in accordance with current standards of good medical practice." (Id.)  The Summary Plan Description identifies excluded charges as those "for any treatment, supply or medicine that is not medically necessary or is considered unsafe, experimental or investigational by the American Medical Association or the appropriate medical specialty society." (Id.; Ex. 2, p. 16.)

Acknowledging that the use of intravenous Ketamine is the subject of dispute within the medical community, Plaintiff argues that the emerging data she provided to the MCMC Reviewer regarding Ketamine treatment for CRPS was of critical importance to evaluate her claim. (Pl.'s Mem. Law Opp'n Defs.' Mot. for Summ. J. at 2, 8.)  She points out that the Medical Policy Bulletin states that it "describes the status of the medical technology at the time the document was developed.  Since that time, new technology may have emerged or new medical literature may have been published." (Id.) (citing Defs.' Mot. for Summ. J.; Ex. 6.)

In addition to referring to the 2011 Schwartzman Article as emerging medical data, Plaintiff also refers to the case-specific information of another individual's dealing with a different health care plan and independent medical review by Permedion that she referenced in the April 22, 2012 Letter.  It does not appear that Plaintiff included the documentation regarding this other individual's medical review appeal process.  Apparently, she provided the documentation to Defendants during discovery.  Defendants argue that Plaintiff's citation to a decision by Permedion, another independent medical reviewer, allowing inpatient intravenous Ketamine treatment for a different patient does not demonstrate that Defendants' decision was arbitrary or capricious. (Defs.' Reply at 3.)  Defendants point out that there is no indication that

13

the prior treatments for the Permedion patient and Plaintiff in this case were the same. (Id.) In addition, Defendants assert that the Permedion decision indicates that a recent study other than that of Dr. Schwartzman concludes that there still is a dispute about the efficacy of intravenous Ketamine treatment and further study is needed. (Id.)

Regarding Plaintiff's procedural conflict argument, AmeriHealth asserts that there were no procedural conflicts on its part. (Defs.' Mem. Law Support Mot. for Summ. J. at 8.) AmeriHealth argues that neither the Keystone-Crozer medical plan/policy nor AmeriHealth's medical policy obligate or require that every medical study regarding a particular disease or treatment be cited in a decision given to a subscriber or in the appropriate medical policy. (Defs.' Reply at 2.) AmeriHealth states that the lack of citation does not prove or even imply that those studies not cited were not considered. (Id.) Additionally, Defendants counter Plaintiff's argument that Dr. Hill directed the MCMC Reviewer not to consider the 2011 Schwartzman Study Report by asserting that Dr. Hill's deposition testimony was limited to only saying that MCMC had not cited the 2011 Schwartzman Article in its report. (Id. at 3.) AmeirHealth asserts that Dr. Hill's testimony was that he had not given any direction as to what the independent Medical Reviewer was to consider. (Id.)

The glaring omission of the 2011 Schwartzman Article from the MCMC Reviewer's reference section implies that he or she did not review it. It is not to say that the MCMC Reviewer would have changed his or her conclusion with the 2011 Schwartzman Article, rather the failure to cite it calls into question the independence of the external appellate review. Plaintiff points out that Dr. Hill testified, based upon his review of thousands of appeals, that the reference section of the MCMC Report would list the studies utilized in reaching the conclusions

14

set forth in the denial letter dated May 30, 2012. (Pl.'s Mem. Law Opp'n Defs.' Mot. for Summ. J.; Ex. 6, p. 44-45.) Dr. Hill testified that he did not know why the 2011 Schwartzman Article was not included within the MCMC Reviewer's references. (Id. at 45.) It can be implied that the MCMC Reviewer did not consider Plaintiff's supplemental documentation; however, whether it was actually considered is a factual issue that cannot be decided at this time. In his deposition, Dr. Hill did not explicitly state that he instructed the MCMC Reviewer not to review Plaintiff's supplemental submission of the 2011 Schwartzman Article. It is unclear exactly what occurred regarding the review of Plaintiff's supplemental information pertaining to MCMC's independent medical review. Such a critical determination cannot be made by us at this moment within the Court's limited role in deciding a summary judgment motion.

## IV. CONCLUSION

We are aware that the denial of summary judgment will set this case on track for a bench trial under ERISA. When deciding a motion for summary judgment, it is not our role to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. See Anderson, 477 U.S. at 249 ("[A]t the summary judgment stage the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.") "'A judge does not sit as a trier of fact when deciding a motion for summary judgment even if the case is scheduled to be heard without a jury.'" Stewart v. Bert Bell/Pete Rozelle NFL Player Ret. Plan, No. 09-2612, 2012 WL 122362, at *4 (D. Md. Jan. 12, 2012) (quoting Med. Inst. of Minn. v. Nat'l Ass'n of Trade & Technical Schs., 817 F.2d 1310, 1315 (8th Cir. 1987); citing Johnson v. Maryland, No. 92-1808, 1993 WL 120480, at *2 (4th Cir. Apr. 20, 1993) ("Whether a case is set for jury trial or . . . bench trial, . . . at the

15

summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter")). The material factual disputes regarding whether Dr. Hill told the MCMC Reviewer not to consider the 2011 Schwartzman Article, and whether it was considered or not, preclude summary judgment. Consequently, Defendants' Motion for Summary Judgment is denied.

    An appropriate Order follows.